No. 24-3978

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

IN RE: SUBPOENA OF INTERNET
SUBSCRIBERS OF COX
COMMUNICATIONS, LLC AND COXCOM LLC

CAPSTONE STUDIOS CORP.

*Petitioner-Appellant*, and

MILLENNIUM FUNDING, INC. and VOLTAGE PICTURES, LLC

*Petitioners*

v.

JOHN DOE

*Respondent,* and

COXCOM, LLC

*Interested Party-Appellee*

On Appeal from the United States District Court
for the District of Hawaii
No. 1:20-cv-00426-JMS-WRP
Hon. Judge Seabright

---

### APPELLANT'S OPENING BRIEF

---

Kerry S. Culpepper, HI Bar No. 9837

Culpepper IP, LLLC
75-170 Hualalai Rd, Suite B204
Kailua Kona, HI 96740
808-464-4047
kculpepper@culpepperip.com
*Attorney for Appellant*
*Capstone Studios Corp.*

## DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, Petitioner-Appellant Capstone Studios, Corp. is a Delaware Corporation with its principal place of business in Dover, Delaware. No entity is a parent corporation, and no publicly held corporation owns 10% or more of its stock.


Date: Sept. 10, 2024

Culpepper IP, LLLC


*/s/ Kerry S. Culpepper*
Kerry S. Culpepper

*Attorney for Appellant Capstone Studios, Corp.*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS…………………………..………………………ii

TABLE OF AUTHORITIES ................................................................4

INTRODUCTION ................................................................................10

JURISDICTIONAL STATEMENT ....................................................12

ISSUE(S) PRESENTED......................................................................13

STATUTORY AUTHORITY ..............................................................16

STATEMENT OF THE CASE............................................................28

SUMMARY OF THE ARGUMENT ...................................................35

STANDARD OF REVIEW ..................................................................40

ARGUMENT ........................................................................................42

    I.    17 U.S.C. §512(h) AUTHORIZES SUBPOENAS TO §512(a)
          SERVICE PROVIDERS INCLUDING COX ...................................42

        A.    §512(h) refers to the broad definition of service provider in
            §512(k) that does not exclude §512(a) service providers ........42

        B.    The Court erred in concluding that Cox is a mere conduit that
            does not store infringing material .............................................44

            1. Not all §512(a) service providers are mere conduits. ..........44

            2. Not even the declaration from Ms. Hall supports the Court's
               conclusion that Cox is merely a conduit. .............................46

1

C.    A valid §512(c)(3)(A) notification can be sent to a §512(a) service provider. ........................................................48

   1. A §512(a) service provider can use simple measures to disable access to material that is subject of infringing activity ....................................................................................49

   2. Interpreting §512(c)(3)(A) as not applying to §512(a) service providers contradicts language in the statute and leads to absurd results. ...................................................................54

   3. A §512(a) service provider can remove or disable access to infringing material on its servers. .........................................56

   4. The absence of a notice and take down language in §512(a) does not imply that §512(a) conduit service providers are not subject to notifications. ........................................................58

II.    ALTERNATIVELY, THE DMCA SUBPOENA IS VALID BECAUSE COX IS A §512(d) SERVICE PROVIDER ...................61

A.    Cox assigns IP addresses to its subscribers that are used for sharing *Fall* on peer-to-peer network .......................................62

B.    Active assistance or otherwise volitional conduct is not required for a service provider to be a §512(d) information tool service provider ..................................................................................63

C.    The transmissions in §512(a) are not the same as referring or linking in §512(d) ...................................................................66

D.    Cox (as a §512(d) service provider) can use simple measures to disable access to the IP address ................................................67

E.    The simple measures Cox (as a §512(d) service provider) can use to disable access to the IP address are not similar to the 512(j)(A)(1)(ii) remedy. ........................................................68

III.    THE DISTRICT COURT ABUSED ITS DISCRETION BY
        PERMITTING COX TO FILE MOTIONS TO STRIKE AND
        OPPOSITION TO PETITIONERS' MOTIONS AND DENYING
        PETITIONERS' MOTION TO SUPPLEMENT THE RECORD ......70

        A.    Cox waived any opportunity to participate in the proceedings
              .....................................................................................70

        B.    Cox lacks standing to participate  ............................................72

IV.     THE DISTRICT COURT ABUSED ITS DISCRETION BY
        STRIKING THE DAVID COX DECLARATION ...........................74

CONCLUSION ........................................................................................78

STATEMENT OF RELATED CASES……………………………………...79

CERTIFICATE OF COMPLIANCE………………………………………...80

CERTIFICATE OF SERVICE……………………………………………81

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahanchian v. Xenon Pictures, Inc.*,
  624 F.3d 1253 (9th Cir. 2010) ....................................................41

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176, 183 (2004) ...........................................................63

*BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*,
  149 F. Supp. 3d 634 (E.D. Va. 2015 ............................... 52, 53, 69

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................................78

*Collins v. Gee W. Seattle LLC*,
  631 F.3d 1001 (9th Cir. 2011) ....................................................78

*Columbia Pictures Indus. v. Gary Fung*,
  710 F.3d 1020 (9th Cir. 2013) .............................................. 49, 68

*CPC Patent Techs. PTY Ltd. v. Apple, Inc.*,
  34 F.4th 801 (9th Cir. 2018) .......................................................40

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ......................................................41

*Dove v. Atl. Capital Corp.*,
  963 F.2d 15 (2d Cir. 1992) .........................................................53

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*,
  870 F.3d 978 (9th Cir. 2017) ......................................................41

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) ..............................36, 44-46, 57, 60

*Fahmy v. Jay-Z*,
  908 F.3d 383 (9th Cir. 2018) ......................................................41

*Frederick S. Wyle Pro. Corp. v. Texaco, Inc.*,
  764 F.2d 604 (9th Cir. 1985) ....................................................................78

*Guenther v. Lockheed Martin Corp.*,
  972 F.3d 1043 (9th Cir. 2020) .................................................................41

*Hambleton Bros. Lumber Co. v. Balkin Enterprises Inc.*,
  397 F.3d 1217 (9th Cir. 2005) .................................................................41

*In re Charter Commc'ns, Inc., Subpoena Enf't Matter*,
  393 F.3d 771 (8th Cir. 2005) .................11, 12, 31, 32, 35, 42-46, 56, 58, 59

*In re Grand Jury Investigation*,
  966 F.3d 991 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 308 (2021) .............78

*In re Stevens*,
  15 F.4th 1214, 1217 (9th Cir. 2021) .........................................................63

*J&G Sales Ltd. v. Truscott*,
  473 F.3d 1043 (9th Cir. 2007) .................................................................40

*Linder v. Department of Defense*,
  133 F.3d 17 (D.C. Cir. 1998) ...................................................................53

*McDowell v. Calderon*,
  197 F.3d 1253 (9th Cir. 1999) .................................................................74

*Perfect 10, Inc. v. Giganews, Inc.*,
  993 F. Supp. 2d 1192 (C.D. Cal. 2014) .....................................................65

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) .............................................................64-66

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
  351 F.3d 1229 (D.C. Cir. 2003) ..11-12, 31, 35, 42, 44, 45, 49, 50, 52, 53-56,
  58, 60, 68-69

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992) .................................................................78

5

*Russello v. United States*,
464 U.S. 16 (1983) ...................................................................44

*Spokeo, Inc. v. Robins*,
578 U.S. 330, 136 S. Ct. 1540 (2016) ......................................78

*Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*,
813 F.2d 1553 (9th Cir. 1987) .................................................78

*United States v. American Trucking Ass'ns*,
310 U.S. 534 (1940) .................................................................56

*United States v. Combs*,
379 F.3d 564 (9th Cir. 2004) ...................................................71

*United States v. Iverson*,
162 F.3d 1015 (9th Cir. 1998) .................................................56

*United States v. Shill*,
740 F.3d 1347 (9th Cir. 2014) .................................................62

*United States v. Singh*,
995 F.3d 1069 (9th Cir. 2021) .................................................41

*United States v. $133,420.00 in U.S. Currency*,
672 F.3d 629 (9th Cir. 2012) ...................................................43

*United Transp. Union v. BNSF Ry. Co.*,
710 F.3d 915 (9th Cir. 2013) ...................................................41

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) .................................................41

*Yu v. Idaho State Univ.*,
15 F.4th 1236 (9th Cir. 2021) ..................................................41

**Statutes**

17 U.S.C. § 106 ............................................................... 28, 50

6

17 U.S.C. § 512 ............................................................ 35, 37, 42, 45, 54, 56, 60

17 U.S.C. § 512(a) ....................... 10-14, 30-32, 35-38, 42-49, 54-58, 60-62, 66, 78

17 U.S.C. § 512(b) ................................................................ 10, 31, 35, 42, 43

17 U.S.C. § 512(c) ............. 2, 7, 11, 13-14, 31, 35-37, 42, 47-50, 54-55, 58-61, 99

17 U.S.C. § 512(d) ................... 2, 7,10-12, 15, 31, 32, 35, 38, 42, 43, 61-71, 73, 78

17 U.S.C. § 512(e) .......................................................... 13, 35, 37, 55, 56, 60

17 U.S.C. § 512(h) ...10, 12-14, 29, 30, 35, 36, 40, 43, 44, 48, 54, 57, 60, 61, 70, 74

17 U.S.C. §512(i) ...........................................................................59

17 U.S.C. § 512(j) ................................................ 35, 39, 43, 50, 53, 68, 69, 75, 77

17 U.S.C. § 512(k) .......................................................... 10, 35, 36, 42, 43, 60

17 U.S.C. § 512(m) ........................................................................54

17 U.S.C. § 512(n) ........................................................................61

17 U.S.C. § 1202(a) and (b) ...............................................................28

28 U.S.C. § 1291 .........................................................................13

## Legislative History

H.R. Rep. 105-551, pt. 1 ...............................................................65

H.R. Rep. 105-551, pt. 2 ...............................................................60

S. Rep. 105-190 ........................................................................60

## Rules

Fed. R. App. Pro. 3(a)(1) ...............................................................13

Fed. R. App. Pro. 4(a)(1)(A) .................................................................13

Fed. R. App. Pro. 4(a)(4)(A)(iv) .........................................................13

Fed. R. App. Pro. 4(a)(4)(A)(vi) .........................................................13

Fed. R. App. P. 10(e)(1) ......................................................................34

Fed. R. Civ. P. 6(b)(1)(B) ....................................................................78

Fed. R. Civ. P. 45 ................................................................................78

Fed. R. Civ. P. 45(d)(2)(B) ..................................................................78

Fed. R. Civ. P. 59(e) ........................................................... 13, 40, 74, 76

Fed. R. Civ. P. 60(b) ................................................................ 40, 74, 76

## Other Publications

Bram Cohen, *The BitTorrent Protocol Specification*, Jan. 10, 2008, last modified
on Feb. 4, 2017, https://www.bittorrent.org/beps/bep_0003.html ...............68

Cox Petition for Writ of Certiorari at 2, *Cox Communications, Inc. et al. v. Sony
Music Entertainment, et al.*, Nos. 24-171, 24-181 (filed on Aug. 15, 2024)
...................................................................................... 47, 52

Cloudflare, *What is a network switch?|Switch vs. router*,
https://www.cloudflare.com/learning/network-layer/what-is-a-network-
switch/ ..................................................................................78

Cloudflare, *What is an Internet exchange point?|How do IXPs work?*
https://www.cloudflare.com/learning/cdn/glossary/internet-exchange-point-
ixp/ ......................................................................................78

Cox, *Cox Asks U.S. Supreme Court to Hear Landmark Copyright Infringement
Case*, https://newsroom.cox.com/Cox_Petitions_Supreme_Court) ...... 48, 52

Chris Maxcer, *Study: Cox, Comcast Play Traffic Cop Day and Night*, E-Commerce
Times (May 15, 2008), https://www.ecommercetimes.com/story/study-cox-
comcast-play-traffic-cop-day-and-night-63033.html ..................................51

Grant Gross, *US lawmakers target deep packet inspection in privacy bill*, NY Times (April 23, 2009), https://archive.nytimes.com/www.nytimes.com/external/idg/2009/04/23/23idg-US-lawmakers-ta.html ...........................................................................51

John B. Horrigan, *Broadband Adoption at Home*, Pew Research Center (May 18, 2003) https://www.pewresearch.org/internet/2003/05/18/broadband-adoption-at-home/ ................................................................................ 50-51

Managed Cloud Services, https://www.cox.com/business/cloud-services.html ...78

## INTRODUCTION

Title II (17 U.S.C. §512) of the Digital Millennium Copyright Act ("DMCA") represents a careful balance Congress struck in 1998 between the interests of Internet and online service providers in avoiding liability for their subscribers' online piracy and of copyright owners in minimizing online piracy. Service providers such as Interested Party-Appellee CoxCom LLC ("Cox") were granted safe harbors from monetary liability for their subscribers' infringing activity provided that they comply with certain requirements such as *inter alia* terminating the accounts of subscribers that are repeat infringers in appropriate circumstances and removing or disabling access to infringing material or links thereto upon acquiring knowledge of their subscribers' infringements (such as from a notification from a copyright owner or the service providers' own red flag knowledge). *See* §§512(a)-(d), (k). Further, Congress provided copyright holders such as Petitioner-Appellant Capstone Studios, Corp. ("Capstone") with a simple process set forth in §512(h) to obtain DMCA subpoenas commanding service providers to provide the identifications of subscribers that used the service for online piracy.

This case raises two questions concerning the DMCA of first impression for this Circuit: (1) Can a valid subpoena under 17 U.S.C. §512(h) be issued

10

commanding a §512(a) residential Internet service provider ("ISP") to identify subscribers that use the ISP's service to share copies of pirated copyright protected content online to the entire world via the BitTorrent peer-to-peer network? (2) Is a residential ISP a provider of information location tools as defined in §512(d) when it provides a subscriber with customer premise equipment (modems and/or residential gateways) and assigns the subscriber an Internet Protocol ("IP") addresses and links other users to the subscribers' assigned IP addresses where the subscriber shares pirated copies of copyright protected Works via the BitTorrent peer-to-peer network?

Roughly two decades ago – a time when majority of Americans did not have high speed Internet service and many still used dialup for Internet access – the D.C. Circuit Court of Appeals and Eighth Circuit Court of Appeals answered the first question in the negative in the context of *different* ISPs and a *different* defunct and long forgotten peer-to-peer network (KaZaa) by reading non-existent language into §512(c) and unchallenged assertions that the ISPs were purely "conduits". *See Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1234 (D.C. Cir. 2003) ("*Verizon*") and *In re Charter Commc'ns, Inc., Subpoena Enf't Matter*, 393 F.3d 771, 773 (8th Cir. 2005) ("*Charter*").

The District Court answered both questions in the affirmative by completely adopting the two decades ago conclusions of *Verizon* and *Charter* without holding

11

a full evidentiary hearing on the nature of Cox's service and what measures Cox has for disabling access to infringing activity or links thereto (and ignoring the limited evidence that contradicts the assertion that Cox is a pure conduit). The District Court ignored decades of advances in network technology that provide ISPs with simple anti-piracy measures to disable access to infringing material without terminating subscriber accounts – some of which *Cox* boasted just last month to the Supreme Court are widely successful – and shifted the DMCA's careful balance in favor of service providers. And the District Court compounded the error of *Verizon* and *Charter* by improperly adding a volitional conduct requirement to §512(d) that defeats §512's entire purpose of providing a safe harbor for passive activity.

The District Court's conclusions that: (i) a §512(h) subpoena cannot be issued to a residential ISP that is a §512(a) service provider; and (ii) a residential ISP linking users to an IP address where its subscribers shared pirated content online is not functioning as a §512(d) information location tool service provider were legal errors. This Court should reverse the District Court's decision to quash the DMCA subpoena that was not based upon arguments raised by anyone.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over Petitioners' application for a DMCA subpoena and John Doe's motion to quash the subpoena

under 17 U.S.C. §512(h). ER-225, ER-229–233. This Court has jurisdiction pursuant to Fed. R. App. Pro. 3(a)(1) and 28 U.S.C. §1291. The District Court issued its ruling quashing the subpoena and entered judgment on Jan. 30, 2024. ER-117–139. Petitioners filed a timely motion for reconsideration per Fed. R. Civ. P. 59(e) on Feb. 12, 2024. ER-103–112. The District Court denied Petitioners' motion for reconsideration on April 26, 2024. ER-19–46. Petitioners filed a motion for an extension of time to file a notice of appeal on May 8, 2024, which the Court granted that same day. ER-17. *See* Fed. R. App. Pro. 4(a)(5). Capstone timely filed a Notice of Appeal on June 24, 2024 within the extended deadline. ER-247–249. *See* Fed. R. App. Pro. 4(a)(1)(A), 4(a)(4)(A)(iv) and (vi). This appeal is from a final order or judgment that disposed of the miscellaneous action.

## ISSUES PRESENTED

1. Whether the District Court erred in ruling that a valid 17 U.S.C. §512(c)(3)(A) notification cannot be issued to a §512(a) service provider despite §512(e) explicitly conditioning that a §512(a) service provider not receive more than two §512(c)(3)(A) notifications within 3 years to avoid being attributed with its faculty members' infringing activities? Petitioners raised this issue in their objections to the Findings and Recommendations. ER-197, ER-190–193.

2. Whether the District Court erred in ruling without an evidentiary hearing that a valid §512(c)(3)(A) notification cannot be issued to Cox (as a §512(a)

13

service provider) because Cox cannot disable access to the infringing material despite Cox admitting in multiple public filings that its anti-piracy measures for stopping its subscribers for sharing pirated content without terminating their accounts are successful?  Petitioners raised this issue in their objections to the Findings and Recommendations (ER-197–198, ER-193) and in their motion for reconsideration (ER-95–109).

3.     Whether the District Court erred in ruling that a valid §512(c)(3)(A) notification requires identification of infringing material *stored on the server of the service provider* despite §512(c)(3)(A)(iii) not requiring that the infringing material be stored on the service provider's server?  Petitioners raised this issue in their objections to the Findings and Recommendations. ER-197, ER-190–193.

4.     Whether the District Court abused its discretion in ruling that Cox (as a §512(a) service provider) does not store the infringing material on its servers despite Cox submitting a declaration that states Cox stores the material on its servers albeit for a limited period?  Petitioners raised this issue in their objections to the Findings and Recommendations (ER-197, ER-190–193) and in their response to Cox's declaration.  ER-140–145, ER-190–193.

5.     If this Court concludes that a §512(h) subpoena cannot be issued to a §512(a) service provider, whether the District Court erred in ruling that Cox is not a §512(d) service provider by interpreting §512(d)'s unambiguous language of

14

"referring or linking users to an online location" to require the service provider to provide "active assistance"? Petitioners raised this issue in their motion for reconsideration. ER-157.

6.  Whether the District Court committed legal error by finding nonparty Cox has standing and abused its discretion by allowing Cox to file a motion to strike and oppositions to Petitioners' motions for reconsideration and for an emergency stay even though Cox never filed any objections to the DMCA subpoena or a motion for an extension to file late objections establishing excusable neglect? Petitioners raised this issue in their reply in support of their motion for reconsideration (ER-160–161) and in their opposition to Cox's motion to strike (ER-69–70).

7.  Whether the District Court abused its discretion by striking a declaration Petitioners submitted along with their motion for reconsideration pointing out the technical errors in the District Court's Order?

8.  Whether the District Court erred by disallowing Petitioners to supplement the record with an invoice from Cox showing that it was reimbursed for all costs in connection with the subpoena?

# STATUTORY AUTHORITY

## 17 U.S.C. §512 (2023)

### §512. Limitations on liability relating to material online

(a) Transitory Digital Network Communications.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if—

(1) the transmission of the material was initiated by or at the direction of a person other than the service provider;

(2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;

(3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;

(4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and

(5) the material is transmitted through the system or network without modification of its content.

(b) System Caching.—

(1) Limitation on liability.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider in a case in which—

(A) the material is made available online by a person other than the service provider;

(B) the material is transmitted from the person described in subparagraph (A) through the system or network to a person other than the person described in subparagraph (A) at the direction of that other person; and

(C) the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B), request access to the material from the person described in subparagraph (A),

if the conditions set forth in paragraph (2) are met.

(2) Conditions.—The conditions referred to in paragraph (1) are that—

(A) the material described in paragraph (1) is transmitted to the subsequent users described in paragraph (1)(C) without modification to its content from the manner in which the material was transmitted from the person described in paragraph (1)(A);

(B) the service provider described in paragraph (1) complies with rules concerning the refreshing, reloading, or other updating of the material when specified by the person making the material available online in accordance with a generally accepted industry standard data communications protocol for the system or network through which that person makes the material available, except that this subparagraph applies only if those rules are not used by the person described in paragraph (1)(A) to prevent or unreasonably impair the intermediate storage to which this subsection applies;

(C) the service provider does not interfere with the ability of technology associated with the material to return to the person described in paragraph (1)(A) the information that would have been available to that person if the material had been obtained by the subsequent users described in paragraph (1)(C) directly from that person, except that this subparagraph applies only if that technology—

(i) does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

(ii) is consistent with generally accepted industry standard communications protocols; and

(iii) does not extract information from the provider's system or network other than the information that would have been available to the person described in paragraph (1)(A) if the subsequent users had gained access to the material directly from that person;

17

(D) if the person described in paragraph (1)(A) has in effect a condition that a person must meet prior to having access to the material, such as a condition based on payment of a fee or provision of a password or other information, the service provider permits access to the stored material in significant part only to users of its system or network that have met those conditions and only in accordance with those conditions; and

(E) if the person described in paragraph (1)(A) makes that material available online without the authorization of the copyright owner of the material, the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringement as described in subsection (c)(3), except that this subparagraph applies only if—

(i) the material has previously been removed from the originating site or access to it has been disabled, or a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled; and

(ii) the party giving the notification includes in the notification a statement confirming that the material has been removed from the originating site or access to it has been disabled or that a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled.


(c) Information Residing on Systems or Networks At Direction of Users.—

(1) In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.—The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

(A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

(3) Elements of notification.—

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(B)(i) Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

(ii) In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

(d) Information Location Tools.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider—

(1)(A) does not have actual knowledge that the material or activity is infringing;

(B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

(e) Limitation on Liability of Nonprofit Educational Institutions.—(1) When a public or other nonprofit institution of higher education is a service provider, and when a faculty member or graduate student who is an employee of such institution is performing a teaching or research function, for the purposes of subsections (a) and (b) such faculty member or graduate student shall be considered to be a person other than the institution, and for the purposes of subsections (c) and (d) such faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution, if—

(A) such faculty member's or graduate student's infringing activities do not involve the provision of online access to instructional materials that are or were required or recommended, within the preceding 3-year period, for a course taught at the institution by such faculty member or graduate student;

(B) the institution has not, within the preceding 3-year period, received more than two notifications described in subsection (c)(3) of claimed infringement by such faculty member or graduate student, and such notifications of claimed infringement were not actionable under subsection (f); and

(C) the institution provides to all users of its system or network informational materials that accurately describe, and promote compliance with, the laws of the United States relating to copyright.

(2) For the purposes of this subsection, the limitations on injunctive relief contained in subsections (j)(2) and (j)(3), but not those in (j)(1), shall apply.

(f) Misrepresentations.—Any person who knowingly materially misrepresents under this section—

(1) that material or activity is infringing, or

(2) that material or activity was removed or disabled by mistake or misidentification,

21

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

(g) Replacement of Removed or Disabled Material and Limitation on Other Liability.—

(1) No liability for taking down generally.—Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

(2) Exception.—Paragraph (1) shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or to which access is disabled by the service provider, pursuant to a notice provided under subsection (c)(1)(C), unless the service provider—

(A) takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;

(B) upon receipt of a counter notification described in paragraph (3), promptly provides the person who provided the notification under subsection (c)(1)(C) with a copy of the counter notification, and informs that person that it will replace the removed material or cease disabling access to it in 10 business days; and

(C) replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.

22

(3) Contents of counter notification.—To be effective under this subsection, a counter notification must be a written communication provided to the service provider's designated agent that includes substantially the following:

(A) A physical or electronic signature of the subscriber.

(B) Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.

(C) A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

(D) The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.


(4) Limitation on other liability.—A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).


(h) Subpoena To Identify Infringer.—

(1) Request.—A copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection.

(2) Contents of request.—The request may be made by filing with the clerk—

(A) a copy of a notification described in subsection (c)(3)(A);

(B) a proposed subpoena; and

(C) a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

(3) Contents of subpoena.—The subpoena shall authorize and order the service provider receiving the notification and the subpoena to expeditiously disclose to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged infringer of the material described in the notification to the extent such information is available to the service provider.

(4) Basis for granting subpoena.—If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider.

(5) Actions of service provider receiving subpoena.—Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), the service provider shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

(6) Rules applicable to subpoena.—Unless otherwise provided by this section or by applicable rules of the court, the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum.


(i) Conditions for Eligibility.—

(1) Accommodation of technology.—The limitations on liability established by this section shall apply to a service provider only if the service provider—

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.


(2) Definition.—As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

(j) Injunctions.—The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section:

(1) Scope of relief.—(A) With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief with respect to a service provider only in one or more of the following forms:

(i) An order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

(ii) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(iii) Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

(B) If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

(i) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is using the provider's service to engage in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

25

(ii) An order restraining the service provider from providing access, by taking reasonable steps specified in the order to block access, to a specific, identified, online location outside the United States.

(2) Considerations.—The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider—

(A) whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

(B) the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

(C) whether implementation of such an injunction would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations; and

(D) whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

(3) Notice and ex parte orders.—Injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

(k) Definitions.—

(1) Service provider.—(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

(2) Monetary relief.—As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

26

(l) Other Defenses Not Affected.—The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

(m) Protection of Privacy.—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—

(1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

(2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

\*

(n) Construction.—Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

(Added Pub. L. 105–304, title II, §202(a), Oct. 28, 1998, 112 Stat. 2877; amended Pub. L. 106–44, §1(d), Aug. 5, 1999, 113 Stat. 222; Pub. L. 111–295, §3(a), Dec. 9, 2010, 124 Stat. 3180.)

## STATEMENT OF THE CASE

Appellant Capstone is the owner of the copyright to the motion picture *Fall* and exclusive rights provided by 17 U.S.C. § 106. ER-230–231. *Fall* is a successful thriller released in 2022 starring Caroline Currey and Virginia Gardner as two women who climb to the top of a 2,000-foot abandoned radio tower and become stranded at the top. ER-60–61. Capstone and its business partners invested financial resources, time and effort in making and marketing the motion picture based upon the expectation that they would get a return on their investment from rentals and sales. ER-61.

Cox is a provider of Internet service to residential and business subscribers including Respondent John Doe. ER-147, ER-225. Massive ongoing piracy of *Fall* by Internet users such as Cox's on BitTorrent protocol peer-to-peer networks hinders Capstone's opportunity to get a return on its investments. ER-239–246. To prevent such ongoing piracy, Capstone's agent sent DMCA notices to Cox's designated DMCA email address stating under penalty of perjury the over 35 IP addresses where infringement was confirmed, the times (down to the second) and the infringing file names (which in multiple cases were altered to refer to notorious piracy websites such as YTS in violation of 17 U.S.C. §§1202(a) and (b)). ER-235. On April 13, 2023, Capstone (jointly with other Petitioners Voltage Holdings,

LLC ("Voltage") and Millennium Funding, Inc. ("Millennium") (Millennium, Voltage and Capstone referred to jointly as "Petitioners") filed an application with the District Court for a subpoena haveing a response deadline of June 27, 2023 be issued under §512(h) ("DMCA subpoena") commanding Cox to produce identification information of the subscribers assigned 41 IP addresses where Petitioners confirmed pirated copies of the movies were shared via the BitTorrent protocol and were the subject of DMCA notices. ER-229–233. The Clerk of the District Court issued the DMCA subpoena that same day. ER-226–228. On April 17, 2023, Cox was served the subpoena. ER-48.

On May 25, 2023, Respondent John Doe filed an objection to disclosure of his/her personal information after being notified of the subpoena by Cox while admitting: "We erroneously forgot to add a password to our Wi-Fi and found out our internet service was open for anyone to use." ER-225. Neither Cox nor John Doe nor any other subscriber filed any objection to the validity of the subpoena or other objection. Indeed, Cox did not file *any* objections.

On May 26, 2023, the Magistrate Judge construed John Doe's objection as a motion to quash and ordered Petitioners to file a response in opposition and serve a copy on John Doe. ER-225.

On May 29, 2023, Petitioners filed a response correctly pointing out that John Doe failed to argue a privacy interest, burden or any other recognized legal

29

basis for quashing the subpoena. ER-218–222. Because Petitioners do not know John Doe's identity or address, Petitioners sent a copy of their response by first class mail to Cox and the Clerk of the District Court to comply with the service requirement. ER-210. Neither John Doe nor Cox filed a reply or any other document in support of John Doe's objection.

Cox timely produced all subscriber identifications except for John Doe's prior to the subpoena response deadline of June 27, 2023.

On Aug. 31, 2023, Magistrate Judge Porter issued a Findings and Recommendation ("F&R") concluding that (i) Cox is a mere conduit service provider under §512(a); and (ii) the DMCA subpoena is invalid for being based upon a §512(c)(3)(A) notification to the mere conduit provider Cox. ER-200– 215. The Magistrate Judge issued this F&R despite acknowledging that nobody raised an issue of the validity of the subpoena. *See* ER-203 ("neither party analyzes whether the 512(h) Subpoena was valid"). This is an understatement. Nobody argued or submitted any evidence asserting Cox is a mere conduit provider. Nor did the Magistrate Judge give even a hint that he was considering this issue.

On Sept. 11, 2023, Petitioners filed timely objections to the F&R. ER-185 – 199. Particularly relevant to this appeal, Petitioners objected to the F&R's conclusions that: (i) the DMCA subpoena was invalid because Cox's role in disseminating the allegedly copyrighted material is purportedly confined to acting

as a mere conduit in the transfer of files through its network; (ii) Petitioners cannot identify the infringing material that could be removed or access to which can be disabled as called for in §512(c)(3)(A)(iii) because there was nothing stored on Cox's servers to be taken down; (iii) Cox can neither "remove" nor "disable access to" the infringing material because that material is not stored on its' servers. Petitioners further objected to (iv) all the F&R's factual conclusions that were not based upon any briefings of Doe or Petitioners. ER-196–199. Petitioners argued in their memorandum in support of their objections that the DMCA subpoena was valid under §512(d) and alternatively urged the District Court not to adopt the reasoning of *Verizon* and *Charter* because modern network technology permits even §512(a) service providers to disable access to infringing material. ER-188–193. Petitioners did not concede the inapplicability of other sections such as §512(b) or (c) to Cox because there was no evidence on the record of what type of "Wi-Fi router" was at John Doe's home. ER-189 at FN4.

Between the time Cox notified its subscriber of the subpoena and Sept. 26, 2023, Petitioners entered into settlement agreements with some of the Cox subscribers who identified the piracy website and software application they used to share pirated copies of the movies. ER-72, ER-113–115.

On Sept. 26, 2023, Cox filed a Notice of intent to Respond to Petitioners' objections that identified itself as "Non-Parties". ER-176–177, ER-173–174.

On Sept. 28, 2023, Cox filed its Response in which it stated, "Cox writes to correct the record in certain respects." ER-163–172. Cox's Response was primarily limited to arguing that it was not a §512(d) service provider.

On Oct. 9, 2023, Petitioners filed their Reply to Cox's response where they pointed out that Cox did not refute Petitioners' argument that the Court should adopt the reasoning of Judge Murphy's dissent in *Charter* with respect to the issue of whether a DMCA subpoena can be issued to §512(a) service providers. ER-153–162.

On Nov. 8, 2023, the Court issued an Order requesting that Cox "file with the court appropriate evidentiary proof that it is—or is not—an internet service provider under 17 U.S.C. § 512(a)". ER-150–152.

On Nov. 29, 2023, Cox submitted a declaration from its Chief Compliance and Privacy Officer Amber Hall that was basically a cut and paste of §512(a). ER-146–149. Importantly, the Hall declaration does not state that Cox does not store the infringing material on its servers. Rather, the Hall declaration states "…no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission…". ER-148 at ¶4(4).

On Dec. 5, 2023, Petitioners filed their response to Ms. Hall's declaration. ER-140–145. Petitioners pointed out that Ms. Hall's declaration failed to set forth

any qualifications in network technology, was replete with legal and factual conclusory assertions, and, more importantly, failed to set forth how long the infringing material resides on Cox's servers or refute that Cox could disable access to the infringing material or links thereto. ER-142.

On Jan. 30, 2024, the Court issued the Order adopting the F&R and quashing the subpoena and ordering Petitioners to *inter alia* destroy any information derived from the subpoena. ER-117–139.  Accordingly, the Court's Order prevented Petitioners from seeking legal relief against the websites and piracy apps that Cox subscribers disclosed they used to share pirate copies of their Works.  ER-45, ER-71.

On Feb. 5, 2024, Petitioners withdrew their request for the identification information for John Doe by letter to Cox.  ER-85.

On Feb. 12, 2024, Petitioners filed a motion for reconsideration that included a declaration of David Cox in support. ER-86–112.  Petitioners argued that the Court's comparison of null routing IP addresses where Cox's subscribers were sharing pirated copies to terminating service was a mistake to the extent it considered terminating an Internet connection the same as terminating a subscriber's account.

On Feb. 28, 2024, Cox filed an opposition to Petitioners' motion for reconsideration and a motion to strike the declaration of David Cox.  ER-21.

33

On Feb. 28, 2024, Petitioners filed their reply to Cox's opposition to their motion for a stay. ER-73–81. Petitioners pointed out that Cox had no standing to oppose their motion for a stay since Cox had failed to file any objections to the subpoena.

On Mar. 8, 2024, Petitioners filed their response in opposition to Cox's motion to strike the declaration of David Cox. ER-60–70. Petitioners pointed out that the David Cox declaration was necessary to show the Court's mistake and that Cox had no standing to file a motion to strike since Cox had failed to file any objections to the subpoena.

On April 26, 2024, the District Court issued an Order: (1) granting Cox's motion to strike; (2) denying Petitioners' motion for reconsideration; and (3) clarifying relief and denying Petitioners' motion to stay. ER-19–46. The Court's order reiterated that Petitioners could not use the evidence they obtained from Cox's subscribers to seek relief against the piracy websites Cox subscribers used to pirate Petitioners' Works. ER-45.

On May 8, 2024, Petitioners filed a motion for a 30 day extension of time to file a notice of appeal that the Court granted that same day. ER-17.

On June 4, 2024, Petitioners filed a motion to supplement record for appeal per Fed. R. App. P. 10(e)(1) to include a redacted copy of the invoice Cox sent to Petitioners to reimburse Cox for its production costs. ER-10–16.

On June 7, 2024, the District Court issued an Order denying Petitioners' motion to supplement the record. ER-7–9.

On June 24, 2024, Capstone filed a notice of appeal within the extended deadline. ER-247–249.

## SUMMARY OF THE ARGUMENT

I. A careful reading of the full text of 17 U.S.C. §512 leads to the unquestionable conclusion that Congress intended for DMCA subpoenas to apply to §512(a) service providers despite the contrary conclusions of *Verizon* and *Charter.*

A. §512(h), which provides the procedure for a copyright holder to obtain a DMCA subpoena, refers to service provider as defined broadly in §512(k) rather than the specific types of service providers defined in sections §§512(a)-(d). On the other hand, other sections of §512 such as, for example, §512(j) which provides injunctive relief to copyright holders, explicitly limit the type of service providers against which particular relief is applicable. Likewise, in §512(e), which provides further conditions on educational institutions to qualify for the safe harbors, Congress specified certain legal benefits to the educational institution that is a §512(a) or (b) service provider that are different from the legal benefits to the educational institution that is a §512(c) or (d) service provider. This structure of §512 in which certain type of service providers defined in sections §§512(a)-(d)

35

are specified in some sections while the broader §512(k) definition of service provider is used in other sections shows that Congress intended to provide DMCA subpoenas to all service providers in §512(h) when it used the broader §512(k) definition of service provider.

B. §512(h) specifies that a request for a DMCA subpoena must include a copy of a §512(c)(3)(A) notification. A §512(c)(3)(A) notification can be sent to a §512(a) service provider. 1. Just because a service provider is a §512(a) service provider does not mean that the service provider does not store any material that can be taken down. Particularly, §512(a)(4) permits a service provider to store the infringing material for which access can be disabled – just like section §512(c) – albeit for a limited time. This Court recognized in *Ellison v. Robertson*, 357 F.3d 1072, 1081 (9th Cir. 2004) that a service provider can store the material for 14 days and still qualify as a §512(a) service provider. In response to a DMCA notice, a §512(a) service provider can remove access to the infringing material that is stored on its server. Accordingly, the District Court's conclusion that §512(a) does not have a take down provision because §512(a) service providers have no material to take down contradicts the plain language of §512(a) and this Court's decision in *Ellison*. 2. The District Court's conclusion that Cox is a mere conduit was contradicted by Cox's own declaration which concedes that Cox stores material on its servers for a limited time.

36

C.  A valid DMCA notice compliant with §512(c)(3)(A) can also be sent to a §512(a) service provider that does not store the infringing material.  1. Particularly, §512(c)(3)(A)(iii) does not require the infringing material that is subject of infringing activity be stored on the servers of the §512(a) service providers.  Thus, a §512(a) service provider that is a conduit not storing any material can use measures to disable access to infringing activity specified in the DMCA notice such as, for example, blocking port associated with BitTorrent at the subscribers' service, filtering BitTorrent traffic from and to the subscribers' service, null routing the subscribers' IP address, etc.  2. The reference of §512(c)(3)(A) notifications being sent to 512(a) service providers in other portions of §512 such as §512(e) supports the conclusion that Congress intended copyright holders to send §512(c)(3)(A) notifications to §512(a) service providers. 3. Further, as discussed above, because a §512(a) service provider, such as Cox, stores the infringing material on its network, albeit for a limited period, Cox can remove or disable access to material stored on its own servers in response to DMCA notices.

4. Alternatively, due to §512(c)(3)(A)(III)'s use of the disjunctive "or" between "Identification of the material that is claimed to be infringing" and " to be the subject of infringing activity and that is to be removed or access to which is to be disabled", §512(c)(3)(A)(III) does not require a conduit service provider to remove or disable access to the material that is subject of the infringing activity.

37

Particularly, a notification to a conduit service provider that does not store material on its server is still valid because it sets forth "identification of the material that is claimed to be infringing".

II. Alternatively, the DMCA subpoena is valid because Cox also is a §512(d) information location tools service provider. A. Cox assigns the IP addresses that are used by its subscribers to share pirated copies of *Fall* online. Cox links other users to the online location to obtain copies of *Fall* when it routes their data to and from that IP address. Accordingly, Cox is a §512(d) service provider. B. The plain language of §512(d) does not limit information location tools to directories such as search engines. Rather, §512(d) includes other broader information location tools such as pointers, reference and hypertext links which are similar to IP addresses. Also, section §512(d) does not require volitional conduct. Rather, §512(d), like the other sections, provides a service provider with a safe harbor from liability from passive actions.

C. Interpreting an ISP such as Cox that refers and links users to the online location per §512(d) is not the same as transmitting and routing data in §512(a). Particularly, Cox's activity of providing its customers with IP addresses and customer premises equipment that is key for referring and linking goes further than transmitting and routing data. In comparison, a transient §512(a) service provider does not necessarily provide IP addresses to subscribers.

D.  Cox can use measures to disable the link to the infringing material such as null routing the IP addresses, blocking the ports associated with BitTorrent activity from the subscribers' endpoint, or filtering the BitTorrent content from the subscriber's endpoint.  Some of these are measures that Cox currently uses to prevent their customers from using the service for piracy upon receiving DMCA notices.  E.  These simple measures do not conflict with the remedies Congress provided in §512(j)(1)(ii) because they do involve terminating the subscriber account.

III.  Cox, as it admits, is a nonparty to this proceeding.  A. Cox waived its opportunity to make objections or otherwise participate by fully responding to the DMCA subpoena without objections and failing to join John Doe's motion to quash or file a reply in support of John Doe's motion to quash. Nor did Cox file any motion for an extension of time to file objections to the subpoena establishing excusable neglect.  B. And because Cox fully complied with the subpoena, Cox does not have standing to file opposition papers such as Cox's opposition to the motion for reconsideration or a motion to strike a declaration.  Thus, the Court erred by concluding that Cox has standing.  Accordingly, the Court abused its discretion by permitting Cox to file oppositions to Petitioners' motions for reconsideration and for a stay or to file a motion to strike the declaration submitted with the motion for reconsideration.

IV.  The District Court' striking of the declaration Petitioners submitted to correct factual errors in the Court's order that could not have been anticipated was an abuse of its discretion.  Fed. R. Civ. P. 59(e) and 60(b)(1) permit a movant to seek relief from judgment based upon the Court's mistake.  The declaration was necessary to point out the technical nature of the Court's factual error.  Moreover, as Cox did not even have standing to file papers, the Court should not have considered Cox's motion to strike the declaration.

## STANDARD OF REVIEW

This Court has applied an abuse of discretion standard for interlocutory appeals of district court orders quashing subpoenas. *See In re Grand Jury Investigation*, 966 F.3d 991, 994 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 308 (2021).  However, the District Court's Order quashing the subpoena (ER-117–139) was not a pretrial order but rather an order that disposed of a standalone miscellaneous case opened to apply for a subpoena under 17 U.S.C. §512(h).  Accordingly, the standard of review of the District Judge's findings is *de novo*.  *See CPC Patent Techs. PTY Ltd. v. Apple, Inc.*, 34 F.4th 801, 805 (9th Cir. 2022).

The District Court's statutory interpretations are reviewed *de novo*.  *See Collins v. Gee W. Seattle LLC*, 631 F.3d 1001, 1004 (9th Cir. 2011) (quoting *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1047 (9th Cir. 2007).

The District Court's ruling on a motion to strike is reviewed for an abuse of discretion. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018) (as amended); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012); *Hambleton Bros. Lumber Co. v. Balkin Enterprises Inc.*, 397 F.3d 1217, 1224 n. 4 (9th Cir. 2005).

Findings of fact are reviewed for clear error. *See Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (9th Cir. 2021).

Standing in a copyright case is reviewed *de novo*. *See Fahmy v. Jay-Z*, 908 F.3d 383, 389 (9th Cir. 2018) (as amended); *DRK Photo v. McGraw-Hill Glob. Educ. Holdings*, LLC, 870 F.3d 978, 982 (9th Cir. 2017); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

The District Court's decision to extend deadline for Cox to file objections is reviewed for abuse of discretion. *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258 (9th Cir. 2010).

The District Court's denial of a motion for reconsideration is reviewed for an abuse of discretion. *See Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1058 (9th Cir. 2020).

41

## ARGUMENT

## I.     17 U.S.C. §512(h) AUTHORIZES SUBPOENAS TO §512(a) SERVICE PROVIDERS INCLUDING COX.

The District Court's conclusion (based upon *Verizon* and *Charter*) that a §512(h) subpoena cannot be issued to a §512(a) service provider is based upon a narrow view of subsections (a) and (c) that contradicts text from other subsections and is divorced from the full context of §512. Analysis of §512 holistically consistent with binding precedents of this Court leads to the clear conclusion that a §512(h) subpoena can be issued to all service providers and a notification that satisfies §512(c)(3)(A)(iii) can issued to §512(a) service providers, even those that are conduit service providers.

### A.  §512(h) refers to the broad definition of service provider in §512(k) that does not exclude §512(a) service providers.

§512(a)-(d) defines four types of service providers: transitory networks in subsection (a); system caching in subsection (b); storage at direction of users in subsection (c); and information location tools in subsection (d). However, §512(k)(1) gives a broader definition of service provider generally that explicitly includes §512(a) providers:

> (1)Service provider.—(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between

42

or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.
(B)As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

§512(h) provides the basis for a subpoena. §512(h)(1), which provides for the requests, states, "A copyright owner…may request the clerk of any United States district court to issue a subpoena to a ***service provider***…" (emphasis added). Here, §512(h)(1) uses the broad definition of a service provider as provided in §512(k)(1) rather than explicitly referring to only certain service providers in §512(a)-(d) as in other sections. And Congress knew when it wanted to limit a section to a certain type of service provider. For example, §512(j) sets forth injunctive relief that is available to copyright holders. §512(j)(1)(A) explicitly excludes §512(a) service providers from the specified injunctive relief while §512 (j)(1)(B) explicitly limits the specified injunctive relief to §512(a) service providers. Since it is clear that Congress knew how to limit the type of service providers against whom relief was available for copyright owners in §512(j), the Court can reasonably presume that Congress did not mean to limit the type of service providers against whom copyright holder can obtain subpoenas in §512(h). *See United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 928 (9th Cir. 2013) ("[W]here Congress includes particular language in one section of a statute but

43

omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  The plain language of §512(h) contradicts the Court's conclusion that "…§512(h) does not authorize the subpoena issued here [to Cox]."  ER-118.

**B.  The Court erred in concluding that Cox is a mere conduit that does not store infringing material.**

§512(h)(2)(A), which provides one of the contents of the request for the subpoena the copyright holder must file with the clerk of the court, states "…a copy of a notification described in subsection (c)(3)(A)".

The District Court concluded based upon *Verizon* that "§512(a) does not contain any notice and take down provision referring to Subsection (c)(3)(A) – because there is no material to take down".  ER-126, ER-31. However, as discussed below, this erroneous conclusion is contradicted by §512(a)(4) and this Court's decision in *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ("*Ellison*").

**1. Not all §512(a) service providers are mere conduits.**

The *Verizon* Court repeatedly used "conduit" to describe all §512(a) service providers.  *See, e.g. Verizon*, 351 F.3d at 1231.  The *Charter* Court described the ISP as a §512(a) "conduit" service provider based upon an agreement of the parties.  *See Charter*, 393 F.3d at 777 ("…the parties do not dispute that Charter's

function was limited to acting as a conduit for the allegedly copyright protected material…). It is important to distinguish between a §512(a) service provider in general and a conduit in particular. The common use in *Verizon*, *Charter* and other published cases of the misnomer "conduit" – a word that is not used in §512(a) or any other section of §512 – gives the false impression that *all* §512(a) service providers just pass the material through like water passing through a conduit pipe and never store infringing material on their server. But §512(a)(4) states:

> no copy of the material made by the service provider in the course of such ***intermediate or transient storage*** is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for ***a longer period than is reasonably necessary*** for the transmission, routing, or provision of connections… (emphasis added)

Thus, even a §512(a) service provider may store infringing material on its servers although for no longer than reasonably necessary for the transmission. For example, in *Ellison* this Court affirmed a District Court's conclusion that the fourteen day period during which AOL stored and retained the infringing material was "transient" and "intermediate" within the meaning of §512(a). *Ellison*, 357 F.3d at 1081. During the fourteen day period, AOL stored infringing material that could be taken down in response to a notification. Accordingly, to the extent the *Verizon* Court and District Court's conclude that all §512(a) service providers are

45

mere conduits, this conclusion is without any legal basis. And the District Court's conclusion that "§512(a) does not contain any notice and take down provision referring to Subsection (c)(3)(A) – because there is no material to take down" (ER-126, ER-31) is contradicted by §512(a)(4) and further by *Ellison*. The District Court's conclusion was legal error.

**2. Not even the declaration from Ms. Hall supports the Court's conclusion that Cox is merely a conduit.**

The District Court's Order states that "…Petitioners conceded that Cox acted as a "conduit" for P2P infringement under the safe harbor in §512(a)…" ER-130. Not true. Unlike the copyright holders in *Charter*, Petitioners never conceded that Cox is a mere conduit.

In response to an Order from the Court to file appropriate evidentiary proof that it is a §512(a) service provider, Cox submitted a three-page declaration of Amber Hall ("Ms. Hall") replete with legal conclusions and devoid of any facts besides her job title and the relationship between Cox entities. ER-146–149. Petitioners explained by a side-by-side comparison of Ms. Hall's declaration and §512(a) that her declaration was basically nothing more than a cut and paste of §512(a) replacing the word "service provider" with "Cox". ER-141. But in her declaration Ms. Hall declares that "(4)…no such copy [of the material] is maintained on the system or network…***for a longer period than is reasonably***

*necessary*…" ER-148 (emphasis added). Petitioners rightfully pointed out that "Ms. Hall does not describe how long Cox maintains copies of material…" ER-142.

Without even knowing how long infringing material is stored on Cox's servers, the District Court abused its discretion by concluding factually that Cox acts as a mere conduit and cannot disable access to or remove infringing material. ER-134. Notably, Ms. Hall's declaration says nothing in response to Petitioners' contention in their objections to the F&R concerning Cox's ability to null route IP addresses that are subject of notices to block access to infringing material.

And the Court's conclusion that "Hall attests that Cox "is engaged in transmitting, routing, or providing connections for" material *only* as described in §512(a)" is incorrect. ER-136 (emphasis added). Rather, Ms. Hall prefaced her declarations about Cox's service by stating "Cox, as an Internet service provider…" ER-148. Accordingly, Ms. Hall's declaration was limited to Cox's broadband service. Notably, Cox advertises backup online storage services similar to services described in §512(c). *See* Managed Cloud Services, https://www.cox.com/business/cloud-services.html (last visited on Sept. 8, 2024) (Cox advertises its managed cloud services). Cox also described itself as operating "advanced cloud and managed IT services" in its press release promoting its petition for Writ of Certiorari which is a service similar to services described in

47

§512(c). Cox, *Cox Asks U.S. Supreme Court to Hear Landmark Copyright Infringement Case*, https://newsroom.cox.com/Cox_Petitions_Supreme_Court (last visited on Sept. 9, 2024) ("Cox News Release"). Cox's advertisements contradict the District Court's interpretation of Ms. Hall's declaration as applying to all of Cox's services.

Accordingly, the declaration of Ms. Hall did not provide any evidentiary basis for the Court to make the factual conclusion that Cox cannot remove infringing material stored on its servers or block access to infringing material. This problem is particularly acute here because Cox did not even object to the subpoena, let alone assert that a §512(h) subpoena cannot be issued to a §512(a) service provider or that it cannot disable access to infringing material. The entire question of the validity of the subpoena was raised solely by the Magistrate Judge. The District Court's adoption of the F&R concluding that Cox is a mere conduit without any substantive evidence was an abuse of discretion.

**C. A valid §512(c)(3)(A) notification can be sent to a §512(a) service provider.**

§512(c)(3)(A) sets forth the elements of the notification. At issue is subsection (iii) which states: "Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit

48

the service provider to locate the material." As explained below, the notifications Petitioners sent to Cox satisfy the textual requirements of §512(c)(3)(A)(iii). ER-235–237.

### 1. A §512(a) service provider can use simple measures to disable access to material that is subject of infringing activity.

The *Verizon* Court concluded that a copyright holder cannot issue a valid notification including the elements of §512(c)(3)(A)(iii) to an ISP that acts as a conduit to peer-to-peer file sharing because the ISP neither removes nor disables access to the infringing material that is stored on the user's computer rather than the ISP's servers. *See Verizon*, 351 F.3d at 1235. However, §512(c)(3)(A)(iii) does not include any requirement that the infringing material *be stored on the ISP's servers*. Rather, the applicable language is "…to be the subject of infringing activity and is to be removed or access to which is to be disabled". To read in such a requirement that the material be stored on the ISP's servers would be contrary to this Court's guidance that "we will not read requirements into the safe harbors that are not contained in the text of the statute." *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1042 (9th Cir. 2013) ("*Fung*"). And to the extent the *Verizon* Court and the District Court focus on the inability of an ISP to delete the infringing material from the subscriber's computers, they overlook that §512(c)(3)(A)(iii) refers to *infringing activity*. Besides the right of reproduction,

49

another one of the exclusive rights provided by §106(3) is the right of distribution. Cox's subscribers violate Capstone's exclusive right to distribute copies of the work when they engage in *infringing activity* of sharing copies of *Fall* over the BitTorrent peer-to-peer network, which can only be done when Cox connects the subscribers to the Internet. However, Cox can disable other peer-to-peer users from accessing this infringing activity.

The *Verizon* Court rejected the contention that the ISP could disable access to the infringing material consistent with §512(c)(3)(A) by terminating the customer account because termination of a customer's account is a remedy already set forth in §512(j)(1). *See Verizon*, 351 F.3d at 1235. However, account termination appears to have been the only means for disabling access to the infringing material discussed in *Verizon*. The District Court adopted *Verizon*'s reasoning without receiving any substantive evidence of whether Cox had any means for disabling access to the infringing activity short of terminating the subscribers' account. But network technology has advanced substantially in the more than two decades since 2003 (the year of *Verizon* decision). In 2003 nearly 60 percent of Americans did not even have high speed Internet service and still used dialup for Internet access. *See* John B. Horrigan, *Broadband Adoption at Home*, Pew Research Center (May 18, 2003),

50

https://www.pewresearch.org/internet/2003/05/18/broadband-adoption-at-home/ (last visited on Sept. 6, 2024). On the other hand, the revolutionary advances in processor speed and miniaturization over the past two decades and the introduction of artificial intelligence are without question. *See, e.g.,* ER-89–90. These advances have increased the tools used by network providers to monitor the networks to defend from attacks. ER-143 (Cox describes blocking of botnets, viruses, phishing sites, malware and certain ports).

Petitioners discussed exemplary measures Cox could implement to disable access to the infringing material such as port blocking, filtering, deep packet inspection, and null routing that have become common approaches used by networks in the past two decades. ER-193, ER-108–109, ER-88–89. And these are not Capstone's speculations. Rather, these are measures Cox currently uses or has in the past. *See* Chris Maxcer, *Study: Cox, Comcast Play Traffic Cop Day and Night*, E-Commerce Times (May 15, 2008), https://www.ecommercetimes.com/story/study-cox-comcast-play-traffic-cop-day-and-night-63033.html (last visited on Sept. 4, 2024) (study shows Cox was blocking BitTorrent); Grant Gross, *US lawmakers target deep packet inspection in privacy bill*, NY Times (April 23, 2009), https://archive.nytimes.com/www.nytimes.com/external/idg/2009/04/23/23idg-US-lawmakers-ta.html (last visited on Sept. 4, 2024) (article discussing Congressional

response to Cox and other ISPs' use of deep packet inspection). Cox's own disclosures state that it uses filtering and port blocking. ER-143. Cox admitted in a different case that it places customers that are subject to notifications in a walled garden (i.e., null route) to force them to stop infringing activity. *See BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 149 F. Supp. 3d 634, 641 (E.D. Va. 2015) ("*BMG*") (describing how Cox places accounts in different walled gardens after certain number of notices). Indeed, Cox boasts in its petition to the Supreme Court that its anti-infringement measures cause 95 percent of its subscribers that use Cox's service for piracy to cease their activities without terminating their subscribers' service. *See* Cox's Petition for a Writ of Certiorari at 2, *Cox Communications, Inc. et al. v. Sony Music Entertainment, et al.*, Nos. 24-171, 24-181 (filed on Aug. 15, 2024); *see also* Cox News Release. Cox has never disputed Petitioners' assertion that Cox could disable access to the infringing activity.

Nonetheless, the District Court misapplied the logic of *Verizon* and rejected null routing as a measure for disabling access to infringing material because null routing can terminate an Internet connection. *See* ER-134. In denying Petitioners' motion for reconsideration, the Court stated that:

> Null routing a subscriber's IP address is not equivalent to "remov[ing], or disabl[ing] access to" links to infringing material or activity, because null routing a user's IP address has the outsize effect of terminating that address's connection to the network (thus terminating access to the internet for any user of that IP).

ER-35.

First, assuming *arguendo* that null routing terminates an Internet connection, this is still a remedial measure that is short of termination *of the subscriber's account*. Accordingly, the logic in *Verizon* that the remedial measure for disabling access cannot be just like one of the remedies provided in §512(j) is not applicable to null routing. Second, the Court's conclusion that null routing has the effect of "terminating access to the internet for any user of that IP" is wrong. ER-35. As discussed in *BMG*, the null route implemented by Cox (referred to as soft-walled garden) "means the account holder's internet access is temporarily limited to a single webpage that displays a warning message." *BMG*, 149 F. Supp. 3d at 641 (E.D. Va. 2015). Third, and most importantly, Cox never disputed Petitioners' assertion that it can use means for disabling access to the infringing activity short of terminating the subscribers' account. Accordingly, there was no evidence by which the Court to conclude to the contrary. And Petitioners had no burden to affirmatively prove that Cox could not do so when nobody (besides the Magistrate Judge) asserted it cannot. It was John Doe's burden of proof as the person resisting the subpoena to prove that Cox had no means for disabling access to the infringing activity short of terminating his account. *See Dove v. Atl. Capital Corp.*, 963 F.2d 15, 19 (2d Cir. 1992); *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir.

1998).   Therefore, Petitioners sent a valid notification including the elements of §512(c)(3)(A)(iii) to Cox as a §512(a) service provider.

The Court committed legal error to the extent it concluded that Cox cannot disable access to infringing activity as provided in §512(c)(3)(A)(iii).

**2. Interpreting §512(c)(3)(A) as not applying to §512(a) service providers contradicts language in the statute and leads to absurd results.**

Despite §512(a) service providers being referred to in numerous other sections in §512 that mention the notification or disabling access as discussed above, the *Verizon* Court concluded:

> …the presence in § 512(h) of three separate references to §512(c) and the absence of any reference to §512(a) suggests the subpoena power of §512(h) applies only to ISPs engaged in storing copyrighted material and not to those engaged solely in transmitting it on behalf of others.

*Verizon*, 351 F.3d at 1236-1237.

However, Congress referred to §512(a) service providers in other portions of the statute such as section (e) and (m) that make clear Congress intended §512(c)(3)(A) notifications to be sent to §512(a) service providers.

§512(m) provides further protection explicitly to §512(a) service providers as well as (c)-(d) providers to ensure protection of user privacy.   Particularly, §512(m) states that the applicability of §512(a) is not conditioned on "a service provider gaining access to, ***removing, or disabling access*** to material in cases in

54

which such conduct is prohibited by law". (emphasis added). Congress would not have been concerned with making clear that §512(a) service providers are not required to break laws such as privacy laws when removing or disabling access to the infringing material if it did not envision §512(a) service providers receiving §512(c)(3)(A) notifications.

§512(e) sets forth conditions for a safe harbor for nonprofit educational institutions from having a faculty or graduate student considered the same person as the institution (and thus have the infringing conduct attributed to the institution) or having a faculty or graduate student's infringing knowledge attributed to the educations institution when the educations institution acts as a service provider. §512(e)(1) recognizes that the educational institution can be a §512(a) service provider: ("…for the purposes of subsections (a)…"). One of the conditions is specified in §512(e)(B):

> the institution has not, within the preceding 3-year period, received more than two ***notifications described in subsection (c)(3)*** of claimed infringement by such faculty member or graduate student, and such notifications of claimed infringement were not actionable under subsection (f) ***(emphasis added)***.

This language in §512(e)(B) makes clear that Congress recognized that a higher education §512(a) service provider would be receiving §512(c)(3) notifications. Accepting *arguendo* the logic of *Verizon* that a §512(c)(3) notification cannot be sent to a §512(a) service provider leads to the absurd result

55

that a copyright holder would never be able to attribute a faculty or graduate students' infringing conduct to the nonprofit educational institution no matter how many thousands of notifications concerning ongoing piracy the copyright holders sent. This absurdity would defeat the entire purpose of §512(e)(B)'s condition. Accordingly, §512 must be interpreted that §512(a) service providers can receive valid notifications to "…avoid a literal interpretation of the statute that produces an 'absurd' result." *United States v. Shill*, 740 F.3d 1347, 1353 (9th Cir. 2014) (citing *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543 (1940)).

### 3. A §512(a) service provider can remove or disable access to infringing material on its servers.

The *Verizon* Court repeatedly used the misnomer "conduit" to describe all §512(a) service providers. *See, e.g. Verizon*, 351 F.3d at 1231. The *Charter* Court described the ISP as a §512(a) "conduit" service provider based upon an agreement of the parties. *See Charter*, 393 F.3d at 777 ("…the parties do not dispute that Charter's function was limited to acting as a conduit for the allegedly copyright protected material…"). However, the Courts' use of this term "conduit" in *Verizon* and *Charter* – a word that is not used in §512(a) or any other section of §512 – gives the false impression that §512(a) service providers never store infringing material and just pass it through like water passing through a conduit pipe. On the other hand, §512(a)(4) states:

56

> no copy of the material made by the service provider in the course of such ***intermediate or transient storage*** is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for ***a longer period than is reasonably necessary*** for the transmission, routing, or provision of connections… (emphasis added)

Thus, even a §512(a) service provider may store infringing material on its servers although for no longer than reasonably necessary for the transmission. And in *Ellison* as discussed above, this Court affirmed a District Court's conclusion that the fourteen-day period during which AOL stored and retained the infringing material was "transient" and "intermediate" within the meaning of §512(a). *Ellison*, 357 F.3d at 1081 (9th Cir. 2004). During the fourteen-day period, AOL stored infringing material that could be taken down in response to a notification.

Notably, §512(h)(4) does not require the copyright holder to confirm that the service provider has not already disabled access to the infringing material before applying for the subpoena. Rather, the notification must only satisfy the provisions of subsection (c)(3)(A). And subsection (c)(3)(A)(iii) calls for information reasonably sufficient to permit the service provider to locate the material. Capstone did this by providing Cox with the IP address and port number.

Accordingly, the District Court's conclusion that "§512(a) does not contain any notice and take down provision referring to Subsection (c)(3)(A) – because there is no material to take down" is incorrect. ER-126.

**4. The absence of a notice and take down language in §512(a) does not imply that §512(a) conduit service providers are not subject to notifications.**

The *Verizon* Court pointed to the absence of the notice and take down provision in §512(a) and concluded that a notice under §512(c)(3)(A) to a mere conduit is ineffective because the conduit cannot remove or disable access to the material. *See Verizon*, 351 F.3d at 1234-1236. Capstone disagrees. Nonetheless, should this Court agree with *Verizon* and the District Court that: (i) Cox is a mere conduit; and (ii) Cox cannot remove or disable access to the material, the DMCA notices are still effective because §512(c)(3)(A)(iii) does not require the conduit service provider to be able to remove or disable access to the material. Particularly, as the *Verizon* Court pointed out, §512(a) does not include the requirement for the service provider to expeditiously remove or disable access to the infringing material found in sections (b)(2)(E), (c)((1)(C) and (d)(3). However, the reading by the District Court and the Courts in *Verizon* and *Charter* ignores Congress' use of the disjunctive form "or" in §512(c)(3)(A)(iii). Particularly, §512(c)(3)(A)(iii) states "(iii)Identification of the material that is claimed to be

58

infringing **_or_** to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." (emphasis added). Thus, there are two cases for (c)(3)(A)(iii): (1) Identification of the material that is claimed to be infringing; or (2) Identification of the material to be the subject of infringing activity and that is to be removed or access to which is to be disabled. In both cases the copyright holder has to provide "information reasonably sufficient to permit the service provider to locate the material", but the first case does not require a conduit service provider to remove or disable access to anything. And in either case the plain language of (c)(3)(A)(iii) does not require the material to be located on the conduit provider's server (although the provider must terminate repeat infringers per §512(i)(1)(A)).

Even though the material will be located on the subscriber's device in the case of a conduit, Capstone provided Cox with information reasonably sufficient to permit it to locate the material as required by 12(c)(3)(A)(iii) by providing the IP address and port number. Judge Murphy's dissent in *Charter* made this point:

> …The majority's reading of [§ 512(c)(3)(A)(iii)] ignores the use of the disjunctive form in describing the infringing material (the subsection also contains a second use of the disjunctive form to distinguish "to be removed or … to be disabled") …The copyrighted material stored on an ISP's network becomes the subject of infringing activity when it is unlawfully duplicated by subscribers. In order to remove such material or disable access to it, a storage ISP needs it to

be identified. On the other hand, when a subscriber transfers copyrighted material through a conduit ISP, that service provider cannot remove the material from the network. It can, however, provide identifying information about the offeror of the material "claimed to be infringing".

*Charter*, 393 F.3d at 781 (8th Cir. 2005).

Judge Murphy's interpretation is consistent with the overall scheme of §512 where a §512(h) subpoena refers to all service providers as defined by §512(k). It also avoids the absurd result discussed above where an educational institution that is a §512(a) service provider never reaches the 3 notice threshold explicitly set by Congress in §512(e). Judge Murphy's interpretation is also consistent with the purpose of the DMCA to "…facilitate cooperation among Internet service providers and copyright owners "to detect and deal with copyright infringements that take place in the digital networked environment."" *Ellison*, 357 F.3d at 1076 (9th Cir. 2004) (quoting S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551, pt. 2, at 49 (1998)).

Accordingly, should this Court agree with *Verizon* and the District Court that: (i) Cox is a mere conduit; and (ii) Cox cannot remove or disable access to the material, Capstone asserts that this Court should adopt the reasoning of Judge Murphy's dissent and conclude that Petitioners sent valid notifications to Cox because the notices includes the necessary elements of identification of the material that is claimed to be infringing (*Fall*) and information reasonably

60

sufficient to permit the service provider to locate the material (the IP address, port number and time of infringement). This Court should not read a statute's plain language to "produce a result contrary to the statute's purpose or lead to unreasonable results." *United States v. Combs*, 379 F.3d 564, 569 (9th Cir. 2004). Notably, neither Cox nor John Doe ever substantively challenged Petitioners' objection to the F&R that §512(h) subpoenas are applicable to §512(a) service providers.

## II.   ALTERNATIVELY, COX IS A §512(d) SERVICE PROVIDER.

§512(n) provides:

> Whether a service provider qualifies for the limitation on liability in any one of those subsections… shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

Thus, a service provider may qualify for more than one safe harbor. Should the Court conclude that a DMCA subpoena cannot be issued to a §512(a) service provider, Capstone asserts that Cox is further an information location tool service provider under §512(d) because Cox provides its subscribers with customer premises equipment and the IP addresses which link other peer-to-peer users to the online location containing infringing material. §512(c)(3)(A)(iii) (as modified by §512(d)(3)) explicitly provides for DMCA notices to §512(d) service providers identifying the link to activity claimed to be infringing that is to be removed or

access to which is to disabled. Thus, a DMCA subpoena can be issued to a §512(d) service provider.

### A. Cox assigns IP addresses to its subscribers that are used for sharing *Fall* on peer-to-peer networks.

§512(d) provides that:

> "A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider **referring or linking** users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link…" (emphasis added).

Example definitions of information location tools given are non-exhaustive list due to use of the word "include". *United States v. Singh*, 995 F.3d 1069, 1077 (9th Cir. 2021). However, an IP address is the same as a hypertext link, reference or pointer because an IP address can be used just like a hypertext link to go to a website such as the District of Hawaii's website. ER-158. Accordingly, Cox is a §512(d) service provider because it assigns the IP address to its user and refers or link other users to an online location at the IP address containing infringing material or infringing activity.

The District Court conceded that "Cox assigned Doe an IP address, and routed traffic that allegedly contained a copyrighted file to that IP address using "automatic technical processes."" ER-133. It is undisputed that Capstone asserted

in the DMCA notice that pirated copies of *Fall* were shared from the IP address Cox assigned to Doe. Moreover, the term information location tools in §512(d) is not ambiguous but clearly defined with examples. Nor is referring or linking users to an online location ambiguous, particularly in the context of the information locations tools. The inquiry ends with the text of a statutory provision "if the text is unambiguous." *In re Stevens*, 15 F.4th 1214, 1217 (9th Cir. 2021) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)). Thus, Capstone respectfully asserts that the inquiry should end here with the conclusion being that Cox is a §512(d) service provider because Cox routed traffic to and from the IP address Cox assigned to John Doe when the person who used John Doe's Wi-Fi without authorization shared pirated copies of *Fall* online from John Doe's IP address. ER-225.

**B. Active assistance or otherwise volitional conduct is not required for a service provider to be a §512(d) information tool service provider.**

The District Court examined how the pirated content is shared in the context of the BitTorrent protocol peer-to-peer system and concluded that "Although each internet user sharing files over P2P has an IP address, it is the P2P system that enables users to locate peers who are also seeking to distribute or receive files." ER-132. However, the plain language of §512(d) does not require any analysis of

63

the underlying software used by the service providers' users for the online infringing activity or condition applicability on the software.

The District Court's focused in on one type of information location tool – a search engine directory created by people that was discussed in the House committee report – as the appropriate information tool. ER-132 at FN6, ER-134. However, the District Court ignores the fact that §512(d) definition of information tool is not limited to a directory but also includes an index, reference, pointer, or hypertext link. Nor does the plain language of §512(d) require the service provider to exercise editorial discretion of the information locations tools as argued by the District Court.

In a footnote, the District Court asserted that ""referring or linking" requires more than just the assignment of an IP address to a user through automatic operations—it requires providing some degree of "active assistance" to users in locating online resources." ER-132 at FN4. This requirement of a degree of "active assistance" for referring or linking is akin to the requirement to show volitional conduct requirement for direct infringement. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 667 (9th Cir. 2017) ("the distinction between active and passive participation remains a central part of the analysis of an alleged infringement"). However, importing the direct infringement volitional conduct requirement to §512(d) defeats the entire purpose of providing a safe harbor

64

wherein "…liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another." H.R. Rep. 105-551, pt. 1, at 58 (1998). The District Court's importation of a requirement for active assistance to §512(d) would end incentives for passive providers of information location tools such as Usenet service providers to take down links connecting their users to infringing material residing on other servers. And Usenet providers take down links in response to thousands (if not millions) of DMCA takedown notices served by copyright holders everyday concerning hypertext links linking to infringing content added by third-party users. *See, e.g., Perfect 10,* 847 F.3d at 671 (9th Cir. 2017) (service provider Giganews receives DMCA notices including 10 million Message-IDs identifying Usenet messages to be removed every month).

Because Usenet messages propagate through servers of different Usenet providers, a Usenet provider must use the Message-ID specified in a DMCA notices to block a message containing infringing material from being propagated to its servers. *See Perfect 10, Inc. v. Giganews, Inc.*, 993 F. Supp. 2d 1192, 1201 (C.D. Cal. 2014). But under the District Court's construction requiring "active" assistance, a Usenet provider would not have to comply with a DMCA notice that specified the Message-ID (link) of a message containing infringing content on another Usenet server to maintain it safe harbor since the Usenet provider does not exercise any editorial control over the links or messages. *See Perfect 10,* 847 F.3d

65

at 664 (9th Cir. 2017) (Noting that Usenet provider Giganews does not select any of the content available and does not post any articles).

The District Court's conclusion that §512(d) requires a degree of "active assistance" was a legal error.

**C.  The transmissions in §512(a) are not the same as referring or linking in §512(d).**

In rejecting Petitioners' assertion that Cox is a §512(d) service provider, the District Court stated that "If an ISP assigning an IP address is both "providing connections for" infringement under (a) and "referring or linking" to infringing material under (d)—as Petitioners contend—Congress would not have created two separate safe harbors." ER-131. However, as discussed above, providing connections as in §512(a) involves not just transmitting material but also storing copies of the material for a period necessary for transmission such as 14 days. Further, Cox does not just assign its subscribers an IP address, but also provides certain customer premises equipment such as modems or gateways.  ER-182. §512(d), on the other hand, does not provide for limited storage but only linking. Accordingly, there are differences in the requirements and language for subsections (a) and (d).  Moreover, the District Court is incorrect in assuming that every §512(a) service provider must assign an IP address to engage in

66

"transmission, routing, provision of connections, or storage." Nor was there any evidence on the record to support this conclusion[1].

**D. Cox (as a §512(d) service provider) can use simple measures to disable access to the link to the infringing material.**

Petitioners discussed exemplary simple measures Cox could implement to disable access to the link to the link to the infringing material such as port blocking, filtering and null routing that have become prominent in the past two decades. ER-68, ER-111-112, ER-142, ER-193.

According to the BitTorrent protocol, a tracker broadcasts to other peers that wish to obtain a copy of the infringing material the IP addresses where the infringing material is being made available. *See* ER-90–91 at ¶22. Particularly, the BitTorrent protocol specification states that a tracker request can include the parameter "ip  An optional parameter giving the IP…which the peer is at…" and tracker responses including a parameter "peers [which] maps to a list of

---

[1] For example, a local area network ("LAN") service provider will use Ethernet switches to route data based upon media access control ("MAC") addresses between two devices. Rather than assigning IP addresses, the switch stores MAC addresses of all devices on the LAN. *See* Cloudflare, *What is a network switch? |Switch vs. router*, https://www.cloudflare.com/learning/network-layer/what-is-a-network-switch/ (last visited on Sept. 8, 2024). Likewise, on a larger scale, an Internet Exchange Point ("IXP") will use Ethernet switches to connect multiple Internet service providers without assigning IP addresses. *See* Cloudflare, *What is an Internet exchange point?|How do IXPs work?* https://www.cloudflare.com/learning/cdn/glossary/internet-exchange-point-ixp/ (last visited on Sept. 2, 2024). Indeed, an IXP is an example of a conduit. *See* ER-92–93.

dictionaries corresponding to peers, each of which contains the keys peer id, ***ip, and port***, which map to the peer's self-selected ID, IP address or dns name as a string, and port number…" Bram Cohen, *The BitTorrent Protocol Specification*, Jan. 10, 2008, last modified on Feb. 4, 2017, https://www.bittorrent.org/beps/bep_0003.html (last visited on Sept. 4, 2024) (emphasis added); *see also Fung*, 710 F.3d at 1028 (9th Cir. 2013) ("The tracker's primary purpose is to provide a list of peers that have files available for download.").

Were Cox to null route the IP address specified in the notice, from that time forward the trackers would be broadcasting inaccurate IP addresses as the location of the infringing material to other peers. *See* ER-90 at ¶19. Thus, the link to the infringing material will be blocked even if the subscriber switched to a different IP address. Accordingly, null routing the IP address will be particularly effective for blocking access to the infringing material distributed via the BitTorrent protocol.

**E. The simple measures Cox (§512(d) service provider) can use to disable access to the IP address are not similar to the §512(j)(1)(A)(ii) remedy.**

The District Court cites the language of *Verizon* "that in the text of the DMCA, Congress considered disabling access to infringing material and disabling access to a subscriber's account to be distinct remedies." ER-134. However, the Court is asserting the wrong language with respect to §512(d). While

§512(c)(3)(A)(iii) is concerned with removing or disabling access to *material* that is subject of infringing activity, §512(d)(3) modifies this language to be concerned with disabling *references or links* to the material that is subject of infringing activity. Further, unlike subsection (c), subsection (d) is not conditioned on the links being posted by users rather than the service provider. Accordingly, the concern in *Verizon* that terminating a customer's account to disable access to the infringing material would not be distinct from the remedy of terminating the account is simply not applicable to §512(d) because in this section whether the links was posted by third-party users or the service provider itself has not relevance.

Nonetheless, assuming that the logic in *Verizon* is applicable to §512(d), as argued above, null routing the IP address indicated in the notices that is the link to the infringing material is not analogous to terminating the subscriber's account service as in §512(j)(1)(ii) because the subscriber can later resume full service. For example, the soft walled garden null route implemented by Cox still allows a customer to browse to a specific website. *See BMG*, 149 F. Supp. 3d at 641 (E.D. Va. 2015). Moreover, there are other measures available for blocking access to the link to the infringing material such as port blocking or filtering. But as argued above, it was the burden of John Doe – not Petitioners – to set forth evidence that Cox has no measures for blocking access to the links.

The Court's conclusion that Cox is not a §512(d) service provider was a legal error. And the Court's denial of Petitioners' motion for reconsideration of its conclusion that null routing is a harsher remedy than authorized by the DMCA was an abuse of discretion.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY PERMITTING COX TO FILE A MOTION TO STRIKE AND OPPOSITIONS TO PETITIONERS' MOTIONS AND DENYING PETITIONERS' MOTION TO SUPPLEMENT THE RECORD.

Because Cox was not a party to District Court proceedings and lacked standing, the District Court abused its discretion by allowing Cox to file motions or opposition papers. Even Cox admitted that it is a nonparty when it filed its notice of intent to file a response to Petitioners' objection to the F&R. *See* ER-173–177 (Cox identifies itself as a nonparty).

### A. Cox waived any opportunity to participate in the proceedings.

It is undisputed that Cox served a response to the subpoena including the names of the subscribers requested by Petitioners except for John Doe's without any objections or reservations. §512(h)(6) specifies that provisions of Fed. R. Civ. P. 45 should be applied for the remedies for nonenforcement. A nonparty has the earlier of the time specified for compliance or 14 days after the subpoena is served to make an objection. *See* Fed. R. Civ. P. 45(d)(2)(B). Because Cox failed to make a timely objection to the subpoena, it waived any opportunity to challenge the

validity of the subpoena or otherwise oppose Petitioners' objections to the Magistrate Judge's F&R. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992).

In denying Petitioners' Request for Reconsideration, the District Court recognized that Cox had never filed a timely objection to the subpoena but asserted that good cause existed to consider Cox's arguments because Cox substantially complied with the subpoena and would incur new costs or obligations if the court were to adopt Petitioners' construction of §512(d). *See* ER-24–25. However, because the deadline to file objections had expired, the Court could only extend Cox's deadline to file an objection "on motion" by Cox showing "excusable neglect". Fed. R. Civ. P. 6(b)(1)(B). But Cox did not even file a motion for an extension of time to file an objection. And the Court's finding does not state that Cox had shown excusable neglect. Therefore, the Court abused its discretion in considering Cox's response to Petitioners' objections to the F&R, motion to strike and oppositions to Petitioners' Motions for a reconsideration and a stay because it did not even find excusable neglect. *See United States v. Iverson,* 162 F.3d 1015, 1026 (9th Cir. 1998) ("A district court abuses its discretion when it makes an error of law or rests its decision on clearly erroneous findings of material fact").

**B. Cox lacks standing to participate.**

For Cox to have standing, there needed to be a "case or controversy" between Cox and Petitioners. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547 (2016). It is undisputed that Cox did not file any objections to the subpoena or file a request for leave to serve a late objection. Rather, Cox complied with the subpoena by disclosing the requested subscriber identifications. John Doe, not Cox, filed the objection to the subpoena that the Magistrate Judge construed as motion to quash. ER-225. Nonetheless, Petitioners withdrew their request for John Doe's identification information on Feb. 4, 2024 before filing the motion for reconsideration on Feb. 12, 2024. ER-85. Therefore, any limited interest Cox had in these proceedings by holding John Doe's identification information for the benefit of Petitioners pending final resolution ended on Feb. 4. The District Court also directed Cox to file a response to Petitioners' motion for a stay. ER-115. Cox's response should have been limited to explaining whether it would suffer any prejudice from the proposed stay and if it could maintain the subscriber information it produced during the duration of the appeal if the stay was denied. Cox did not have any further interest sufficient for providing it standing to file an opposition to Petitioners' motion for a stay and reconsideration or a motion to strike the declaration.

72

The District Court recognized that Cox never filed a timely objection to the subpoena but asserted that good cause existed to consider Cox's arguments because "It also **appears** that Cox stands to incur new costs or obligations if the court were to adopt Petitioners' construction of § 512(d)."  ER-25 at FN3 (emphasis added).  However, this argument about an appearance of possible future costs or obligations for Cox is exactly the type of speculative theory of future injury that the Supreme Court has rejected as providing standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-02 (2013).  And the District Court's conclusion that Cox would incur new costs was not supported by any evidence in the record.  On the other hand, Petitioners filed a motion to supplement the record to include a document showing that Cox incurs **no costs** because it demands reimbursement for its costs for subpoenas before production.  *See* ER-11–16.  In the District Court's order rejecting Petitioners' motion to supplement the record, the Court stated, "to clarify, this holding refers to the costs and obligations that Cox **will incur** if the court adopts Petitioners' construction…"  ER-9 (emphasis added).  The Court failed to cite any evidence of a concrete future intent of Petitioners or anyone else to serve a similar subpoena on Cox to support its shift from "appearance of incurring" to "will occur". On the other hand, the only evidence in the record is of Cox's production of customer identifications without

objections to the subpoena which implies that Cox did not foresee any harm from complying with a §512(h) subpoena.

The District Court also stated that it had "*directed* Cox to file an Opposition/Response to Petitioners' Motion for Reconsideration". ER-25. But the Order does not direct Cox to do anything. Rather, the Order only states, "Accordingly, the court DIRECTS that an Opposition/Response be filed to the Motion for Reconsideration." ER-82. The Order was not directed to Cox. The District Court's conclusion that Cox had standing to file a motion to strike and an opposition to Petitioners' motions for reconsideration and stay despite filing no objections to the subpoena was a legal error. And the District Court's refusal to grant Petitioners' motion to supplement the record to include a document showing that Cox incurs **no costs** that contradicts a conclusion the Court made based upon no evidence was an abuse of its discretion.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION BY STRIKING THE DAVID COX DECLARATION.

Petitioners filed their motion for reconsideration under Fed. R. Civ. P. 59(e) and 60(b)(1). ER-104. Rule 60(b)(1) provides that a basis for relief for judgment is "mistake". This Court has agreed that one basis for seeking reconsideration under Rule 59(e) is to correct a manifest error of fact upon which the judgment is based. *See McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999). To show

that the Court's Order included a mistake that was a manifest error of fact, Petitioners included a declaration of David Cox explaining the hierarchy of the Internet, technical intricacies of BitTorrent, null routing and port blocking. *See* ER-86–102. Particularly, David Cox's declaration explains the difference between source and destination null routing and importantly makes clear that null routing does not terminate a customer's Internet service. ER-88. Further, David Cox's declaration explains (i) how an IP address is fundament to connectivity and (ii) how some transient Tier 1 network providers that provide interconnectivity function as pure conduits in comparison to Tier 2 providers such as Cox that assigns subscribers IP addresses and provides customer premise equipment. ER-92. Finally, David Cox's declaration explains how an ISP such as Cox can use remedial measures to disable access to infringing material or the link thereto. ER-88–89.

In response to Cox's motion, the District Court struck David Cox's declaration purportedly because it included evidence that could have reasonably been raised earlier in the litigation. ER-23. However, Petitioners could not anticipate that the District Court would make the technical mistake of analogizing terminating an Internet connection (by null routing) to terminating a subscriber account as provided in §512(j)(1)(B)(i). ER-134. The declaration of David Cox was necessary to show that the District Court had committed a mistake that was a

75

manifest error of fact. If Petitioners had not included a declaration in support of their argument that the Court had mistaken as to the technical nature of null routing their arguments would have been dismissed as unsupported attorney arguments. Fed. R. Civ. P. 59(e) and 60(b)(1) support a Movant submitting declarations with their motions to establish the mistake or manifest error of fact.

The District Court cited this Court's decisions of *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553 (9th Cir. 1987) and *Frederick S. Wyle Pro. Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985) in support of its decision to strike the David Cox declaration. ER-23. However, neither the *Trentacosta* nor the *Texaco* opinions state that the court below struck a declaration. Rather, in *Trentacosta*, this Court found that the District Court properly denied the Movant's motion for reconsideration that included affidavits because the Movant offered no excuse for not presenting them at that time of the hearing on the opposing party's motion to dismiss. *See Trentacosta*, 813 F.2d at 1557 n.4. Nonetheless, *Trentacosta* is not applicable because Petitioners offered an excuse – Petitioners stated that they could not have anticipated that the Court would misapprehend the meaning of null routing a connection. ER-65. This was not a case in which Petitioners completely failed in their burden to present evidence in response to a speaking motion to dismiss as in *Trentacosta*. *See id.* at 1558 (Explaining that a Plaintiff must present evidence outside the pleadings to support

jurisdictional allegations in response to a speaking motion to dismiss for lack of subject matter jurisdiction).

In denying Petitioners' motion for reconsideration, the District Court asserted that Petitioners should have anticipated that the Court would reference a source they cited. ER-23. But no source cited by Petitioners analogized terminating an Internet connection to terminating a subscriber account or all Internet access as provided in §512(j)(1)(B)(i). The Court's analogy of terminating an Internet connection to terminating the service is like analogizing disconnecting outgoing phone calls on a telephone household phone line to terminating the account or all telephone service at a household. Petitioners could not anticipate the Court would make this egregious mistake.

The District Court's decision to strike the declaration of David Cox and keep its head in the sand as to its mistake of the true meaning of null routing and what Cox currently does to block access to infringing activity was an abuse of its discretion. Moreover, as discussed above, Cox did not have standing to file a motion to strike the declaration. Thus, the District Court committed legal error by considering Cox's motion to strike the declaration.

## CONCLUSION

For the foregoing reasons, the Court should hold that a DMCA subpoena can be issued to §512(a) service providers or, alternatively, that Cox is also a §512(d) service provider and reverse the District Court's Order quashing the DMCA subpoena. Alternatively, the Court should reverse and remand back to the District Court to conduct an evidentiary hearing on how long infringing material is stored on Cox's servers and whether Cox can disable access to infringing activity or links thereto without terminating the subscriber's Internet service.

Date: Sept. 10, 2024

Culpepper IP, LLLC

_/s/ Kerry S. Culpepper_
Kerry S. Culpepper

_Attorney for Appellant_
_Capstone Studios Corp._

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s) 24-3978**

The undersigned attorney or self-represented party states the following:

[x ] I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Kerry S. Culpepper **Date** ___September 10, 2024_

79

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) 24-3978**

I am the attorney or self-represented party.

**This brief contains <u>13,126</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Kerry S. Culpepper  **Date** _____September 10, 2024_____

80

# CERTIFICATE OF SERVICE

**9th Cir. Case Number(s) 24-3978**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent (per Court order), by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

| |
|---|
| Opening Brief |

**Signature** _s/ Kerry S. Culpepper__ **Date** ____September 10, 2024____
*(use "s/[typed name]" to sign electronically-filed documents)*

81