**Case No. 24-3978**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: SUBPOENA OF INTERNET SUBSCRIBERS TO COX
COMMUNICATIONS, LLC AND COXCOM LLC

CAPSTONE STUDIOS CORP.

*Petitioner and Appellant,*

*vs.*

COXCOM LLC

*Respondent and Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII
NO. 1:23-cv-00426 JMS-WRP
THE HONORABLE J. MICHAEL SEABRIGHT

**BRIEF OF *AMICI CURIAE* MOTION PICTURE ASSOCIATION, INC.
AND RECORDING INDUSTRY ASSOCIATION OF AMERICA
IN SUPPORT OF NEITHER PARTY**

MUNGER, TOLLES & OLSON LLP

Kelly M. Klaus
kelly.klaus@mto.com
Shannon Aminirad
shannon.aminirad@mto.com
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
(415) 512-4000

Rose Leda Ehler
rose.ehler@mto.com
Oliver L. Brown
oliver.brown@mto.com
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
(213) 683-9100

Attorneys for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Motion Picture Association, Inc. ("MPA") is a not-for-profit trade association. The MPA's members are Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. The MPA does not have any parent companies, and no publicly held company owns 10% or more of the MPA.

The Recording Industry Association of America ("RIAA") is a nonprofit corporation that does not have a parent corporation, is not owned in any part by a publicly held corporation, and is not a government entity.

i

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF *AMICI CURIAE* ...................................................1

ARGUMENT ...........................................................................................................3

I.  INTRODUCTION ..........................................................................................3

II.  CONGRESS IN THE DMCA CAREFULLY BALANCED THE RIGHTS AND RESPONSIBILITIES OF COPYRIGHT OWNERS AND SERVICE PROVIDERS ...........................................................................5

    A.  The DMCA Implements A Shared System Of Responsibility And Cooperation For Online Copyright Infringement ........................5

    B.  Section 512 Reflects A Compromise:  ISPs Are Eligible For Certain Safe Harbors, But They Must Assist Copyright Owners In Identifying Infringers ......................................................................7

        1.  ISPs Advocated For And, In Infringement Litigation, May Avail Themselves Of Limitations On Monetary Liability If They Satisfy The Requirements In 512(a)-(d) .........7

        2.  In Exchange For Limitations On Liability, Section 512(h) Ensures ISPs Cooperate With Copyright Owners To Identify Infringers ...................................................................9

III.  COPYRIGHT OWNERS USE SECTION 512(h) SUBPOENAS TO PROTECT THEIR SUBSTANTIAL ECONOMIC INVESTMENT AND COMBAT DIGITAL PIRACY ..........................................................11

    A.  Amici's Members Invest Substantial Resources In Their Creative Works And Depend On Congressionally-Authorized Means Of Combating The Infringement Of Those Works ................11

    B.  Section 512(h) Is An Important Tool In Amici's Efforts To Combat Online Copyright Infringement ...........................................14

IV.  THE DISTRICT COURT'S CATEGORICAL STATEMENTS ABOUT THE SCOPE OF SECTION 512(d) WERE UNNECESSARY AND ERRONEOUS .....................................................19

    A.  The Limited Record Before The District Court Concerned Only Section 512(a) ...........................................................................19

    B.  The District Court Erroneously Interpreted And Applied Section 512(d) In The Context Of An Insufficient Record ................21

1.    The District Court Failed To Analyze Section 512 Activities In The Specific Context Of A Service Provider's Business................................................21

2.    The District Court Erroneously Assumed That The Same Service Provider Activity Cannot Qualify For More Than One Section 512 Safe Harbor...................................25

3.    The District Court Imposed Extra-Statutory Requirements Onto Subsection 512(d)...................................27

4.    Litigation Regarding The Service Provider's Liability Presents A Better Vehicle For Deciding The Scope Of A 512 Subsection...................................................28

V.    CONCLUSION .................................................................31

iii

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
    No. C 99-05183 MHP, 2000 WL 573136 (N.D. Cal. May 12,
    2000) .................................................................................................22, 23, 27

*Amazon Content Servs. LLC, et al. v. Freemon*,
    No. 3:24-cv-00733-L (N.D. Tex.) ...................................................................16

*Amazon Content Servs. LLC, et al. v. Set Broad., LLC*,
    No. 2:18-cv-03325 (C.D. Cal. July 31, 2019)..................................................16

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018)........................................................................4, 30

*In re Charter Communications, Inc., Subpoena Enforcement Matter*,
    393 F.3d 771 (8th Cir. 2005)..............................................................................4

*Columbia Pictures Indus., Inc., et al. v. Galindo*,
    No. 2:20-cv-03129, 2020 WL 3124347 (C.D. Cal. May 11, 2020)...................16

*Columbia Pictures Indus., Inc. v. Fung*,
    No. CV 06-5578 SVW(JCx), 2009 WL 6355911 (C.D. Cal. Dec.
    21, 2009), aff'd in relevant part as modified, 710 F.3d 1020 (9th
    Cir. 2013)..........................................................................................................23

*Columbia Pictures Indus., Inc. v. Galindo*,
    No. 2:20-cv-03129-MEMF, 2022 WL 17094713 (C.D. Cal. Nov.
    18, 2022)............................................................................................................17

*Cox Comms., Inc. v. Sony Music Enter., Inc.*,
    No. 24-171 (U.S. 2024)......................................................................................4

*Disney Enters., Inc., et al. v. TTKN Enters., LLC*,
    No. 2:20-cv-07274 (C.D. Cal. Sept. 8, 2020) ..................................................16

*Disney Enters., Inc., et al. v. VidAngel Inc.*,
    No. 2:16-cv-04109 (C.D. Cal. Sept. 5, 2019) ..................................................16

iv

*In re: DMCA 512(h) Subpoena to Discord, Inc.*,
  No. 1:23-mc-00062 (D.D.C. Jun. 14, 2023) ....................................................17

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004)......................................................................6, 9

*Green v. Miss United States of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022)......................................................................3, 27

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
  873 F.3d 1045 (9th Cir. 2017)..........................................................................6

*Netflix Studios, LLC, et al. v. Dragon Media Inc.*,
  No. 2:18-cv-00230 (C.D. Cal. Jan. 29, 2019)................................................16

*Paramount Pictures Corp., et al. v. Omniverse One World Television, Inc.*,
  No. 2:19-cv-01156 (C.D. Cal. Nov. 14, 2019) ...............................................16

*Paramount Pictures Corp. v. Does*,
  No. 2:21-cv-09317-MCS-SK, 2022 WL 17886018 (C.D. Cal. Aug.
  26, 2022)........................................................................................................17

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007)........................................................................29

*Perfect 10, Inc. v. Google, Inc.*,
  No. CV 04-9484 AHM, 2010 WL 9479059 (C.D. Cal. July 26,
  2010) .........................................................................................................22, 23

*Recording Industry Association of America, Inc. v. Verizon Internet
  Services., Inc.*,
  351 F.3d 1229 (D.C. Cir. 2003) ..................................................................4, 24

*Totally Her Media, LLC v. BWP Media USA, Inc.*,
  No. CV 13-08379-AB (PLAx), 2015 WL 12659912 (C.D. Cal.
  Mar. 24, 2015) ...........................................................................................23, 28

*Universal City Studios Prods. LLLP, et al. v. TickBox TV LLC*,
  No. 2:17-cv-07496 (C.D. Cal. Sept. 12, 2018) ...............................................16

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019)..........................................................................27

*Warner Bros. Ent. Inc., et al. v. Tusa*,
No. 2:21-cv-05456, 2021 WL 4815947 (C.D. Cal. Aug. 16, 2021) ...................16

**FEDERAL STATUTES**

17 U.S.C. § 512 ...............................................................................*passim*

17 U.S.C. § 512(a) ..........................................................................*passim*

17 U.S.C. § 512(b) ...............................................................................8, 30

17 U.S.C. § 512(c) ....................................................................................8

17 U.S.C. § 512(d) .........................................................................*passim*

17 U.S.C. § 1201(a)(3) ..............................................................................8

17 U.S.C. § 1201(b)(2) ..............................................................................8

17 U.S.C. § 512(b)(2)(E) ...........................................................................9

17 U.S.C. § 512(c)(1)(C) ...........................................................................9

17 U.S.C. § 512(d)(1)(C) ...........................................................................9

17 U.S.C. § 512(h) .........................................................................*passim*

17 U.S.C. § 512(h)(2) ..............................................................................11

17 U.S.C. § 512(h)(4) ..............................................................................11

17 U.S.C. § 512(h)(5) ..............................................................................11

17 U.S.C. § 512(i)(1)(A) ............................................................................9

17 U.S.C. § 512(n) ...................................................................................25

**FEDERAL RULES**

Federal Rule of Appellate Procedure, Ninth Circuit Rule 29-3 ...............2

Federal Rule of Appellate Procedure 29(a)(2) .........................................2

Federal Rule of Appellate Procedure 29(a)(4)(E) ....................................1

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105-551(I) (1998) ..........................................................................7

S. Exec. Rep. No. 105-25 (1998) ..........................................................................6

S. Rep. No. 105-190 (1998) ...................................................................*passim*

The Copyright Infringement Liability of Online and Internet Service
   Providers: Hearing on S. 1146 Before the Senate Comm. on the
   Judiciary, 105th Cong. 45-55 (1997)................................................................7

Hearing on H.R. 2281 and 2280, *reprinted in* William H. Manz,
   Federal Copyright Law: The Legislative Histories of the Major
   Enactments of the 105th Congress (1997)........................................................10

Testimony of Karyn A. Temple, Digital Copyright Piracy: Protecting
   American Consumers, Workers, and Creators, Hearing Before H.
   Judiciary Comm. on Courts, Intellectual Property, and the Internet,
   https://judiciary.house.gov/sites/evo-subsites/republicans-
   judiciary.house.gov/files/evo-media-document/temple-
   testimony.pdf ..................................................................................... 14, 15, 24

WIPO Copyright Treaties Implementation Act and Online Copyright
   Liability Limitation Act: Hearing on H.R. 2281 and 2280 Before
   the Subcomm. on Courts and Intellectual Property of the House
   Comm. on the Judiciary, 105th Cong. 22-25 (1997)..........................................7

**OTHER AUTHORITIES**

2022 Review of Notorious Markets for Counterfeiting and Piracy
   (2022) ..........................................................................................................11

2023 Review of Notorious Markets for Counterfeiting and Piracy 17
   (2023) ..........................................................................................................13

Alliance for Creativity & Entertainment, Movie & TV Piracy Trends
   Worldwide (2022)........................................................................................12, 13

Billboard, RIAA Cracks Down on AI Voice Group on Discord:
   'Undermines The Entire Music Ecosystem,' (Jun. 22, 2023) .....................16, 17

Digital Citizens Alliance, Fishing in the Piracy Stream: How the Dark Web of Entertainment Is Exposing Consumers to Harm (Apr. 2019) ..................................................................................................15

Digital Citizens Alliance, Giving Piracy Operators Credit: How Signing Up for Piracy Subscription Services Ratchets Up the User Risk of Credit Card Theft and Other Harms (June 2023) ................................15

Digital Citizens Alliance, Money for Nothing: The Billion-Dollar Pirate Subscription IPTV Business (Aug. 2020) ..............................................14

IFPI, Engaging with Music Report (2023) ............................................................12

Motion Picture Association, The American Motion Picture and Television Industry: Creating Jobs, Trading Around the World (2021) ..................................................................................................12

National Intellectual Property Rights Coordination Center, Motion Picture Association Signs Up to Assist the IPR Center with Anti-Piracy Effort (2020) ..................................................................15, 16

RIAA, Press Statement, IPR Center, RIAA Launch Partnership to Combat Digital Piracy (Apr. 21, 2022) ............................................................16

RIAA, U.S. Music Revenue Database, Year-End 2022 RIAA Revenue Statistics, Recorded Music Revenues by Format, Adjusted for Inflation in 2023 Dollars ..............................................................................12

U.S. Chamber of Commerce, Impacts of Digital Video Piracy on the U.S. Economy (June 2019) ..............................................................................13

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are the Motion Picture Association, Inc. and the Recording Industry Association of America. Amici are industry associations that represent the interests of copyright holders in creative works.

*Amicus* **Motion Picture Association, Inc.** ("MPA") is a not-for-profit trade association founded in 1922. The MPA serves as the voice and advocate of the film and television industry, advancing the business and art of storytelling, protecting the creative and artistic freedoms of storytellers, and bringing entertainment and inspiration to audiences worldwide. The MPA's members are Netflix Studios, LLC, Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, and Warner Bros. Entertainment Inc. These entities and their affiliates are the leading producers and distributors of filmed entertainment in the United States.

*Amicus* **Recording Industry of America** ("RIAA") is a nonprofit trade organization comprised of several hundred companies—ranging from small artist-owned labels to global businesses—that collectively create, manufacture, and/or

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), amici confirm that no party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no person other than amici, amici's members, or their counsel contributed money intended to fund the preparation or submission of this brief.

distribute the majority of sound recordings in the United States. RIAA supports and promotes the creative and commercial vitality of music labels in the United States by, among other things, working to protect the intellectual property rights of artists and record labels.

Amici's members make substantial creative and financial investments in their copyrighted works. They depend upon the protection and enforcement mechanisms afforded by the Copyright Act, including the Digital Millenium Copyright Act ("DMCA"), to safeguard their works from online piracy and the harms it causes. The MPA and RIAA have a strong interest in the proper application of the DMCA, including the interpretation of the statute's so-called "safe harbor" limitations on liability and the subpoena right that Congress granted copyright holders in 17 U.S.C. § 512(h).

Amici file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). In accordance with Circuit Rule 29-3, amici represent that all parties have consented to filing.

## <u>ARGUMENT</u>

**I.      INTRODUCTION**

The district court here had to answer just one question:  did petitioners satisfy the requirements of 17 U.S.C. § 512(h) in order to justify a subpoena commanding Cox to identify a customer that petitioners claimed was engaged in infringing activity?

In light of the particular record before the district court, the answer to that narrow question may be no.  The district court, however, did not limit itself to the narrow question.  The court instead attempted to provide broad answers to interpretive questions regarding an entirely different provision of the DMCA, 17 U.S.C. § 512(d), where the answers did not have any support in the record evidence.  It is axiomatic that "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 796 (9th Cir. 2022) (citation omitted).  That principle is particularly apposite in this case, given the paucity of the record and the manner in which this subpoena dispute developed. With all due respect to the district court, amici respectfully urge this Court to resolve this appeal on much narrower grounds than the district court did.

Specifically, amici submit that the district court could have quashed (or not quashed) the subpoena based on the record before it that entirely addressed

3

whether Cox's services vis-à-vis the objecting customer might have been within the scope of section 512(a)[2]; the district court likewise could have concluded that it had an insufficient record to address issues regarding the scope of section 512(d). By instead addressing the section 512(d) issues, including by making conclusions based on the unsubstantiated assertions and arguments in Cox's briefs, the district court went well beyond what this record supported.[3] Most notably, the district court suggested that IP addresses may never function as "reference[s] or link[s]" within the meaning of the section 512(d) safe harbor. ER 134. There was no need for the district court to reach such a categorical conclusion, which resulted from

---

[2] Amici take no position on the district court's decision that the particular Cox services described in the admissible record evidence might be eligible for the section 512(a) safe harbor. ER 121–27. Amici likewise take no position in this brief on whether *Recording Industry Association of America, Inc. v. Verizon Internet Services., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003), and *In re Charter Communications, Inc., Subpoena Enforcement Matter*, 393 F.3d 771 (8th Cir. 2005), were correctly decided.

[3] Cox did not timely object to the subpoena and in fact *complied* with the subpoena. ER 74. By the time Cox filed a "response," petitioners' opportunity to timely introduce evidence had passed. *See* ER 163–71; *see also* ER 74. The timing and circuitous manner by which Cox injected its "response" (not objection) both serves as an explanation for how the record developed and raises questions regarding Cox's legal interests in this issue. Cox, it should be noted, is a defendant-appellant in other, higher-stakes cases, where Cox's safe-harbor eligibility under the DMCA and related standards of secondary copyright liability have been squarely in issue. *See, e.g.*, *Cox Comms., Inc. v. Sony Music Enter., Inc.*, No. 24-171 (U.S.) (petition for cert. filed Aug. 15, 2024); *see also BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 298 (4th Cir. 2018) (holding Cox was not entitled to the safe harbor defense).

4

erroneous interpretations of complex issues regarding eligibility for the section 512(d) safe harbor.

Amici urge this Court to decide this appeal on narrower grounds. Congress intended for the section 512(h) subpoena to be an important tool for combating the devastating harms of infringement occurring in the context of constantly evolving internet technologies. The breadth of the district court's erroneous and unnecessary conclusions could imperil efforts by copyright holders, in other factual contexts, to make proper use of the section 512(h) subpoena procedure.

## II. CONGRESS IN THE DMCA CAREFULLY BALANCED THE RIGHTS AND RESPONSIBILITIES OF COPYRIGHT OWNERS AND SERVICE PROVIDERS

### A. The DMCA Implements A Shared System Of Responsibility And Cooperation For Online Copyright Infringement

When Congress considered and enacted the DMCA in the late 1990s, the internet was still in its relatively nascent stages. Congress recognized that the internet would give rise to incredible opportunities but also incredible risks. One of those risks was the emerging internet's potential to facilitate infringement on a previously unimaginable scale. Through the DMCA, Congress sought to "adapt [copyright laws] in order to make digital networks safe places to disseminate and exploit copyrighted materials." S. Rep. No. 105-190, at 2 (1998); *see id.* at 8. Congress and stakeholders from across the spectrum worked to balance the goals

of promoting investment in the internet by internet service providers ("ISPs") and the protection of rights secured by copyright.

Congress ultimately settled on a system of shared responsibility and cooperation to combat online copyright infringement. *Id.* at 2, 7, 9. The ISP industry itself acknowledged that the task of combating internet copyright piracy would have to be one of "joint responsibility between copyright owners and ISPs." S. Exec. Rep. No. 105-25, at 43 (1998) (statement of Roy Neel, President and Chief Executive Officer, United States Telephone Association).

The purpose of section 512 is to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment" and "provide certainty for copyright owners and Internet service providers with respect to copyright infringement liability online." S. Rep. No. 105-190, at 2, 40; *see also Ellison v. Robertson*, 357 F.3d 1072, 1076–77 (9th Cir. 2004) (describing how DMCA "endeavors to facilitate cooperation" among service providers and copyright owners). The statute "strikes a balance" between the interests of copyright owners, ISPs, and the public to promote the goals of copyright law. *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1051–52 (9th Cir. 2017). In exchange for limiting the "liability faced by service providers who transmit potentially infringing material over their networks," Congress provided

6

the creative industries with balanced remedies and tools that made the risks of digital copyright infringement more manageable, including through notice-and-takedown procedures and a subpoena power to identify infringers. S. Rep. No. 105-190, at 2, 40.

**B. Section 512 Reflects A Compromise: ISPs Are Eligible For Certain Safe Harbors, But They Must Assist Copyright Owners In Identifying Infringers**

Section 512 of the DMCA provides a functional, fact-specific inquiry that reflects a careful balance of interests between ISPs and copyright owners.

**1. ISPs Advocated For And, In Infringement Litigation, May Avail Themselves Of Limitations On Monetary Liability If They Satisfy The Requirements In 512(a)-(d)**

Leading up to the passage of the DMCA, ISPs were concerned that traditional doctrines of copyright liability, including theories of contributory and vicarious infringement, exposed ISPs to potential liability for the infringing conduct of their customers. *See* H.R. Rep. No. 105-551(I), at 11 (1998). Perhaps not surprisingly, ISPs sought to introduce bills that would grant ISPs broad protection from claims arising from the infringing conduct of their users. *See The Copyright Infringement Liability of Online and Internet Service Providers: Hearing on S. 1146 Before the Senate Comm. on the Judiciary*, 105th Cong. 45-55 (1997); *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and 2280 Before the Subcomm. on*

7

*Courts and Intellectual Property of the House Comm. on the Judiciary*, 105th Cong. 22-25 (1997).

"Rather than embarking on a wholesale clarification of" the various doctrines of copyright liability, Congress instead opted "to leave current law in its evolving state and, instead, to create a series of 'safe harbors,' for certain common activities of service providers." S. Rep. No. 105-190, at 19. Congress took a function-based approach to outlining these "safe harbors" by identifying "general categories" of service providers' activities.[4] *Id.* A service provider may be protected from liability, assuming certain statutory criteria are met, for

(1) "transmitting, routing, or providing connections," 17 U.S.C. § 512(a);

(2) "intermediate and temporary storage of material," i.e., system caching, *id.* § 512(b);

(3) "storage at the direction of a user," *id.* § 512(c); and

(4) "referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link," *id.* § 512(d).

---

[4] The DMCA's legal framework was intentionally drafted to adapt to new technologies and means of online distribution. Congress noted that "[c]opyright laws have struggled through[out] the years to keep pace with emerging technology" and that "[w]ith this constant evolution in technology, the law must adapt." S. Rep. No. 105-190, at 2; *see also id.* at 15 (envisioning "the rapid and dynamic development of better technologies" in discussing the DMCA's anti-circumvention provisions). Accordingly, the DMCA, including section 512, focuses on function in describing categories of technologies and services, rather than attempting to catalogue every possible type. *See, e.g.*, 17 U.S.C. §§ 512(a)–(b), 1201(a)(3), 1201(b)(2).

8

These safe harbors limit a service provider's monetary liability, if other conditions are met, in cases where the service provider might otherwise "be liable under existing principles of law." *Ellison*, 357 F.3d at 1077 (quoting S. Rep. No. 105-190, at 19) (emphasis omitted).

The DMCA also provides statutory incentives for service providers to exercise their shared responsibility for combatting the infringing activity their services may facilitate. For example, to qualify for three of the four safe harbors, service providers must act to remove or block access to infringing material or activity upon becoming aware of it, including through the DMCA's "notice-and-takedown" process. 17 U.S.C. §§ 512(b)(2)(E), (c)(1)(C), (d)(1)(C). To take another example, a service provider wishing to qualify for any of the safe harbors must adopt, reasonably implement, and inform subscribers and account holders of a policy for terminating the accounts of repeat infringers. *Id*. § 512(i)(1)(A). If an ISP *does not* respond to takedowns or implement such a policy, then it might lose safe harbor protection for itself. *Id.*

> **2.     In Exchange For Limitations On Liability, Section 512(h) Ensures ISPs Cooperate With Copyright Owners To Identify Infringers**

Section 512(h) is another critical component of the DMCA's framework for cooperation and shared responsibility. The statute accomplishes this goal by providing copyright owners with a tool to combat online copyright infringement:

subpoenas to service providers for the purpose of identifying the underlying direct infringers. *See* S. Rep. No. 105-190, at 51 (describing the purpose of this provision as "creat[ing] a procedure by which copyright owners or their authorized agents . . . may obtain an order for identification of alleged infringers who are users of a service provider's system or network").

In the hearings preceding the statute's enactment, copyright owners emphasized the importance of incentivizing service providers to identify those customers suspected of infringement. *See, e.g.*, Hearing on H.R. 2281 and 2280, *reprinted in* William H. Manz, Federal Copyright Law: The Legislative Histories of the Major Enactments of the 105th Congress (1997), at 77 (statement of Robert W. Holleyman II, President, Business Software Alliance) (urging Congress to "provide incentives for service providers to share information, under appropriate circumstances, about the infringer's identity"); *id.* at 177 (statement of Ronald G. Dunn, President, Information Industry Association) (urging Congress to "condition reduced liability for infringement on the access or service provider's willingness to reveal the names of users that violate copyright and to preclude repeat offenders from accessing their services").

Congress intended the DMCA subpoena process to be conducted "quickly" so as to provide an expeditious way for copyright owners to discover underlying direct infringers. S. Rep. No. 105-190, at 51. Section 512(h) permits copyright

10

owners to "request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer." 17 U.S.C. § 512(h). Under this procedure, the copyright owner or agent files three documents with the clerk of the district court: a copy of the subsection (c)(3)(A) notification, a proposed subpoena, and a sworn declaration that the purpose of the order is to obtain the identity of an alleged infringer and that the information obtained will only be used to protect the owner's copyrights. *Id.* § 512(h)(2). Upon receipt, the clerk "shall expeditiously issue and sign the proposed subpoena." *Id.* § 512(h)(4). The service provider in turn shall "expeditiously" disclose the information requested by the subpoena. *Id.* § 512(h)(5).

## III. COPYRIGHT OWNERS USE SECTION 512(h) SUBPOENAS TO PROTECT THEIR SUBSTANTIAL ECONOMIC INVESTMENT AND COMBAT DIGITAL PIRACY

### A. Amici's Members Invest Substantial Resources In Their Creative Works And Depend On Congressionally-Authorized Means Of Combating The Infringement Of Those Works

The MPA's and RIAA's members create many of the world's most popular and critically acclaimed motion pictures, television programs, and sound recordings. Beyond their inherent artistic and entertainment value, these copyrighted works contribute substantially to the U.S. economy. In 2019, copyright-intensive industries added $1.3 trillion to the U.S. economy and directly employed over 6.6 million workers. Office of the U.S. Trade Representative, 2022

11

Review of Notorious Markets for Counterfeiting and Piracy 5 (2022). The American film and television industry alone supports 2.4 million jobs and pays $186 billion in total wages. Motion Picture Association, The American Motion Picture and Television Industry: Creating Jobs, Trading Around the World (2021).

Piracy poses a significant threat to the creative marketplace and to the U.S. economy. It is common knowledge that the recorded music industry's revenues plummeted between the years 2000 and 2010 due to internet piracy, and still have not recovered when adjusting for inflation. *See* RIAA, U.S. Music Revenue Database, Year-End 2022 RIAA Revenue Statistics, Recorded Music Revenues by Format, Adjusted for Inflation in 2023 Dollars.[5] That problem has morphed but not abated. Nearly 30 percent of survey respondents (and over 40 percent for 16–24-year-olds) were willing to admit that stream ripping and other forms of infringement were a way they listen to music. IFPI, Engaging with Music Report (2023).[6]

On the motion picture side, there were approximately 14.7 billion visits to film and television piracy sites in 2022. Alliance for Creativity & Entertainment,

---

[5] https://www.riaa.com/u-s-sales-database/.

[6] https://www.ifpi.org/wp-content/uploads/2023/12/IFPI-Engaging-With-Music-2023_full-report.pdf.

Movie & TV Piracy Trends Worldwide (2022).[7] Mass internet piracy is responsible for billions of dollars in lost revenues each year for the motion picture industry. U.S. Chamber of Commerce, Impacts of Digital Video Piracy on the U.S. Economy (June 2019).[8] And the effects of this piracy extend far beyond the members of the MPA and RIAA. The many individuals who depend for their livelihoods on the creation and distribution of motion pictures, television programs, and sound recordings are harmed in direct and tangible ways by the losses that this illicit activity causes.

The means for online infringement of motion picture content is constantly evolving. The infringing technology that Congress knew about when it enacted the DMCA has long-since been surpassed by new generations of illegal piracy services. The more modern forms of internet piracy include linking and streaming websites, direct-download cyberlockers, streaming-video hosting services, illegal internet-protocol TV (IPTV) services, piracy devices and apps, and peer-to-peer

---

[7] https://www.alliance4creativity.com/wp-content/uploads/2023/12/WDWK-2022-worldwide-071223.pdf.

[8] https://www.uschamber.com/technology/data-privacy/impacts-of-digital-piracy-on-the-u-s-economy. *See also* 2023 Review of Notorious Markets for Counterfeiting and Piracy 17 (2023) (reporting piracy cost the U.S. economy an estimated $29.2 billion in lost revenue), https://ustr.gov/sites/default/files/2023_Review_of_Notorious_Markets_for_Counterfeiting_and_Piracy_Notorious_Markets_List_final.pdf.

networks and BitTorrent protocols. *See, e.g.*, Digital Citizens Alliance, Money for Nothing: The Billion-Dollar Pirate Subscription IPTV Business (Aug. 2020).[9]

Mass infringement sites also utilize a variety of service-provider tools to facilitate their illicit activities. For example, infringing sites utilize reverse-proxy services and content-delivery networks to mask their IP address and the hosting provider of their website. Testimony of Karyn A. Temple, Digital Copyright Piracy: Protecting American Consumers, Workers, and Creators, Hearing Before H. Judiciary Comm. on Courts, Intellectual Property, and the Internet (hereinafter "Temple Testimony"), at 8.[10] Infringing sites' use of such services enables the sites to operate in anonymity, which significantly hinders efforts to enforce the law's requirements.

### B. Section 512(h) Is An Important Tool In Amici's Efforts To Combat Online Copyright Infringement

The MPA and RIAA have been forced to respond to the growth and evolution of online copyright infringement through sustained, coordinated, and large investments in antipiracy resources. The MPA alone employs nearly a hundred investigators who work to identify and devise strategies to attack a

---

[9] https://www.digitalcitizensalliance.org/clientuploads/directory/Reports/DCA-Money-for-Nothing-Report.pdf.

[10] https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/temple-testimony.pdf

complex underground web of bad actors engaged in online piracy. Temple
Testimony at 3. Their targets include stream-rippers—the modern equivalent of
bootleggers—who create perfect digital pirated copies of movies, TV shows, sound
recordings, or illicit live streams of TV channels; black-market distributors who
serve as kingpins, selling the illicit content; and downstream resellers who offer
myriad forms of unauthorized access to often-unwitting consumers at prices that
undercut the legitimate market and, in some cases, infect consumer devices with
malware or steal consumer identities. *See* Digital Citizens Alliance, Giving Piracy
Operators Credit: How Signing Up for Piracy Subscription Services Ratchets Up
the User Risk of Credit Card Theft and Other Harms 1–2 (June 2023)[11]; Digital
Citizens Alliance, Fishing in the Piracy Stream: How the Dark Web of
Entertainment Is Exposing Consumers to Harm 3–6 (Apr. 2019).[12] Both the MPA
and RIAA collaborate with the U.S. Immigration and Customs Enforcement,
Intellectual Property Rights Center (IPR Center) to stop the destructive economic
effects of online piracy. National Intellectual Property Rights Coordination
Center, Motion Picture Association Signs Up to Assist the IPR Center with Anti-

---

[11] https://www.digitalcitizensalliance.org/clientuploads/directory/Reports/Giving-Piracy-Operators-Credit.pdf

[12]
https://www.digitalcitizensalliance.org/clientuploads/directory/Reports/DCA_Fishing_in_the_Piracy_Stream_v6.pdf.

Piracy Effort (2020); RIAA, Press Statement, IPR Center, RIAA Launch

Partnership to Combat Digital Piracy (Apr. 21, 2022).[13]

Amici's tools in this enforcement endeavor are primarily legal ones. Efforts

include everything from DMCA takedown requests for infringements on legitimate

websites and platforms, to cease-and-desist letters, as well as legal action to stop

illegitimate websites and the individuals who operate them from continuing to

engage in defiant, for-profit copyright piracy.[14] As just one well-publicized

example, RIAA filed a DMCA subpoena to stop the rampant infringement

occurring on an anonymous Discord server known as "AI Hub." *See* Billboard,

RIAA Cracks Down on AI Voice Group on Discord: 'Undermines The Entire

---

[13] https://www.iprcenter.gov/news/motion-picture-association-signs-up-to-assist-the-ipr-center-with-anti-piracy-efforts; https://www.riaa.com/ipr-center-riaa-launch-partnership-to-combat-digital-piracy/.

[14] *See, e.g., Amazon Content Servs. LLC, et al. v. Freemon*, No. 3:24-cv-00733-L (N.D. Tex.) (ongoing); *Warner Bros. Ent. Inc., et al. v. Tusa*, No. 2:21-cv-05456, 2021 WL 4815947 (C.D. Cal. Aug. 16, 2021) (preliminary injunction); Preliminary Injunction, *Disney Enters., Inc., et al. v. TTKN Enters., LLC*, No. 2:20-cv-07274 (C.D. Cal. Sept. 8, 2020), ECF No. 27; *Columbia Pictures Indus., Inc., et al. v. Galindo*, No. 2:20-cv-03129, 2020 WL 3124347 (C.D. Cal. May 11, 2020) (preliminary injunction); Permanent Injunction, *Paramount Pictures Corp., et al. v. Omniverse One World Television, Inc.*, No. 2:19-cv-01156 (C.D. Cal. Nov. 14, 2019), ECF No. 60; Permanent Injunction, *Amazon Content Servs. LLC, et al. v. Set Broad., LLC*, No. 2:18-cv-03325 (C.D. Cal. July 31, 2019), ECF No. 59; Permanent Injunction, *Netflix Studios, LLC, et al. v. Dragon Media Inc.*, No. 2:18-cv-00230 (C.D. Cal. Jan. 29, 2019), ECF No. 59; Permanent Injunction, *Disney Enters., Inc., et al. v. VidAngel Inc.*, No. 2:16-cv-04109 (C.D. Cal. Sept. 5, 2019), ECF No. 520; Permanent Injunction, *Universal City Studios Prods. LLLP, et al. v. TickBox TV LLC*, No. 2:17-cv-07496 (C.D. Cal. Sept. 12, 2018), ECF No. 72.

Music Ecosystem,' (Jun. 22, 2023).[15]  A group of thousands of anonymous individuals were using the server, hosted by Discord, to upload unauthorized copies of recorded music.  *Id.*  DMCA subpoenas were crucial in bringing a quick and cost-effective end to the infringement.[16]

The anonymity of the internet presents a serious challenge to content creators' efforts to combat online copyright infringement.  Online leakers of newly released albums and movies are notoriously anonymous and hard to both track down and prosecute.  Infringers often operate under aliases and behind proxies. *See, e.g.*, *Columbia Pictures Indus., Inc. v. Galindo*, No. 2:20-cv-03129-MEMF (GJSx), 2022 WL 17094713, at *2 (C.D. Cal. Nov. 18, 2022) (describing how website operators took steps to "hide their tracks" and conceal their identities). Once one infringing service is shut down, anonymous operators can simply rebrand and launch a new service.  *See, e.g.*, *Paramount Pictures Corp. v. Does*, No. 2:21-cv-09317-MCS-SK, 2022 WL 17886018, at *1–2 (C.D. Cal. Aug. 26, 2022) (new "HydraWire" website launched one day after court issued injunction targeting PrimeWire website).

---

[15] https://www.billboard.com/pro/ai-voice-group-discord-riaa-copyright-infringement/.

[16] *In re: DMCA 512(h) Subpoena to Discord, Inc.*, No. 1:23-mc-00062 (D.D.C. Jun. 14, 2023).

Section 512(h) subpoenas are particularly important for combating piracy given the anonymity the internet otherwise provides to infringing sites. Section 512(h) subpoenas are an effective, and often the only, practical means of identifying online copyright pirates. Many service providers receive section 512(h) subpoenas on a regular basis and have developed streamlined procedures to provide a fast and accurate response.

Copyright owners use section 512(h) subpoenas to obtain information from a range of ISPs providing a range of functions to their users. The ISPs may include social media, domain registrars, reverse proxy services, or hosting services. The functions provided also vary, but they include linking and reference tools that mask an infringer's identity. Often the only services that know the infringer's identity are the intermediary service provider. This, of course, is intentional. The infringers know they are providing unauthorized copies of movies, TV shows, and sound recordings to the public for their own financial benefit and to the detriment of the copyright owner. They therefore use such services to intentionally shield their identity.

**IV. THE DISTRICT COURT'S CATEGORICAL STATEMENTS ABOUT THE SCOPE OF SECTION 512(d) WERE UNNECESSARY AND ERRONEOUS**

    **A.    The Limited Record Before The District Court Concerned Only Section 512(a)**

The proceedings below began with petitioners' subpoena to Cox under section 512(h) seeking identifying information for infringing BitTorrent users. ER 229–33. An anonymous "John Doe" objected via letter, and the court interpreted the letter as a motion to quash the subpoena to Cox. ER 223, 225. At that point, petitioners did not withdraw the subpoena as to "John Doe" (though they did later, ER 85), but opposed the motion on the grounds raised in the letter, ER 218–22. Petitioners then objected to the magistrate's findings and recommendation which considered whether the subpoena was validly issued and quashed it as to all IP addresses listed. ER 185–99, 200–15.

Although it had not objected to the subpoena, Cox submitted a "response" to petitioners' objection. Cox said it was doing this to "correct the record in certain respects" because, Cox argued, petitioners had "urge[d] the Court to make 'factual' findings that [were] based on unsupported speculation." ER 163–71. Cox argued that petitioners had failed to meet their evidentiary burden, but it did not submit evidence to support its assertion that "IP addresses, standing alone, are [not] 'information location tools' within the meaning of 17 U.S.C. § 512(d)." *Id.*

19

The district court ordered Cox to file additional evidentiary proof to show that Cox "falls (or does not fall) under 17 U.S.C. § 512(a)." ER 129. Cox's evidence, a declaration from its Chief Compliance and Privacy Officer, stated in highly general terms that Cox's provision of IP addresses satisfied the statutory elements listed in section 512(a). ER 146–49 (Hall Declaration). The Court did not require Cox to submit evidence regarding whether its services might fall within the scope of section 512(d). *See* ER 150–52. And the declaration that Cox provided did not speak to section 512(d). ER 146–49. Specifically, the declaration speaks to Cox's "transmitting, routing, or providing connections," which is the activity in section 512(a); the declaration says nothing of "referring," "linking" or "information location tools," the activity in section 512(d).

With that record before it, the district court overruled petitioners' objections and quashed the subpoena. The district court's reasoning reflects it focused on analyzing subsection 512(h), but lost sight of the broader purpose and structure of section 512. ER 117–38. On a record devoid of any evidence from Cox, the district court offered factual findings and conclusions regarding how Cox's provision of IP addresses interplayed with P2P filesharing to render section 512(d) inapplicable. *Id.* The district court reiterated its ruling at the motion to reconsider stage and rejected petitioners' efforts to belatedly introduce expert evidence. ER 19–28.

In sum, the record before the district court developed in a highly abbreviated, unusual manner. This was not the sort of adversarial proceeding that provides grounds for factual findings regarding complex technology. And, as noted, the limited record concerned only section 512(a). Nothing in the record, including Cox's declaration, addressed section 512(d). *See* ER 146–49. The district court nevertheless proceeded to make broad conclusions about the scope of section 512(d) and all IP address technology.

### B. The District Court Erroneously Interpreted And Applied Section 512(d) In The Context Of An Insufficient Record

The district court specifically erred by attempting to bind a technology, like an IP address, to one particular category of section 512 activity: "[a]n IP address does not, in itself, constitute a 'directory, index, reference, pointer, or hypertext link.'" ER 134. The district court's bright-line rule erroneously indicated that IP addresses *never* constitute "links" within the meaning of section 512(d). The court's conclusion was overbroad and unnecessary, and likely wrong in at least some contexts outside of those presented in the record here.

### 1. The District Court Failed To Analyze Section 512 Activities In The Specific Context Of A Service Provider's Business

Contrary to the district court's claim that IP address technology itself can never constitute "links" under section 512(d), the statute makes clear that whether a particular activity falls under section 512(d) is a flexible inquiry that depends on

the specific facts of the particular case. Subsection (d) applies when ISPs "link" users "to an online location containing infringing material or infringing activity" via an "information location tool." 17 U.S.C. § 512(d). The statute defines "information location tool" broadly, by reference to a non-exclusive list of relevant technologies, "including a directory, index, reference, pointer, or hypertext link." *Id.* The DMCA generally was intended to provide flexibility in its application as technology evolved. Congress specifically envisioned that section 512(d) could encompass technologies other than those existing at the time, since the provision was "intended to promote the development of information location tools generally." S. Rep. No. 105-190, at 49. The district court here did not have sufficient factual information to decide categorically that IP addresses cannot involve linking or referring activity sufficient for section 512(d).

The handful of cases that have addressed section 512(d) have taken a flexible approach to that category. Rather than asking whether the alleged section 512(d) activity involves a traditional directory or link, these decisions have focused on whether the ISP's service *functionally* links end-users to infringement. *See, e.g.*, *A&M Recs., Inc. v. Napster, Inc.*, No. C 99-05183 MHP, 2000 WL 573136, at *5 (N.D. Cal. May 12, 2000) (discussing Napster's index and other tools as information location tools under section 512(d)); *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 AHM (SHx), 2010 WL 9479059, at *6 (C.D. Cal. July 26, 2010)

22

(discussing Google's Blogger service and web search caching feature as information location tools under section 512(d)); *Totally Her Media, LLC v. BWP Media USA, Inc.*, No. CV 13-08379-AB (PLAx), 2015 WL 12659912, at *9 (C.D. Cal. Mar. 24, 2015) (a web-based social discussion forum was an "information location tool" under section 512(d)); *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW(JCx), 2009 WL 6355911, at *16 (C.D. Cal. Dec. 21, 2009) (BitTorrent sites were "information location tools" under section 512(d)), *aff'd in relevant part as modified*, 710 F.3d 1020 (9th Cir. 2013).

Courts have repeatedly referred to "function" in analyzing section 512. In *A&M Records, Inc. v. Napster, Inc.*, for instance, the court reasoned that "Napster undisputedly performs some information location *functions*" by storing a transient list of files that each logged-on user wants to share and allowing users to search for other users' log-in names and receive notifications about other users. 2000 WL 573136, at *5 (emphasis added). Similarly, the court in *Perfect 10, Inc. v. Google, Inc.* reasoned that Google's Blogger service fell under section 512(d) to the extent it "*function[s]*" as an information location tool "by linking users to [infringing] content hosted on third-party websites." 2010 WL 9479059, at *6 (emphasis added).

Because the DMCA safe harbors address different categories of conduct, whether an activity concerning an IP address constitutes a mere "transmission"

23

under section 512(a) or a "link" under section 512(d) depends on how the IP address is used in the infringement at issue. In *Verizon*, the parties treated it as undisputed that Verizon's functionality was subject, if it all, to section 512(a), so the D.C. Circuit considered only Verizon's transmission activities. *See Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003). The district court decided that the P2P nature of BitTorrent technology meant Cox was not engaged in activity linking or referring under section 512(d). ER 132. There was not support for the district court's factual leap.

There are a range of situations where the use of an IP address may function as a "link" to an online location hosting infringing material or where infringing activity takes place. For example, many pirate websites utilize reverse-proxy services, which provide a server with a "proxy" address (akin to an IP address) that then links to the pirate website's own server. *See* Temple Testimony at 8. These services maintain an index or reference for the proxy, and parties engaged in illegal infringement use them to conceal the identities of the website operators. *See id*. In fact, Congress specifically intended for an "information location tool" under section 512(d) to include "a pointer that stands for *an Internet location or address*." S. Rep. No. 105-190, at 47 (emphasis added).

24

**2.    The District Court Erroneously Assumed That The Same Service Provider Activity Cannot Qualify For More Than One Section 512 Safe Harbor**

The district court's orders also did not account for the broader purpose and structure of section 512 and conflict with the statute's plain text. The district court reasoned that the same activity that qualifies under subsection 512(a) cannot also qualify under 512(d): "[i]f an ISP assigning an IP address is both 'providing connections for' infringement under (a) and 'referring or linking' to infringing material under (d)—as Petitioners contend—Congress would not have created two separate safe harbors." ER 133; *see also* ER 40. Concluding that Cox's services qualified under subsection 512(a), the district court erroneously determined subsection 512(d) could not apply.

The district court's reasoning was contrary to the statute's plain language. Section 512(n), which the district court did not cite, expressly states: "Whether a service provider qualifies for the limitation on liability in any one of th[e] subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection." 17 U.S.C. § 512(n). Section 512(n) thus makes clear that in the course of providing services, the service provider's activity may be subject to more than one safe harbor. Indeed, Congress provided an example where a service provider could qualify for multiple section 512 safe

25

harbors: where a "service provider . . . provides a hyperlink to a site containing infringing material which it then caches on its system in order to facilitate access to it by its users." S. Rep. No. 105-190, at 55. Congress reasoned that "[t]his service provider is engaging in at least three functions that may be subject to the limitation on liability: transitory digital network communications under subsection (a), system caching under subsection (b), and information location tools under subsection (d)." *Id.* Whether the service provider qualified for one of those liability limitations "has no effect on the determination of whether it qualifies for a separate and distinct liability limitation under another subsection of section 512." *Id.* at 56.

Even assuming that *Verizon* correctly interpreted section 512(h) where a subpoena is based only on account of a function described under section 512(a), the subpoena may be justified if the service provider activity falls under one of the other statutory safe harbors. Here, the evidence that Cox submitted went *only* to the question whether its assignment of IP addresses might be within the scope of section 512(a). ER 146–49. Cox did not submit evidence either establishing or refuting that its provision of IP addresses might also be within the scope of section 512(d). *Id.* The district court went well beyond the evidentiary record and what was necessary to decide the subpoena question by offering legal conclusions and making factual determinations that Cox's services could not *also* fall within the

26

scope of the subsection 512(d).  Amici submit the district court did not have to reach, and should not have addressed, the section 512(d) issues because they were not sufficiently developed.  *Green*, 52 F.4th at 796 ("[C]ourts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." (citation and internal quotation marks omitted)).

### 3. The District Court Imposed Extra-Statutory Requirements Onto Subsection 512(d)

The district court further erred by suggesting, in a footnote, that a service must provide "active assistance" in order to be a referring or linking service within the meaning of section 512(d).[17]  *See* ER 132 at n.6; ER 41 at n. 13.  Section 512(d) contains no such requirement.  Nor did the district court cite binding authority for the proposition that "active assistance" is required.  The district court cited *A&M Records, Inc. v. Napster*, 2000 WL 573136 (N.D. Cal. May 12, 2000), but that case from nearly a quarter-century ago, during the DMCA's nascent stages, was neither binding nor persuasive on the "active assistance" issue.  The *Napster* district court said there was such a requirement as an aside, and without any analysis.  2000 WL 573136, at *5.

---

[17] Petitioner's opening brief refers to this as a "volitional conduct" requirement. Br. 63–64.  That is even further afield, referencing proximate cause that is applied in cases involving secondarily liability.  *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (explaining volitional conduct "simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts").

The district court's citation to *Totally Her Media, LLC v. BWP Media USA, Inc.*, 2015 WL 12659912, No. CV 13-08379-AB (PLAx), (C.D. Cal. Mar. 24, 2015), further confuses the issue. That case does not say that the service provider at issue "*actively* 'referr[ed] or link[ed]'" to the infringement. ER 41 at n. 13. That court's holding was that "[t]he undisputed evidence further shows that the images in question were linked entirely by third-party users and [the service provider] did not review or approve any of the linked images prior to posting." *Totally Her Media*., 2015 WL 12659912, at *10. The district court's announcement of a requirement without support in text or well-reasoned case law underscores the dangers of making broad pronouncements about the scope of the DMCA safe harbors in the context of a truncated motion to quash proceeding.

### 4. Litigation Regarding The Service Provider's Liability Presents A Better Vehicle For Deciding The Scope Of A 512 Subsection

The procedural posture of a motion to quash a subpoena led the district court to its incorrect reading of the safe harbor subsections. Congress intended that litigation *against the service provider* would be the context for courts to analyze the scope of safe harbor protection. The question that section 512 asks is whether the service provider is potentially *liable* for infringement "*by reason of*" its providing a particular function. In other words, section 512 instructs courts to look, in context, at the service provider's role in the infringement at issue.

Here, the district court simply asked whether an IP address is an "information location tool."  ER 133–34.  The same question would be analyzed differently had this matter been decided on a complete record in the context of copyright infringement litigation against a service provider.  Such a court would ask whether the service provider may be liable "*by reason of the provider referring or linking users to an online location* containing infringing material or infringing activity, by using information location tools."  17 U.S.C. § 512(d) (emphasis added).  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007), illustrates how the context of infringement litigation is the better posture for analyzing the applicability of the relevant subsection.  CCBill, a payment processor, had been sued for copyright infringement in connection with infringing websites.  It argued that it could avail itself of the section 512(d) safe harbor because it displayed a hyperlink to access the websites after processing payment.  *Id.* at 1116.  The Ninth Circuit disagreed.  *Id.*  Section 512(d) did not apply because "[the plaintiff] Perfect 10 does not claim that CCBill infringed its copyrights by providing a hyperlink; rather, Perfect 10 alleges infringement through CCBill's performance of other business services for these websites."  *Id.* at 1117.

Since the applicability of section 512(d) depends on the basis for alleged liability, a motion to quash, divorced from these issues, is a poor vehicle to litigate the outer bounds of section 512(d).  By necessity, the evidence before the district

29

court on a subpoena is limited, and will not account for everything involved in determining whether a service provider qualifies for a safe harbor. *See* 17 U.S.C. § 512(h). In the context of litigation *against* that service provider, the parties have every incentive to develop a full record regarding the activity and function of the technology at issue.

\*     \*     \*

Given the complexity of the piracy landscape, the Court should limit its holding to the specific evidence (or lack of evidence) presented here. The record in this matter fails to support a broad conclusion that an IP address itself can never function as a "link" or "reference" within the meaning of section 512(d).

The posture of this case meant that petitioners litigated these issues reflexively and quickly in response to an individual John Doe "objection" construed as a motion to quash before the magistrate judge.[18] Indeed, Cox did not object to the subpoena before the district court, and Cox did not present any evidence regarding its eligibility for the safe harbor under subsection 512(d).[19] Only at the motion for reconsideration stage did petitioners try to introduce

---

[18] In contrast, Cox has spent years litigating complicated issues relating to the DMCA's safe harbors in other contexts. *See, e.g.*, *BMG Rights Mgmt.*, 881 F.3d at 298.

[19] It appears that Cox may want to have it both ways—invite this Court to rule that it need not respond to DMCA subpoenas, but reserve its ability to claim safe harbor protection under subsections 512(b)–(d) in other contexts.

30

evidence on these issues—which the district court did not consider.  ER 22–25,
86–93.  These limited facts do not support a broad conclusion about IP addresses
and the limits of section 512(d).

## V.    CONCLUSION

The piracy landscape is constantly evolving and continues to be a threat to
the MPA, RIAA, and their members.  Yet, the district court's holding on section
512(d) could prevent copyright owners from issuing section 512(h) subpoenas
against yet *other* kinds of intermediary services, such as reverse proxies and other
registrar tools, that are now often the best or only sources of information about
direct infringers of their works.  The Court should limit its holding to the specific
facts at issue in this case.


DATED:  September 17, 2024         MUNGER, TOLLES & OLSON LLP



By:    _____*/s/ Rose Leda Ehler*_____
              Rose Leda Ehler

Attorneys for *Amici Curiae*


31

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-3978

I am the attorney or self-represented party.

**This brief contains** 6,926 **words, including** 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Rose Leda Ehler **Date** 9/17/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form17instructions.pdf](http://www.ca9.uscourts.gov/forms/form17instructions.pdf)

**9th Cir. Case Number(s)** | 24-3978

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Rose Leda Ehler **Date** | September 17, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* [forms@ca9.uscourts.gov](mailto:forms@ca9.uscourts.gov)

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

| **9th Cir. Case Number(s)** | 24-3978 |
|---|---|

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

BRIEF OF AMICI CURIAE MOTION PICTURE ASSOCIATION, INC. AND RECORDING INDUSTRY ASSOCIATION OF AMERICA IN SUPPORT OF NEITHER PARTY

| **Signature** | s/ Rose Leda Ehler | **Date** | September 17, 2024 |
|---|---|---|---|

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15**                                                                 *Rev. 12/01/2018*