No. 24-3978

IN THE
# United States Court of Appeals for the Ninth Circuit

IN RE: SUBPOENA OF INTERNET SUBSCRIBERS OF
COX COMMUNICATIONS, LLC AND COXCOM, LLC

CAPSTONE STUDIOS CORP.,

*Petitioner-Appellant,*

MILLENNIUM FUNDING, INC., VOLTAGE HOLDINGS, LLC,

*Petitioners,*

*v.*

COXCOM LLC,

*Respondent-Appellee.*

On Appeal from the United States District Court for the
District of Hawaii
No. 1:23-cv-00426-JMS-WRP, Hon. J. Michael Seabright

## ANSWERING BRIEF FOR
## RESPONDENT-APPELLEE COXCOM LLC

Abigail Colella
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037

Rachael Jensen
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
200 West 6th Street, Suite 2250
Austin, TX 78701

Christopher J. Cariello
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Jennifer Golinveaux
Thomas J. Kearney
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111

*Counsel for Respondent-Appellee CoxCom LLC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, CoxCom

LLC hereby states it is a wholly-owned subsidiary of Cox

Communications, Inc. CoxCom LLC is not owned 10% or more by any

publicly held corporation.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Christopher J. Cariello*
Christopher J. Cariello
*Counsel for Respondent-Appellee*
*Coxcom LLC*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ............................................................................. 1

STATEMENT OF THE ISSUES ......................................................... 4

STATEMENT OF THE CASE ............................................................ 5

    The DMCA Provides A Streamlined Subpoena Procedure In Defined Circumstances. ............................................................. 5

    Capstone Serves Cox, A Conduit ISP, With A DMCA Subpoena. ................................................................................ 10

    The District Court Quashes The DMCA Subpoena. ..................... 12

    The District Court Denies Reconsideration And Strikes Capstone's Belatedly Submitted Evidence. .......................... 16

SUMMARY OF ARGUMENT .......................................................... 17

STANDARD OF REVIEW .............................................................. 21

ARGUMENT ................................................................................. 22

    I.    The District Court Correctly Quashed Capstone's DMCA Subpoena. ................................................................. 22

        A.    As the D.C. Circuit and Eighth Circuit have held, § 512(a) conduit ISPs are not proper recipients of § 512(h) subpoenas. ........................................ 23

            1.    The DMCA's text and structure establish that an effective § 512(h) subpoena cannot issue to an entity that only facilitates transitory communication. ................................ 23

            2.    Capstone's textual arguments do not support a contrary interpretation of the statute. ................................................ 29

3. Capstone's arguments about conduit ISPs' ability to disable access to content are irrelevant and wrong. ........................... 36

B. The district court correctly found that Cox acted as a § 512(a) "conduit" service provider. ...................... 43

C. The district court correctly rejected Petitioner's argument that conduit ISPs are § 512(d) service providers because they assign IP addresses. .............. 46

1. Assigning an IP address is not "referring" or "linking." ............................................. 47

2. Cox's assignment of IP addresses is not "using" an "information location tool[]." ............. 52

3. Capstone's arguments concerning Cox's ability to disable access to an IP address are irrelevant ............................................. 54

II. The District Court Did Not Abuse Its Discretion By Striking The Improper Factual Declaration Capstone Submitted With Its Motion To Reconsider. ........................ 57

III. The District Court Did Not Abuse Its Discretion By Permitting Cox To Participate. ............................................. 62

A. Capstone's waiver arguments are meritless ............... 63

B. Cox has "standing to participate." .............................. 69

CONCLUSION ....................................................................... 72

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
No. C 99-05183 MHP,
2000 WL 573136 (N.D. Cal. May 12, 2000) ....................................... 52

*Biodiversity Legal Found. v. Badgley*,
309 F.3d 1166 (9th Cir. 2002) ........................................................... 70

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
149 F. Supp. 3d 634 (E.D. Va. 2015) ................................................... 39

*Bond v. United States*,
564 U.S. 211 (2011) .......................................................................... 69

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) ............................................................. 58

*Cashner v. Freedom Stores, Inc.*,
98 F.3d 572 (10th Cir. 1996) ............................................................. 59

*In re Charter Commc'ns, Inc.*,
393 F.3d 771 (8th Cir. 2005) ...................................................... *passim*

*Cognosphere Pte. Ltd. v. X Corp.*,
No. 23-mc-80294-PHK,
2024 WL 4227594 (N.D. Cal. Sept. 18, 2024) ..................................... 64

*In re DMCA Subpoena to Reddit, Inc.*,
441 F. Supp. 3d 875 (N.D. Cal. 2020) ................................................. 64

*Does No. 1-6 v. Reddit, Inc.*,
51 F.4th 1137 (9th Cir. 2022) ........................................................... 35

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ................................................. 36, 41, 42

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ................................................................ 34

*GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*,
  51 F.4th 1092 (9th Cir. 2022) ............................................... 52

*Gov't of Virgin Islands v. Knight*,
  989 F.2d 619 (3d Cir. 1993) .................................................. 66

*In re Grand Jury Subpoena*,
  383 F.3d 905 (9th Cir. 2004)................................... 21, 22, 43

*Ingenuity13 LLC v. Doe*,
  651 F. App'x 716 (9th Cir. 2016) ........................................... 9

*Interscope Recs. v. Does 1-7*,
  494 F. Supp. 2d 388 (E.D. Va. 2007) ................................... 22

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  567 U.S. 298 (2012) ................................................................ 71

*Koerner v. Grigas*,
  328 F.3d 1039 (9th Cir. 2003)................................................ 40

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
  624 F.3d 1083 (9th Cir. 2010)................................................ 22

*Lenz v. Universal Music Corp.*,
  815 F.3d 1145 (9th Cir. 2016)................................................. 9

*McCoy v. Sw. Airlines Co.*,
  211 F.R.D. 381 (C.D. Cal. 2002) ........................................... 68

*Mount Hope Church v. Bash Back!*,
  705 F.3d 418 (9th Cir. 2012)................................................. 64

*Nat'l Cable Telecomms. Assn. v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ............................................................... 11

*Padilla-Ramirez v. Bible*,
  882 F.3d 826 (9th Cir. 2017)................................................. 30

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
  708 F.2d 492 (9th Cir. 1983)................................................................ 65

*Ready Transp., Inc. v. AAR Mfg., Inc.*,
  627 F.3d 402 (9th Cir. 2010)......................................................... 22, 58

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet*
  *Servs., Inc.*,
  351 F.3d 1229 (D.C. Cir. 2003) .................................................. *passim*

*Richmark Corp. v. Timber Falling Consultants*,
  959 F.2d 1468 (9th Cir. 1992)............................................................ 67

*Riley v. Filson*,
  933 F.3d 1068 (9th Cir. 2019)............................................................ 60

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ......................................................................... 36

*Seila Law LLC v. C.F.P.B.*,
  591 U.S. 197 (2020) ......................................................................... 69

*In re Subpoena Issued to Birch Commc'ns, Inc.*,
  No. 1:14-cv-3904-WSD,
  2015 WL 2091735 (N.D. Ga. May 5, 2015) ........................................ 22

*In re Subpoena to Univ. of N.C. at Chapel Hill*,
  367 F. Supp. 2d 945 (M.D.N.C. 2005) ........................................... 23, 44

*Sw. Airlines Co. v. Saxon*,
  596 U.S. 450 (2022) ......................................................................... 54

*United States v. Anderson*,
  46 F.4th 1000 (9th Cir. 2022) ............................................................ 23

*United States v. Fiorillo*,
  186 F.3d 1136 (9th Cir. 1999)............................................................ 50

*United States v. Hord*,
  459 F.2d 1003 (9th Cir. 1972)............................................................ 58

*Well Go USA, Inc. v. Unknown Participants in Filesharing Swarm*,
No. 4:12-cv-00963,
2012 WL 4387420 (S.D. Tex. Sept. 25, 2012) ..................................... 22

*Wood v. Ryan*,
759 F.3d 1117 (9th Cir. 2014) ............................................................. 60

*Yousuf v. Samantar*,
451 F.3d 248 (D.C. Cir. 2006) ............................................................. 68

**Statutes**

Online Copyright Infringement Liability Limitation Act, 17 U.S.C.

§ 512(a) ............................................................... *passim*

§ 512(b) ............................................................... *passim*

§ 512(b)(2)(E) ............................................................... 25, 28

§ 512(c) ............................................................... *passim*

§ 512(c)(1)(A) ............................................................... 8

§ 512(c)(1)(C) ............................................... 8, 25, 27, 28, 35

§ 512(c)(3) ............................................................... 6, 8, 32

§ 512(c)(3)(A) ............................................................... *passim*

§ 512(c)(3)(A)(iii) ............................................... 8, 28, 34, 35

§ 512(d) ............................................................... *passim*

§ 512(d)(1)(C) ............................................................... 25

§ 512(d)(3) ............................................................... 28, 35

§ 512(e) ............................................................... 31, 32, 33

§ 512(g) ............................................................... 9, 26

§ 512(h) ............................................................ *passim*

§ 512(h)(1) ................................................................ 10

§ 512(h)(2)(A) ...................................................... 10, 25

§ 512(h)(3) ................................................................ 25

§ 512(h)(4) ...................................................... 10, 25, 28

§ 512(h)(5) ................................................................ 10

§ 512(h)(6) ................................................................ 66

§ 512(i) ............................................................... 39, 56

§ 512(j) ............................................................... 31, 39

§ 512(k)(1) ...................................................... 27, 30, 46

§ 512(m) ...................................................... 31, 32, 33

§ 512(n) .................................................................... 6

28 U.S.C. § 2111 ...................................................... 63

## Rules and Regulations

Fed. R. Civ. P. 45 ................................................ 63, 66

Fed. R. Civ. P. 45(d) ................................................ 65

Fed. R. Civ. P. 45(d)(2)(B) ................................ 21, 64, 65

Fed. R. Civ. P. 59(e) .......................................... 58, 59, 60

Fed. R. Civ. P. 60(b) .................................................. 59

Fed. R. Civ. P. 60(b)(1) ...................................... 58, 59

Fed. R. Civ. P. 60(b)(6) .............................................. 60

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The
 Interpretation of Legal Texts* (2012) ..................................................... 54

H.R. Rep. No. 105-551, pt. 2 (1998) .......................................... 6, 7, 48, 66

Oxford Dictionary of English (3d ed. 2010) ............................................ 11

## INTRODUCTION

This case turns on a straightforward statutory interpretation question under the Digital Millenium Copyright Act (DMCA). At issue is 17 U.S.C. § 512(h), which creates an alternative, process-lite subpoena procedure for rightsholders to learn the identities of online infringers. The question is whether such subpoenas may issue to "conduit" internet service providers (ISPs)—entities that merely provide basic internet connections that transmit data from point A to point B— or whether a rightsholder must instead use ordinary subpoena procedures. The district court joined the two circuits that have addressed this question in correctly holding that DMCA subpoenas are not available against conduit ISPs.

The statute is "clear (albeit complex)." *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1238 (D.C. Cir. 2003). The DMCA's subpoena provision is appurtenant to the statute's larger "notice-and-takedown" framework, under which a rightsholder may send a notification to certain online service providers, triggering the service provider's "expeditious" takedown of allegedly infringing content from its system. To obtain a DMCA subpoena, a rightsholder

must then provide the clerk of a district court with the "notice" part of the DMCA's notice-and-takedown process. But when it comes to conduit ISPs, there is *no such thing* as a DMCA-compliant notification. That is because Congress decided not to subject such ISPs to the notice-and-takedown framework at all. No DMCA notice, no DMCA subpoena.

Petitioner Capstone Studios, a rightsholder, invites this Court to strike out on its own and hold that § 512(h) subpoenas can be served on § 512(a) conduit ISPs like Cox. But it offers no coherent statutory interpretation to support that result. Instead, it devotes most of its brief to *factual* arguments about how conduit ISPs who receive DMCA notifications could, in theory, effectuate something that resembles a takedown by disabling the internet access of a subscriber's computer entirely. In Capstone's view, this means that modern conduit ISPs should be subject to DMCA subpoenas.

Capstone's factual arguments are incorrect and largely waived. But the more fundamental problem is that they have no bearing on the underlying statutory interpretation question. If Capstone thinks conduit ISPs should be subject to the notice-and-takedown framework— and are therefore proper recipients of DMCA notifications and

subpoenas—it can push for that legislative change.  But Congress made a different judgment when it enacted the DMCA.

The district court properly applied the DMCA in this case.  It correctly found, as a factual matter, that Cox acted as a conduit ISP under § 512(a) in the context of this case.  And it rightly joined other courts to hold that § 512(h) subpoenas may not issue to such entities. This hardly leaves rightsholders like Capstone in the lurch.  They retain the ability, like any other litigant, to file a John Doe lawsuit and utilize the more formal subpoena procedures available in such cases. All they cannot do is compel a conduit ISP, through a clerk-issued DMCA subpoena, to disclose the information of a subscriber who objects to that disclosure.  *Infra* § I.

Beyond the merits, Capstone raises a handful of arguments challenging the district court's exercise of its discretion in managing its docket.  It says the court erred in granting a motion to strike a factual declaration Capstone belatedly included with a motion to reconsider. The district court hardly abused its discretion, however, by enforcing the customary rule that a litigant must make arguments and adduce

3

evidence *before* a court makes its decision, not after the litigant is disappointed with the result. *Infra* § II.

Nor did the district court err in permitting Cox's participation in this litigation. Cox is the subpoena recipient in this case. The DMCA subpoena Capstone caused the Clerk of Court to issue in this case placed Cox's legal obligations directly in issue—and put Cox in the difficult position of receiving a court-issued subpoena with a questionable legal foundation. Once a subscriber objected, the district court justly permitted Cox to participate to clarify its own legal obligations and assist the court in evaluating the propriety of the subpoena as a whole. Far from abusing its discretion, the district court commendably managed this proceeding to ensure that its evaluation of the propriety of the DMCA subpoena rested on an accurate and full record. *Infra* § III. This Court should affirm.

## STATEMENT OF THE ISSUES

The issues presented are:

1.    Whether the district court correctly quashed Capstone's DMCA subpoena by finding (as a factual matter) that Cox's only connection to the alleged infringement was acting as a 17 U.S.C.

§ 512(a) conduit ISP and concluding (as a matter of law) that § 512(a) providers are not subject to § 512(h) subpoenas.

2.      Whether the district court abused its discretion by striking a declaration attached to Capstone's Motion for Reconsideration because that declaration sought to introduce new facts that were previously available.

3.      Whether the district court abused its discretion by allowing Cox to participate in the proceedings when Cox is the entity charged with responding to Capstone's DMCA subpoena.

## STATEMENT OF THE CASE

### *The DMCA Provides A Streamlined Subpoena Procedure In Defined Circumstances.*

Section 512 of the DMCA is titled "Limitations on liability relating to material online."  17 U.S.C. § 512.[1]  Three aspects of § 512 bear on the statutory interpretation issue in this appeal.  First is the provision's series of four statutory "safe harbors" that limit liability for certain

---

[1] All statutory citations in this brief are to Title 17 unless otherwise noted.  We cite Appellant's Opening Brief, Dkt. 13, as "OB" and the Brief of Amici Curiae Motion Picture Association, Inc., and Recording Industry Association of America In Support Of Neither Party, Dkt. 17, as "MPA Br."

online service providers. *See* § 512(a)-(d). Second is the notice-and-takedown procedure applicable to three of the four safe harbors. *See* § 512(c)(3). And third is the subpoena procedure that rightsholders can use, in defined circumstances, to determine the identity of suspected infringers. *See* § 512(h). We discuss each below.

***The safe harbors.*** Section 512 is organized around four safe harbors that taxonomize "separate and distinct functions" for which an online service provider may "qualif[y] for [a] limitation on liability." § 512(n); *see* § 512(a)-(d).

Subsection (a), titled "[t]ransitory digital network communications," limits liability for "infringement … by reason of … transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." § 512(a). It thus covers basic internet service providers, often referred to as "conduit ISPs." From large ISPs (like Cox), to smaller regional ISPs, to municipal broadband providers, subsection (a) applies where "a service provider plays the role of a 'conduit' for the communications of others." *See* H.R. Rep. No. 105-551, pt. 2, at 51 (1998).

6

Subsections (b) and (c) define safe harbors for entities that store information on their own systems. Subsection (b), titled "[s]ystem caching," § 512(b), applies when a service provider engages in "intermediate and temporary storage" of infringing material. H.R. Rep. No. 105-551, pt. 2, at 52; *see id.* at 52-53. Subsection (c) pertains to "[i]nformation residing on systems or networks at [the] direction of users." § 512(c). It protects online services that host user-generated content—like a webhost for "a user's web site" or a social-media "forum in which material may be posted at the direction of users." H.R. Rep. No. 105-551, pt. 2, at 53.

Finally, subsection (d) applies to "[i]nformation location tools," affording protection when a provider "refer[s] or link[s] users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link." § 512(d). Classic examples are a "search engine that identifies pages by specified criteria," H.R. Rep. No. 105-551, pt. 2, at 56, or an "on-line director[y] prepared by human editors and reviewers, who view and classify various Internet sites," *id.* at 57.

*Notice, takedown, and put-back.* For three of these safe harbors—subsections (b), (c), and (d), but importantly *not* for conduit ISPs under subsection (a)—safe harbor protection depends upon compliance with the so-called "notice-and-takedown process." *See* § 512(b)-(d). The "notice" piece is defined by § 512(c)(3). Suppose a rightsholder believes that a social media user has infringed its copyrighted photo. Under § 512(c)(3), the rightsholder can send the social media service a "notification of claimed infringement." The notice must, among other things, "[i]dentif[y] … the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." § 512(c)(3)(A)(iii).

Then comes the takedown. To be protected by the safe harbor's limitation on copyright infringement liability, the social media service must "respond[] [to the notice] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." § 512(c)(1)(C); *see* § 512(c)(1)(A).

But to ensure that rightsholders do not abuse the takedown mechanism, the service provider must *also* provide a notification to the *user*—the accused infringer—to afford the user an opportunity to object. *See* § 512(g)(1)-(2)(A). Subsection 512(g), in turn, creates a "put-back" procedure by which the user can seek to restore the material by opposing a wrongful takedown. *See generally Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016).

In essence, the above framework incentivizes service providers covered by subsections (b)-(d) to intermediate disputes between rightsholders and users. But again, Congress did not impose the notice-and-takedown framework on subsection (a) entities.

***DMCA subpoenas.*** That brings us to subsection (h) subpoenas. Like other litigants, copyright holders seeking to learn the identity of an alleged infringer have always been able to file a "John Doe action" against an unknown defendant, then subpoena an online service provider to obtain the infringer's identity. *See Ingenuity13 LLC v. Doe*, 651 F. App'x 716, 718 (9th Cir. 2016) (explaining this practice).

With subsection (h) of the DMCA, Congress created an alternative that does not require a pending lawsuit. *See* § 512(h). The provision

9

authorizes rightsholders to seek a subpoena from "the clerk of any United States District Court" "to a service provider for identification of an alleged infringer." § 512(h)(1). To activate this process, the rightsholder must use the § 512(c)(3)(A) notification procedure just described. *See* § 512(h)(2)(A). It must submit a "copy of [the] notification" to the clerk, § 512(h)(2)(A); the clerk must determine that "the notification filed satisfies the provisions of subsection (c)(3)(A)," § 512(h)(4); and the rightsholder must serve the notice on the service provider—triggering the takedown and put-back provisions—to render the subpoena effective, § 512(h)(5).

### Capstone Serves Cox, A Conduit ISP, With A DMCA Subpoena.

Cox is one of the largest conduit ISPs in the country. It provides the basic infrastructure through which its 6.5 million subscribers send and receive data on the internet. Most of its subscribers use the internet for legitimate purposes—to work, attend school, shop, stay up on current events, or connect on social media. A small subset may use the internet to infringe.

In April 2023, Capstone, which owns the copyright to the film *Fall*, suspected that users of Cox internet service had infringed using a

"peer-to-peer" file-sharing protocol called BitTorrent.  *See* OB28; ER-119; ER-121.  Capstone petitioned the district court clerk to issue a DMCA subpoena to Cox ordering disclosure of the identities of subscribers associated with 29 "IP" addresses.  *See* ER-229-233; ER-239-246.

An IP address, or internet protocol address, is a "unique string of numbers … that identifies each computer using the Internet Protocol to communicate over a network."  *IP address*, Oxford Dictionary of English (3d ed. 2010).  It allows a user to send and receive data over the internet.  *Nat'l Cable Telecomms. Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005) ("IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them.").  And often an ISP can use an IP address that it has assigned to identify a subscriber—though not necessarily a particular *user* within that subscriber's home or business.

In its application, Capstone acknowledged that both the D.C. Circuit and Eighth Circuit have "determined that a subpoena under § 512(h) 'may be issued only to an ISP engaged in storing on its servers material that is infringing or the subject of infringing activity.'"  ER-232

11

(quoting *Verizon*, 351 F.3d at 1233 and citing *In re Charter Commc'ns, Inc.*, 393 F.3d 771, 776-77 (8th Cir. 2005)).  But it stated that "[t]he Tenth Circuit [sic] has not yet concluded whether § 512(h) applies to ISPs that function as a conduit."  ER-232.  It thus requested that "the Clerk of the Court expeditiously issue and sign the proposed subpoena."  ER-232.

The clerk issued the requested subpoena on April 13, 2023.  *See* ER-226.  Upon receipt of the court order, Cox issued a notice to affected subscribers informing them of the subpoena and requesting they notify Cox or the court regarding any objections.  *See* ER-219.  For those subscribers who did not object to the subpoena's validity, Cox complied with the subpoena's directive.  ER-194.

### *The District Court Quashes The DMCA Subpoena.*

One individual objected.  On May 24, 2023, John Doe filed a letter with the district court "asking to have this motion quashed or dismissed" and "objecting to having [his] personal information released."  ER-225.  Doe explained that he is "on disability and receiving government aid," and that his internet "is provided through the government Affordable Connectivity Program."  ER-225.  He

12

suspected infringement occurred by someone else using his "unprotected open network," to which he had now "added a password." ER-225. Doe explained that the allegedly infringing file was "not anywhere to be found on our computer," and offered to "mail [the] computer or hard drive for inspection" as long as he could have it back "prior to August 2023 as our children need it for school." ER-225.

The Magistrate Judge construed the letter as a motion to quash the subpoena and directed Capstone to respond. *See* ER-223. With the subpoena's validity now in question, Cox did not disclose Doe's information. *See* ER-194.

In a Findings and Recommendation ("F&R"), the Magistrate Judge recommended that the district court quash the subpoena. *See* ER-200-215. Looking to the text and structure of the DMCA, as well as *Verizon* and *In re Charter*, the Magistrate agreed that a DMCA subpoena cannot issue to a conduit ISP like Cox. *See* ER-207-209. He explained that § 512(h) requires that a subpoena be accompanied by a takedown notice "satisfy[ing] the provisions of subsection 512(c)(3)(A)," ER-206, but that conduit ISPs under subsection (a) are not subject to such notices. *See* ER-205-206. The Magistrate Judge thus

13

recommended the district court quash the subpoena and order Capstone to destroy any information Cox had already provided.  *See* ER-214.

Capstone objected to the F&R.  *See* ER-185-199.  Among other things, it argued that Cox is not a "mere conduit" of infringing material because Cox assigns IP addresses to its subscribers.  ER-187-188.  It likened such addresses to an "information location tool," like a "hyperlink" to infringing material, suggesting that this brings Cox within subsection (d) (the search engine provision, *see supra* 7).  ER-188; *see* ER-188-190.  And it argued that a conduit ISP could use a tactic called "null routing" to send an IP address to "nowhere"—and thereby prevent access to anything at that address.  ER-190 & n.5.

Cox appeared in the district court to respond to Capstone's objections, specifically Capstone's misrepresentations regarding Cox's services.  *See* ER-163-171 (Cox Response); ER-252 (Cox appearance).  After it did, the district court requested that Cox provide evidence, such as "[a] declaration by an appropriate corporate representative," establishing whether Cox "is—or is not—an internet service provider under … § 512(a)."  ER-152.  Cox submitted a declaration detailing its

function as a conduit ISP. *See* ER-146-149. Capstone submitted no evidence of its own in response. *See* ER-253.

The district court overruled Capstone's objections and adopted the F&R in full. *See* ER-138. It rejected Capstone's argument that Cox engages in "referring" or "linking" to infringing material under subsection (d) merely by providing IP addresses to subscribers. *See* ER-130-133. The court explained that Cox does not actively assist users in locating infringing material—rather, "it is the P2P system that enables users to locate peers who are also seeking to distribute or receive files." ER-132. The district court similarly rejected Capstone's argument that an IP address constitutes an "information location tool" under subsection (d). *See* ER-133-134. And as for Capstone's argument that Cox could "effectively terminat[e]" a subscriber's internet connection by "null routing" in response to a notice, ER-190 n.5, the court explained that "the text of the DMCA" foreclosed the notion that null routing is akin to the sort of takedown Congress envisioned for service providers under subsections (b)-(d). ER-134; *see* ER-134-135.

### *The District Court Denies Reconsideration And Strikes Capstone's Belatedly Submitted Evidence.*

Three days later, Capstone sent Cox a letter withdrawing its request for Doe's information. *See* ER-85. It then moved for reconsideration of the district court's order, attaching a new factual declaration in support. *See* ER-86-112. The motion argued that the district court misunderstood "null routing," and further argued that Cox could use other means (like "port blocking") "for removing access to infringing activity or material or the link thereto," ER-108. *See* ER-105-109.

Cox opposed and moved to strike Capstone's submission of evidence on a motion to reconsider. *See* ER-255. The district court granted Cox's motion to strike and denied Capstone's motion to reconsider. *See* ER-46. It found that Capstone "ha[d] not shown that [its new] evidence could not have been raised or presented earlier," ER-23. *See* ER-22-23. Capstone's arguments, moreover, were either already considered and rejected by the district court or could have been raised previously. *See* ER-32-41. Reiterating the basis of its ruling, the district court explained that Cox is only a "'conduit' for [peer-to-peer

16

infringement under the safe harbor in § 512(a)," and does not "fall[]
under § 512(d)."  ER-31.

## SUMMARY OF ARGUMENT

I.  The district court correctly quashed Capstone's DMCA
subpoena.

A.  Both the D.C. Circuit and Eighth Circuit have held that
§ 512(a) conduit ISPs are not proper recipients of DMCA subpoenas.

1.  As those courts have reasoned, the DMCA's text and
structure condition issuance of a § 512(h) DMCA subpoena upon a valid
takedown notice under subsection (c)(3)(A).  A valid takedown notice
cannot be sent to a service provider whose only role with respect to the
alleged infringement is serving as a conduit ISP under subsection (a), so
a DMCA subpoena cannot issue to such a provider either.

2.  None of Capstone's textual arguments overcome this
conclusion—much less justify creation of a circuit split.  Neither the
broad definition of "service provider" elsewhere in the statute, nor other
statutory provisions addressing conduct under *all* statutory safe
harbors, undercut the conclusion that § 512(a) service providers *in*

*particular* are not subject to the takedown notices that are a condition for a DMCA subpoena.

3. Capstone's factual arguments regarding the supposed ability of modern conduit ISPs to disable access to content are both irrelevant and wrong. Neither the validity of a DMCA notification nor the applicability of any safe harbor turns on a particular service provider's factual ability to "disable access" to material. Moreover, the technical measures Capstone purports to identify, including null routing, are not the sort of removal or disabling of access that the statute contemplates.

B. The district court also correctly found that Cox acted as a § 512(a) "conduit" service provider based on the declaration Cox submitted to that effect. That factual conclusion is reviewed only for clear error, and Capstone fails to identify any such error here. Instead, Capstone continues to press its fundamentally misguided arguments about how § 512(a) service providers could theoretically respond to an infringement notice. But, as the district court recognized, such entities are not subject to the notice-and-takedown framework, are not proper recipients of § 512(c)(3)(A) notices, and therefore are not subject to § 512(h) subpoenas.

C.	The district court also correctly rejected Capstone's argument that conduit ISPs are § 512(d) service providers because they assign IP addresses.

1.	As the district court recognized, "referring" or "linking," as described in subsection (d), must entail something beyond mere "transmission, routing, or providing connections," as covered by subsection (a).  Merely assigning an IP address does not refer or link anybody to anything.

2.	Additionally, Cox's assignment of IP addresses does not constitute Cox "using" an "information location tool[]" to refer or link users to an online location, § 512(d).  IP addresses are merely assigned automatically to provide an internet connection.  And Capstone's reading would nonsensically require the IP address to be *both* the "information location tool" and the "online location" to which it links under the statute.

3.	Finally, Capstone's arguments concerning Cox's supposed ability to disable access to an IP address using techniques like null routing are irrelevant.  Many of these arguments were not properly before the district court because Capstone did not raise them until a

motion to reconsider. In any event, the district court made clear that its rejection of the null routing argument was ancillary to its reasoning. And as the district court recognized, null routing an IP address is not akin to removing or disabling a "reference or link," as entailed by the notice-and-takedown procedures applicable to a subsection (d) entity.

The district court correctly held that Cox acted only as a subsection (a) conduit ISP, and that DMCA subpoenas may not issue against such entities.

II. The district court did not abuse its discretion by striking the declaration Capstone submitted with its motion to reconsider. First, Capstone was not prejudiced because the district court still considered and rejected Capstone's new arguments. Second, the district court hardly abused its discretion in finding that facts and arguments previously available may not be raised for the first time in a motion for reconsideration.

III. The district court did not abuse its discretion by permitting Cox to participate in the litigation below. At the outset, Capstone fails to explain what appellate relief would flow from a finding that Cox should not have been permitted to participate. The DMCA subpoena is

20

legally unenforceable whether Cox "participated" or not. Cox's participation was proper in any event.

A. Cox is a party to these proceedings, which concern the enforceability of Capstone's DMCA subpoena to Cox. Cox did not waive its party status or its right to object to the enforceability of the DMCA subpoena. Capstone is incorrect that Rule 45(d)(2)(B)'s objection deadline applies to the recipient of a DMCA subpoena. And, even if it did, the district court properly exercised its discretion to excuse any waiver because Cox acted in good faith under the circumstances.

B. As the entity charged with responding to the DMCA subpoena, Cox has standing to dispute the validity of that subpoena, and to litigate its own legal rights and obligations. Capstone has not mooted the dispute between the parties by withdrawing its request for John Doe's information because Capstone continues to seek to compel Cox to provide Capstone with information regarding other individuals.

## STANDARD OF REVIEW

This Court reviews the grant or denial of a motion to quash a subpoena for abuse of discretion. *In re Grand Jury Subpoena*, 383 F.3d 905, 909 (9th Cir. 2004). "A district court abuses its discretion if it

bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (citation omitted).

"A district court's decision regarding standing is reviewed de novo." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010). The outer bounds of a district court's "inherent power to control [its] docket" are also reviewed de novo, and its exercise of that power is reviewed for abuse of discretion. *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 403-04 (9th Cir. 2010).

## ARGUMENT

## I. The District Court Correctly Quashed Capstone's DMCA Subpoena.

The district court's decision quashing Capstone's DMCA subpoena placed it in good company: As Capstone has acknowledged, both circuits to have addressed the issue have concluded that subpoenas under § 512(h) cannot properly issue to § 512(a) conduit ISPs.[2] This

---

[2] *See Verizon*, 351 F.3d at 1236; *In re Charter*, 393 F.3d at 776-77; *see also In re Subpoena Issued to Birch Commc'ns, Inc.*, No. 1:14-cv-3904-WSD, 2015 WL 2091735, at *5 (N.D. Ga. May 5, 2015); *Well Go USA, Inc. v. Unknown Participants in Filesharing Swarm*, No. 4:12-cv-00963, 2012 WL 4387420, at *2 (S.D. Tex. Sept. 25, 2012); *Interscope Recs. v.*

reading of the DMCA is correct. *Infra* § A. Capstone also identifies no clear error in the district court's factual conclusion that Cox acted as a § 512(a) conduit ISP here. *Infra* § B. And Capstone's alternative argument that Cox's provision of IP addresses means it *also* provided "information location tools" can be squared with neither § 512(d) nor the factual record. *Infra* § C.

**A.    As the D.C. Circuit and Eighth Circuit have held, § 512(a) conduit ISPs are not proper recipients of § 512(h) subpoenas.**

**1.    The DMCA's text and structure establish that an effective § 512(h) subpoena cannot issue to an entity that only facilitates transitory communication.**

Statutory interpretation begins with "the plain language of the statute" and involves "examination of the specific provision at issue" as well as "the structure of the statute as a whole." *United States v. Anderson*, 46 F.4th 1000, 1005 (9th Cir. 2022) (citation omitted). Here, interpretation of DMCA subpoena requirements turns on the "meaning of and interaction[s] between," *Verizon*, 351 F.3d at 1234, the three sets of provisions detailed above (*supra* 6-7):

---

*Does 1-7*, 494 F. Supp. 2d 388, 391 (E.D. Va. 2007); *In re Subpoena to Univ. of N.C. at Chapel Hill*, 367 F. Supp. 2d 945, 956 (M.D.N.C. 2005).

- Subsection 512(h), which sets forth the requirements for issuance of a subpoena—most importantly a "notification" that satisfies the provisions of "subsection (c)(3)(A)";

- Subsection 512(c)(3)(A), which sets forth the requirements for such takedown notices—and is applicable only to the safe harbor provisions of subsections (b), (c), and (d); and

- Subsections 512(a)-(d), which taxonomize the conduct eligible for each safe harbor—most salient here, subsection (a), which applies to conduit ISPs.

The district court, following *Verizon* and *In re Charter*, recognized that the issuance of a DMCA subpoena is conditioned upon a valid takedown notice. A valid takedown notice cannot be sent to a service provider whose only connection with the infringement is serving as a conduit ISP under subsection (a). Therefore, as the district court explained, a request for a DMCA subpoena to a conduit ISP can never satisfy the DMCA's requirements.

The district court began its analysis with subsection (h)'s subpoena requirements. ER-204-205. As the *Verizon* court similarly recognized, several steps in the specified subpoena process rely upon the provision of a notification under § 512(c)(3)(A). *See Verizon,* 351 F.3d at 1232, 1234-35. Section 512(h) requires a copyright holder seeking a DMCA subpoena to include "a copy of a notification described

in subsection (c)(3)(A)" in its subpoena request. § 512(h)(2)(A). "If the notification filed *satisfies the provisions* of subsection (c)(3)(A)," the clerk must issue the proposed subpoena, § 512(h)(4) (emphasis added), and the contents of the notice will delineate the information that must be disclosed. *See* § 512(h)(3) (service provider must "disclose … information sufficient to identify the alleged infringer of the material described in the notification"). A copyright holder whose notice does not "satisfy" § 512(c)(3)(A)'s provisions thus cannot satisfy § 512(h)'s requirements either. *See* ER-206; *Verizon,* 351 F.3d at 1235.

The primary statutory function of subsection (c)(3)(A) notices is not, of course, to serve as subpoena support. As the Eighth Circuit and D.C. Circuit recognized, they are principally the mechanism for triggering a takedown—and the cascading steps that follow from that. *See In re Charter*, 393 F.3d at 776; *Verizon*, 351 F.3d at 1234. By way of review, the rightsholder serves a notice on the service provider's designated agent. *See* § 512(c)(3)(A). The service provider, to receive safe-harbor protection, must "expeditiously … remove, or disable access to" infringing material. § 512(b)(2)(E), (c)(1)(C), (d)(1)(C). To avoid liability *for a wrongful takedown*, the service provider must also

25

attempt "promptly to notify the subscriber." § 512(g)(2)(A). That allows the subscriber to send a "counter notification" claiming a wrongful takedown, § 512(g)(3), which the service provider must then provide to the *original* notification sender, § 512(g)(2)(B), and may ultimately require a put-back, § 512(g).

In creating this framework, Congress also made a highly consequential judgment that drives the resolution of the subpoena issue in this case: This notice-and-takedown (and put-back) system would apply only to some types of service providers and not others. *See Verizon*, 351 F.3d at 1234 (recognizing that notice-and-takedown provisions are "[n]otably present" in subsections (b)-(d) and "notably absent" in subsection (a)). Those providers in subsections (b), (c), and (d)—which maintain services that cache, store, and link to infringing material—would be subject to the framework. To receive safe-harbor protection, these entities would be expected to receive notifications, use them to locate and take down infringing material, deliver notices to rightsholders and subscribers, etc. *See* ER-210.

But Congress decided to treat § 512(a) entities differently. The service providers in § 512(a) are defined as "entit[ies] offering the

26

transmission, routing, or providing of connections … between or among points specified by a user, of material of the user's choosing." § 512(k)(1). As the D.C. Circuit and Eighth Circuit recognized, Congress evidently did not expect the conduits in subsection (a) to receive notifications, locate and take down material, deliver notices to rightsholders and subscribers, and so forth. *See Verizon*, 351 F.3d at 1234; *In re Charter*, 393 F.3d at 776. This judgment "makes sense," because, unlike subsection (b)-(d) service providers, subsection (a) providers "merely act[] as a conduit for infringing material" passing from point A to B. *In re Charter*, 393 F.3d at 776; *see Verizon*, 351 F.3d at 1234. In providing the connections and protocols to make this possible, subsection (a) conduit ISPs do not store (except on a "transient" basis, § 512(a)) infringing material or links to that material that can be "remove[d]" or to which access can be "disable[d]," § 512(c)(1)(C). *See* § 512(a).

The upshot: As the district court acknowledged, there simply can be no such thing as a subsection (c)(3)(A) notification when it comes to the conduit ISPs embraced by subsection (a), and therefore no way to supply a notification that "satisfies" that provision in order to obtain a

subsection (h) subpoena. *See* § 512(h)(4); *Verizon*, 351 F.3d at 1234; *In re Charter*, 393 F.3d at 776. A notification to a conduit ISP could not, as required, "[i]dentif[y] … the material … that is to be removed or access to which is to be disabled." § 512(c)(3)(A)(iii). Doing so would be a non sequitur for subsection (a) entities, who are not expected to "remove" or "disable access" to anything. *See Verizon*, 351 F.3d at 1234; *In re Charter*, 393 F.3d at 776-77. For similar reasons, a notification to a subsection (a) entity could not provide "information reasonably sufficient to permit the service provider to *locate the material*," § 512(c)(3)(A)(iii) (emphasis added), in the manner the statute contemplates—as an antecedent for a required takedown. *See* § 512(b)(2)(E), (c)(1)(C), (d)(3). Rather, as the D.C. Circuit and Eighth Circuit recognized, the infringing material would necessarily be "located in the computer … of an individual user," over which the conduit ISP has no control or access. *Verizon*, 351 F.3d at 1235; *see In re Charter*, 393 F.3d at 776; ER-127.

The district court understood all of this. It correctly recognized that, in contrast to the safe harbors in "§ 512 (b), (c), and (d)," which include "'notice and take down' provisions" providing for content

28

removal upon receipt of a notice "meet[ing] the requirements of Subsection (c)(3)(A)," "the 'mere conduit' safe harbor in § 512(a) does not contain any notice and take down provision referring to Subsection (c)(3)(A)." ER-125-126; *see* ER-29-30; ER-210-211; *Verizon*, 351 F.3d at 1234; *In re Charter*, 393 F.3d at 776. In the context of a § 512(a) conduit, "nothing is stored, and there is nothing to take down." ER-125; *see* ER-30-31; ER-207-208; *In re Charter*, 393 F.3d at 776; *Verizon*, 351 F.3d at 1233. Accordingly, "the [§] 512(c)(3)(A) notice provision was not intended to apply to ISPs acting as mere conduits" under § 512(a). ER-211; *see* ER-30; ER-210-211; *Verizon*, 351 F.3d at 1234-35; *In re Charter*, 393 F.3d at 776. And because "the validity of a [§] 512(h) subpoena depends on whether the copyright owner has provided the ISP with a [§] 512(c)(3)(A) notice," ER-208, "a [§] 512(h) subpoena may not be issued to a conduit ISP," ER-211. *See* ER-27-28; ER-30-31; ER-126-127; *Verizon*, 351 F.3d at 1234-35; *In re Charter*, 393 F.3d at 776-77.

### 2. Capstone's textual arguments do not support a contrary interpretation of the statute.

In response, Capstone offers no coherent statutory analysis, instead raising disparate critiques of *Verizon*'s and *In re Charter*'s interpretation of § 512(h). *See* OB42-61. None has force, and together

29

they come nowhere near supplying a "compelling reason" to create a circuit split. *Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017) (citation omitted). Indeed, Capstone acknowledges that its statutory interpretation would not only mean that "a § 512(h) subpoena can be issued" to "conduit service providers," but that a "*notification*"—that is, a takedown request—"can [be] issued to § 512(a) service providers"; a departure from Congress's decision not to extend the notice-and-takedown framework to conduit ISPs. OB42 (emphasis added). This Court should reject that result.

**The definition of "service provider."** Reviving an argument that the D.C. Circuit rejected, *Verizon*, 351 F.3d at 1236, Capstone first argues that § 512(a) service providers must be subject to DMCA subpoenas because § 512(h) applies the "broad definition of a service provider as provided in § 512(k)(1)." OB43. All Capstone means is that § 512(h) generally uses the term "service provider," a term that § 512(k)(1) defines broadly to include all entities potentially eligible for any of the § 512(a)-(d) safe harbors. *See* OB42-44; § 512(k)(1)(B).

This argument fails because it ignores § 512(h)'s *additional* requirement that the copyright holder issue a notification under

30

§ 512(c)(3)(A).  As the D.C. Circuit explained, regardless of how "service provider" is defined, issuance of "a § 512(h) subpoena still depends upon the copyright holder having given the ISP … a notification effective under § 512(c)(3)(A)," which is not possible in the case of conduit ISPs covered by subsection (a).  *Verizon*, 351 F.3d at 1236.

In a similar vein, Capstone points out that § 512(h) does not "explicitly" distinguish between types of service providers, which Congress did in § 512(j)—a provision specifying different injunction requirements for § 512(a) providers and § 512(b)-(d) providers.  *See* OB43-44; § 512(j).  But Congress had no reason to distinguish between providers in § 512(h).  It delineated a process that could be triggered only by a subsection (c)(3)(A) notification—which, definitionally, does not exist for subsection (a) entities.  As the D.C. Circuit put it, the result is "clear (albeit complex)."  *Verizon*, 351 F.3d at 1238.

***Sections 512(m) and 512(e)***.  Capstone next takes aim at the premise that subsection (a) entities are not subject to subsection (c)(3)(A) notifications.  It highlights that subsections (e) and (m) apply to § 512(a) providers *and also* include references to notice and takedown concepts.  Specifically, subsection (m) mentions "removing" or "disabling

access" to infringing material, § 512(m), and subsection (e) discusses a provider receiving "notifications described in subsection (c)(3)," §512(e). OB54-56. On this basis, Capstone argues that Congress must have "intended § 512(c)(3)(A) notifications to be sent to § 512(a) service providers." OB54.

But sections § 512(m) and § 512(e) are broadly applicable to *all* safe harbors and both make perfect sense under the district court's interpretation of the statute. Subsection (m) merely clarifies that immunity for *all* safe harbors is *not* conditioned on (1) "a service provider monitoring its service," *or* (2) "a service provider gaining access to, removing, or disabling access to material" when doing so "is prohibited by law." § 512(m). It therefore clarifies what is *not* required rather than what is (so it has force in the § 512(a) setting), and it applies across the board (so it certainly does not suggest that Congress was specifically "concerned" with § 512(a) providers receiving § 512(c)(3)(A) notices). *See* OB55.

Section 512(e) likewise applies to *all* safe harbors. It provides that a university acting as a service provider should *not* be charged with the knowledge of a faculty member or graduate student, so long as the

32

individual in question is "performing a teaching or research function" and a variety of additional conditions are met—one of which is that the university has received no more than two subsection(c)(3) infringement notices regarding that faculty member in the preceding three years. § 512(e). Like subsection (m), nothing in subsection (e) specifically contemplates a § 512(a) provider receiving § 512(c)(3)(A) notices. Nor does subsection (m) lose force or lack sense in light of the consensus interpretation of the statute—including because universities acting as § 512(a) providers would need to satisfy § 512(e)'s additional requirements, which are unrelated to infringement notices.

Capstone claims that it would be "absurd" to not "attribute a faculty or graduate student's infringing conduct" to a school acting as a § 512(a) conduit ISP if that institution has received "notifications concerning [the faculty or graduate student's] ongoing piracy." OB55-56. But this claim of absurdity is, in fact, a simple policy preference with no bearing on the statutory interpretation question. While Capstone may think it preferable to expand the circumstances in which universities that merely provide internet service to an infringing faculty member (as covered by § 512(a)) may be treated as equivalent to that

33

faculty member, *see* OB55-56, there is nothing "absurd" about Congress making a different choice. *See, e.g., Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005) (Congress's choice "may seem odd" to a party without being "absurd").

*Section 512(c)(3)(A)(iii)*. Finally, Capstone argues (at OB58-59) that § 512(c)(3)(A)(iii) splits at the "disjunctive … 'or'," such that a copyright holder may satisfy the notice provision by *either* (1) identifying "material that is claimed to be infringing" (as illustrated in green below), in which case no removal is contemplated and the notification simply facilitates a subpoena; *or* by (2) identifying "material that is claimed to be … the subject of infringing activity and that is to be removed or access to which is to be disabled" (illustrated in blue below), in which case the notification is intended to facilitate removal under the notice-and-takedown provisions:

> Identification of the material that is claimed [1] to be infringing *or* [2] to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

§ 512(c)(3)(A)(iii) (color and emphasis added); *see* OB58-59.

Capstone's reading is fatally belied by the nearby and related takedown provisions in § 512(c)(1)(C) and § 512(d)(3).  Those provisions state that "upon notification of claimed infringement," the service provider must "respond[] expeditiously to remove, or disable access to, the material *that is claimed to be infringing or to be the subject of infringing activity.*"  § 512(c)(1)(C) (emphasis added); § 512(d)(3) (same language).  They therefore treat the two types of material alike—both are material that, upon receipt of a notice identifying it, a service provider must take down or disable access to.  And so it follows that the provision describing the notification necessary to initiate that takedown (§ 512(c)(3)(A)(iii)) likewise treats the two types of material alike—as predicates for a takedown that a subsection (b)-(d) entity might perform, but that a subsection (a) entity never would.  *See Does No. 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1143 (9th Cir. 2022) ("[I]dentical … phrases within the same statute should normally be given the same meaning[.]" (citation omitted)).

***Statutory purpose.***  Capstone finally argues that the district court's holding defied "the purpose of the DMCA to '[]facilitate cooperation among Internet service providers and copyright owners to

35

detect and deal with copyright infringements that take place in the digital networked environment.'" OB60 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)); *see* MPA Br. at 5, 14-18. But "it is the province of Congress, not the courts, to decide whether to rewrite the DMCA." *In re Charter*, 393 F.3d at 777; *Verizon*, 351 F.3d at 1238 (same). And in any event, like most any statute, the DMCA balances "competing values," *Rodriguez v. United States*, 480 U.S. 522, 526 (1987)—including "Congress['s] hope[] to provide greater certainty to service providers." *Ellison*, 357 F.3d at 1076 (quotation omitted). Capstone's policy arguments do not justify departure from the statutory text.

### 3. Capstone's arguments about conduit ISPs' ability to disable access to content are irrelevant and wrong.

Capstone's last statutory interpretation argument is not a statutory interpretation at all. As it did before the district court, Capstone contends that it must be that "[a] valid § 512(c)(3)(A) notification can be sent to a § 512(a) service provider" because such a service provider "can use simple measures to disable access to material that is [the] subject of infringing activity." OB48-49. In Capstone's

view, *Verizon* rested on the premise that a conduit ISP "neither removes nor disables access to the infringing material that is stored on the user's computer rather than the ISP's servers." OB49. So Capstone sets out to prove that, as a factual matter, "Cox can disable other peer-to-peer users from accessing … infringing activity," and that "network technology has advanced substantially … since … the year of [the] *Verizon* decision." OB50.

Capstone's view of what modern ISPs can do as a factual matter is irrelevant to interpreting or applying the DMCA. As a matter of plain text, neither the validity of a subsection (c)(3)(A) notification nor the applicability of any safe harbor turns on a particular service provider's factual ability to "disable access" to material. Nor did *Verizon*, *In re Charter*, or the district court's interpretation of the statute depend on any such factual conclusion. The only relevant statutory interpretation question here is whether a rightsholder can send a viable subsection (c)(3)(A) notification to a conduit ISP falling within subsection (a). If it cannot, and if the service provider indeed provided only "transitory digital network communications" under subsection (a), the rightsholder cannot satisfy subsection (h)'s subpoena conditions as to that service

provider. Whether a modern conduit ISP could somehow reach into a subscriber's home to disable access to infringing material makes no difference.

To be sure, in explaining why *Congress* chose not to extend the notice-and-takedown provisions to subsection (a) entities, courts have observed that the decision "makes sense" because conduit ISPs cannot take down or disable access to material in the manner subsection (b)-(d) entities can. *See In re Charter*, 393 F.3d at 776; *Verizon*, 351 F.3d at 1234-35. But that is recognition of the *congressional judgment* reflected in the statutory framework. Capstone's counterargument therefore addresses an issue that must be presented to *Congress*, not one to be litigated in every case. This is why the district court rightly explained that Capstone's argument goes to an "ancillary" question that "would not change" the court's reading of the DMCA. ER-33.

In any event, Capstone's largely unsupported factual arguments fail on their own terms because the technical measures it purports to identify are not the sort of removal or disabling of access that the statute contemplates.

*Null Routing.* Capstone first points to the possibility of "null routing" an IP address—that is, directing the address to nowhere—as a way to disable access to material on the computer at that address. *See* OB51-54. Adopting Capstone's own definition of null routing, the district court described the tactic as "effectively terminat[ing]" the IP address's "network connection." ER-134 (quoting ER-190 n.5). That is not a "removal" or "disabling [of] access" under the DMCA, which the statute consistently distinguishes from the more draconian step of "terminating" a subscriber's "account." *See* ER-23-24; ER-134; § 512(j)(1)(A)(i)-(ii) (distinguishing injunctions requiring disabling "access to infringing material" from injunctions requiring "terminating … accounts"); § 512(j)(1)(B) (limiting injunctions for § 512(a) providers to account-termination remedies); § 512(i) (providing for account "termination" for "repeat infringers").

Capstone insists that null routing is technically distinct from full account termination because a null-routed account still exists and may be directed to a "walled garden" webpage—a sort of temporary suspension. *See* OB53 (citing *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 641 (E.D. Va. 2015)); OB69. The

39

district court properly found that Capstone forfeited this argument by failing to make it prior to the motion to reconsider, while striking the improperly introduced evidence Capstone offered in support. ER-23-24. (We take up Capstone's challenge to that decision below, *infra* 57-62.)

The argument fails anyway, because cutting off internet access to a user's *computer* is not what the DMCA treats as a "removal of" or "disabling [of] access to" *material itself*. As the district court correctly reasoned, even if "null routing is not the same as terminating an account," it "nonetheless goes further than" the DMCA's takedown and access removal concepts. ER-36.

***Other Techniques***. Capstone also briefly references port blocking, deep packet inspection, filtering, and "artificial intelligence," *see* OB51-52, 67, but provides no description, analysis, or argument with respect to those techniques. In addition to being irrelevant, *supra* 36-38, these arguments are doubly waived. First, they were not "specifically and distinctly argued in appellant's opening brief." *See Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003). Additionally, they were never raised before the district court to support an argument that § 512(a) providers are not subject to § 512(h) subpoenas, and were

40

only raised in the § 512(d) context for the first time on reconsideration. *See* ER-22 & n.2; ER-37 & n.9; ER-142-143.

In any case, Capstone's argument cites only press releases and news articles for the proposition that Cox "currently uses or has [used]" these measures. OB51. And even if those were credible sources of information, none remotely suggests that Cox can surgically block access to a specific infringing file on a subscriber's computer.

***Removal during transient storage.*** Last, Capstone argues that it is a "misnomer" to "describe all § 512(a) service providers" as "conduit[s]," because § 512(a) service providers may temporarily store material on their own servers for the purpose of transmission, and this Court held in one instance that storage for a 14-day period was still "transient" storage covered by § 512(a). OB56-57 (citing *Ellison*, 357 F.3d at 1081). On that basis, Capstone posits that a § 512(a) provider could be capable of "tak[ing] down [infringing material] in response to a notification." OB57. And because Capstone believes a § 512(a) provider might be capable of taking down infringing material, it posits that such a provider is subject to a § 512(c)(3)(A) notification directing removal of infringing material during that period of transient storage. *See* OB56-

57; OB44-46 (raising similar argument in the context of whether Cox qualifies as a § 512(a) "conduit" as a factual matter, which we address below, *infra* 43-46).

This argument lays Capstone's logical fallacy bare. Subsection (a) explicitly acknowledges that transient storage is part-and-parcel of what conduit ISPs do. Capstone does not and cannot argue otherwise. Yet Congress made the deliberate choice *not* to subject service providers who engage in such transient storage to the notice-and-takedown framework. Capstone's argument that a conduit ISP *can* execute a takedown during a period of transient storage—and therefore should be subject to takedown notices—is just an argument that Congress should have made a different judgment.

Contrary to Capstone's assertion that *Ellison* "contradict[s]" the district court's decision, OB46; *see* OB44-45; OB57, *Ellison* simply says that storage for up to 14 days may qualify as "transient" storage under § 512(a). 357 F.3d at 1081. It does not support Capstone's suggestion that a § 512(a) service provider would be subject to a § 512(c)(3)(A) notification during that period.

42

The district court correctly interpreted the DMCA to preclude issuance of subsection (h) subpoenas to subsection (a) conduit ISPs. And as explained below, the district court also correctly concluded that a subsection (a) conduit ISP is all Cox is.

### B. The district court correctly found that Cox acted as a § 512(a) "conduit" service provider.

Before reviewing the Magistrate Judge's conclusion that the DMCA does not permit § 512(h) subpoenas to issue to service providers who acted only as § 512(a) conduit ISPs, *see* ER-211, the district court asked Cox to file "appropriate evidentiary proof that it is—or is not—an internet service provider under 17 U.S.C. § 512(a) for purposes of the subpoena issued in this matter." ER-152. Cox did so by submitting a declaration from one of its corporate representatives. *See* ER-146-149. The district court appropriately relied on the declaration Cox submitted to confirm that Cox was acting as a § 512(a) ISP, ER-135-137, and to therefore conclude that Capstone's subpoena is invalid, ER-138.

On appeal, Capstone argues that the district court "abused its discretion by concluding factually that Cox acts as a mere conduit." OB47; *see* OB44-48. But the district court's factual conclusion is reviewed only for clear error, *In re Grand Jury Subpoena*, 383 F.3d at

43

909, and Capstone fails to identify any such error here. Capstone does not contest the credibility of the Hall declaration on which the district court relied, and does not cite any evidence undercutting the district court's conclusion that Cox's activity concerning the alleged infringement was limited to functions covered by § 512(a). *See* ER-133; *compare* OB46-48 *with* ER-135-137 (rejecting credibility arguments).

Instead, Capstone points to a press release stating as a general matter that Cox also provides "cloud and managed IT services," which Capstone characterizes as "similar to services described in § 512(c)." OB47-48. But the fact that Cox has other facets of its business that are different from its conduit ISP services has no bearing on the present inquiry, which considers only Cox's actions "with regard to the allegedly infringing material in [t]his case." *In re Subpoena to Univ. of N.C. at Chapel Hill*, 367 F. Supp. 2d at 950; *see Verizon,* 351 F.3d at 1233 (assessing whether service provider is "acting" as a § 512(a) conduit); OB47 (acknowledging that the declaration addressed Cox's "broadband service").

Capstone's remaining arguments stem from Capstone's mistaken view that "[n]ot all § 512(a) service providers are mere conduits," OB44,

and that this separate "conduit" designation is somehow relevant to the issue at hand. OB44-45. Specifically, Capstone posits that a § 512(a) provider is not a "conduit" if it possesses some capacity to respond to an infringement notice—for instance, by deleting material from its own servers during a lengthier period of transitory storage. *See* OB45-46. Capstone imagines that a provider's technical capability to respond to an infringement notice determines whether the provider is subject to such notices—and likewise determines whether the provider is subject to a subpoena under § 512(h). *See* OB46-48.

For the reasons explained above (*supra* 36-43), this argument is fundamentally misguided. Whether you characterize entities carrying out § 512(a) functions (including transitory storage) as "conduits," "mere conduits," or something else (like "transitory digital communications," the term used in the statute), the district court correctly recognized that the DMCA provides that such entities have no takedown requirements, are not proper recipients of § 512(c)(3)(A) notices, and therefore are not subject to § 512(h) subpoenas. *See supra* 23-43.

Given the utter absence of any contrary evidence, the district court did not clearly err in finding that "Cox acted as a [§ 512(a)]

45

conduit for the allegedly copyrighted material." ER-118. No further factual inquiry was required.

### C. The district court correctly rejected Petitioner's argument that conduit ISPs are § 512(d) service providers because they assign IP addresses.

In the alternative, Capstone argues that the DMCA subpoena is valid because even if "a DMCA subpoena cannot be issued to a § 512(a) service provider, … Cox is further an information location tool service provider under § 512(d)." OB61. This is because "Cox provides its subscribers with customer premises equipment and the IP addresses which link other peer-to-peer users to the online location containing infringing material." OB61. Capstone is arguing, in other words, that the same basic things Cox does to "provide[] connections" to the internet under subsection (a)—like offer modems and routers for "transmitting" data, § 512(a), or assign IP addresses to allow "routing … between or among points," § 512(k)(1)(A)—*also* make Cox an "information location tool" provider under subsection (d). *See* OB61-70.

This argument is completely unsupported. Capstone cites no case, no treatise or commentary, no snippet of legislative history that has ever even hinted at this reading of the DMCA. And the implications of

46

sweeping conduit ISPs into subsection (d), thus subjecting them to notice-and-takedown requirements, are staggering. In service of obtaining a DMCA subpoena—rather than simply filing a John Doe action—Capstone's position would upend decades of settled understanding, sending conduit ISPs across the country scrambling to create takedown-based DMCA programs that require swift denials of internet access based on a mere allegation of infringement. (Notably, not even the content industry amici cosign the argument that mere assignment of IP addresses brings an ISP within subsection (d).)

Capstone's argument is plainly wrong. As the district court held, "Cox falls only under § 512(a), not § 512(d)." ER-31; *see* ER-132-134.

### 1. Assigning an IP address is not "referring" or "linking."

Subsection (d) applies to "infringement … by reason of the provider referring or linking users to an online location … by using information location tools, including a directory, index, reference, pointer, or hypertext link." § 512(d). The words "referring" and "linking" stand in contrast to those used in subsection (a), which deals with "transmitting, routing, or providing connections for" material. § 512(a). By choosing different verbs, Congress plainly meant the

concept of referring or linking to material to entail something beyond mere transmission, routing, or connecting someone to material. That something is the reference or link provided to the user. A natural example would be a search engine—a service that offers a search function to aid users in finding a particular thing on the internet, then links directly to that thing. *See* H.R. Rep. No. 105-551, pt. 2, at 56, 58. The search engine provides a "hyperlink," and therefore is engaged in "linking."

Merely *assigning* an *IP address* to a user does not fit the statutory definition of "referring" or "linking" users. As the district court explained, an IP address is just "a unique identifier assigned … to every computer having access to the internet." ER-120. If you are reading this brief on an internet-connected computer, your computer has an IP address. By simply assigning your computer that address, your service provider has not "link[ed]" or "refer[red]" anyone to anything on your computer. It has not provided your IP address to any user as a "reference" or "link." All it has done is "provide [a] connection" (in subsection (a)'s words), which enables you to pass data back and forth on the internet—including swapping files through a peer-to-peer

48

network if you choose. *See supra* 11. What Capstone is really arguing, without admitting it, is that merely by designating a computer as an internet-reachable location, Cox is somehow referring or linking every other user on the internet to any infringing material contained there.

The district court rejected Capstone's semantic trick. Merely "assigning an IP address to a user does not actively 'refer[] or link[]' that user to any other IP address." ER-32. Rather, "Cox assigns ... an IP address automatically," and if another user on the internet accesses a peer-to-peer network and chooses to download a file available at that IP address, it is the "[peer-to-peer filesharing] system—not the ISP— that links internet users with files." ER-32; *see* ER-132.

Capstone's critiques are nothing but more wordplay.

It argues first that the district court improperly "import[ed] the ... volitional conduct requirement" required to sustain a direct infringement claim by reading "referring or linking" to connote the service provider offering "active assistance" in "locating [an] online resource[]." OB64; *see* OB64-65 (arguing that this "defeats the entire purpose" of a safe harbor protecting automatic activities). This is imagined. The district court said nothing about the "volitional conduct"

49

doctrine, nor did it "import[]" direct infringement requirements into § 512(d), *see* OB64.

The court's point was that "referring" and "linking" must connote conduct that goes beyond the mere passive "transmitting, routing, and providing [of] connections" that makes an entity a conduit under subsection (a). *See* ER-132 n.6; ER-132-133. Otherwise, Congress would not have chosen different words for the concept of linking or referring a user to material. As this Court has recognized, interpreting two subsections to cover the same conduct "would contradict logic and ignore the basic assumption that Congress does not use different language in different provisions to accomplish the same result." *United States v. Fiorillo*, 186 F.3d 1136, 1148 (9th Cir. 1999).

Capstone similarly criticizes (at OB66-67) the district court's observation that "[i]f an ISP assigning an IP address is both 'providing connections for' infringement under (a) and 'referring or linking' to infringing material under (d) … Congress would not have created two separate safe harbors." ER-133; *see* ER-40. Amici also point to this sentence to claim that the district court "assumed that the same service

provider activity cannot qualify for more than one section 512 safe harbor." MPA Br. 25.

None of this even matters to the resolution here: Whether or not there is *some* overlap between the two provisions in no way suggests that assigning an IP address constitutes "referring or linking" under subsection (d). This, presumably, is why amici merely label the reasoning "overbroad and unnecessary," and worry that it may be "wrong in at least *some* contexts *outside of those presented in the record here*." MPA Br. 21 (emphasis added). (Notably, "[a]mici take no position on whether" *Verizon* and *In re Charter* "were correctly decided." MPA Br. at 4 n.2.)

Reading the district court's statement in the context of *this* case, it is absolutely correct. What the court was explaining was that it would make no sense for Congress to simultaneously create a safe harbor (in (a)) for mere "routing" that *is not* subject to notice-and-takedown requirements only to treat *the same conduct* as subject to *a different safe harbor* (d) that *is* subject to those requirements. That would render the limitation in subsection (a) meaningless, a result courts "presume

that Congress [woul]d not intend." *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th 1092, 1097 (9th Cir. 2022); *see* ER-40; ER-133.

The same goes for Capstone's insinuation that the district court improperly limited § 512(d) by "focus[ing] in on one type of information location tool—a search engine directory created by people that was discussed in the House committee report—as the appropriate information tool." OB64 (citing ER-132 n.6). It did not. It merely noted in a footnote that the legislative history supported another case's description of "refer[] or link[]" as connoting "active assistance." ER-132 n.6 (citing *A&M Recs., Inc. v. Napster, Inc.*, No. C 99-05183 MHP, 2000 WL 573136, at *5 (N.D. Cal. May 12, 2000)).

### 2. Cox's assignment of IP addresses is not "using" an "information location tool[]."

While the lack of any "referring or linking" is sufficient to affirm the district court's conclusion that "Cox falls only under § 512(a), not § 512(d)," ER-31, this Court can also affirm for the independent reason that assigning IP addresses to subscribers is not "using" an "information location tool[]" within the meaning of § 512(d).

Capstone's contrary argument analogizes IP addresses to a "hypertext link"—one of the exemplar information location tools

52

mentioned in subsection (d). *See* OB62. It argues that "an IP address *can be used* just like a hypertext link to go to a website" because one can type an IP address for a website into a web browser and (sometimes) navigate to that website. OB62 (emphasis added); *see* OB62-63.

But the fact that an IP address *can* be used like a hyperlink does not mean it automatically constitutes an "information location tool" for purposes of the statute—and certainly not that Cox "*used*" it as such merely by assigning an IP address to an internet-connected device. Again, as the district court recognized, "Cox assigns ... an IP address automatically," ER-32, because that is how basic internet connections work. *See* ER-120; *supra* 11. Capstone cites nothing for the proposition that Cox "us[es]" these IP addresses in the way someone might use a "hypertext link"—as a "tool[]" that permits users to "locat[e]" "information." OB62.

Moreover, as the district court observed, ER-31; ER-131, Capstone's argument would require the IP address to be *both* the "information location tool" and the "online location" to which it links. *See* ER-155-159 (Capstone arguing that the IP address simultaneously fills both roles). "[W]here [a] document has used one term in one place,

53

and a materially different term in another, the presumption is that the different term denotes a different idea." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)).  Thus, even if an IP address shares certain features with information location tools, it cannot serve as the "information location tool" in the context of this statute—saying that a service provider "refer[s] or link[s] users *to* an [IP address], *by using* [an IP address]" makes no linguistic sense. § 512(d) (emphases added).

### 3. Capstone's arguments concerning Cox's ability to disable access to an IP address are irrelevant.

Finally, Capstone rehashes its arguments about Cox's ability to disable access to an IP address as somehow suggesting that Cox is a subsection (d) entity.  It fails for much the same reasons described above (*supra* 36-43).

To begin with, much of this argument was waived.  Capstone relies principally on the stricken David Cox declaration, *see infra* 57-62, as well as new citations about "local area network" providers and "Internet Exchange Point[s]," neither of which were properly before the district court.  *See* OB67 (citing ER-90-91 at ¶22); OB67 n.1 (citing

websites); *supra* 40-41 (noting waiver of port blocking and filtering arguments).

Even if it were not waived, the district court made clear that its rejection of the null routing argument "is ancillary to the court's interpretation of § 512(d)," so "even if Petitioners were right [on null routing], it would not change the determination set forth above." ER-33. After all, saying that an ISP could "remove[] or disable access to" infringing material by null routing an IP address does nothing to change the fact that the IP address is not an "information location tool[]" that "refer[s]" or "link[s]" users to infringing material. ER-34-35.

In any case, Capstone's argument about using techniques like null routing to "remove or disable access" fails for the same reasons discussed above, *supra* 36-43. Even accepting that null routing an IP address would prevent other P2P downloaders from reaching infringing material on a subscriber's computer, *see* OB67-68 (explaining, citing stricken David Cox declaration, that "trackers" would broadcast incorrect information), and even accepting that null routing is not the same thing as account termination, null routing remains a far broader remedy than § 512(d) contemplates when it discusses a service provider

55

removing or disabling access to a "reference or link" to a specific, identified piece of infringing material. *See* ER-134-135.

Capstone argues (at OB69) that the district court's concern with maintaining a "distinct[ion]" between § 512(i) account termination and "disabling access" under the notice-and-takedown provisions does not exist in the context of § 512(d) because § 512(d) information location tools need not be uploaded by users. But nothing in the district court's recognition that the statute understands "termination" of an account, § 512(i), to be distinct from "remov[ing], or disabl[ing] access" to a particular link, § 512(d), makes the source of the "information location tool" at all relevant. And the fact that § 512(d) "is concerned with removing … *references or links"* to infringing material rather than removing the actual material, OB69 (emphasis in original), only *deepens* the gap between the broad impact of null routing and § 512(d)'s contemplated, surgical remedy. *See* OB68-70.

\* \* \*

The district court correctly held that Cox acted as a subsection (a) conduit ISP—and only a subsection (a) conduit ISP—and that DMCA subpoenas may not issue against such entities.

## II. The District Court Did Not Abuse Its Discretion By Striking The Improper Factual Declaration Capstone Submitted With Its Motion To Reconsider.

Capstone also argues that "the district court abused its discretion by striking the David Cox declaration," OB74 (capitalization omitted)—the substantive fact declaration Capstone submitted from a "network architect/engineer," ER-87, along with its motion to reconsider the district court's order quashing the subpoena. *See* ER-86-93. This fact declaration purported to provide additional detail regarding the ISP technical capabilities just discussed.

To begin with, the district court's decision to strike Capstone's declaration made no difference to the result and was therefore harmless. Despite granting the motion to strike, the district court considered Capstone's arguments based on the evidence and explained why they were wrong or immaterial. *See*, *e.g.*, ER-36 n.8 (explaining that the court "cannot consider" Capstone's new argument regarding "destination null routing," but considering and rejecting the argument anyway). And we have already explained why the district court was correct to reject those arguments. *See supra* 36-43. So even if Capstone were right that the district court should not have struck the

57

declaration, that decision cannot possibly have made a material impact on the court's decision or the judgment on appeal. *See United States v. Hord*, 459 F.2d 1003, 1004 (9th Cir. 1972) (holding district court's decision to strike competent and relevant evidence was harmless error). Capstone's brief nowhere explains how it could have been prejudiced by the striking of the declaration.

In any event, the district court did not abuse its discretion. "It is well established that district courts have inherent power to control their docket." *Ready Transp.*, 627 F.3d at 404 (cleaned up). This includes "the power to strike items from the docket" where they are improperly filed. *Id.* at 404-05 (collecting cases). And of course, whether or not the court formally *strikes* materials that are improperly filed, it is not obligated to *consider* those materials in disposing of the case. *See Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003).

Here the district court properly exercised those prerogatives. As the district court explained, and Capstone does not dispute, "[a] Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id*. The same goes for a motion under Rule 60(b)(1), the

other rule Capstone invoked. *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 577 (10th Cir. 1996) ("Rule 60(b)(1) is not available to allow a party merely to reargue an issue previously addressed by the court when the reargument merely advances ... supporting facts which were available for presentation at the time of the original argument."). And there is no dispute that the evidence contained in Capstone's declaration was new. Capstone enlisted an expert previously uninvolved in the case to make an evidentiary showing on technical questions bearing on issues already resolved.

Capstone argues that the district court erred in concluding that its belated declaration "included evidence that could have reasonably been raised earlier in the litigation." OB75. It argues that it "could not anticipate that the District Court would make the technical mistake of analogizing terminating an Internet connection (by null routing) to terminating a subscriber account." OB75. Because Rule 59(e) permits a motion to correct a "manifest error of fact," and Rule 60(b) allows relief on grounds of "mistake," Capstone says it should have been able to submit new evidence to support its motion, rather than relying on "attorney argument." OB76.

Capstone cites no case for the proposition that any time a disappointed party believes a district court has made a "mistake" based on the existing record, it is at liberty to file a motion to reconsider with a new evidentiary showing. That would make no sense. After all, a party filing a motion to reconsider *always* thinks the district court has made a mistake. If that belief alone justified the introduction of new evidence, every reconsideration motion would be an opportunity to litigate fact issues anew. That is contrary to the standards applicable to motions to reconsider and to the interest in finality those standards honor. *Riley v. Filson*, 933 F.3d 1068, 1071 (9th Cir. 2019) ("The standard for a Rule 60(b)(6) motion is high, and such relief should be granted sparingly to avoid manifest injustice."); *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) ("[A] Rule 59(e) motion is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.").

Nor does Capstone explain how the purported "technical mistake" on the nature of "null routing" it identifies would somehow authorize an elaborate technical dissertation on not only that topic, but the "hierarchy of the Internet, technical intricacies of BitTorrent, … port

60

blocking," "how an IP address is fundament[al] to connectivity and …
how some transient Tier 1 network providers that provide
interconnectivity function as pure conduits in comparison to Tier 2
providers." OB75. Again, this approach makes a mockery of the
narrowly crafted rules governing reconsideration motions, which do not
permit disappointed parties free rein to relitigate motions based on the
record they *wish* they had produced previously.

Ultimately, the district court was right to hold that Capstone
could have made every evidentiary argument in the David Cox
declaration previously. In its objection to the Magistrate Judge's F&R,
Capstone argued that Cox "can disable access to … infringing material"
by "null routing" a user's "IP address." ER-190. It could have
submitted evidence from the David Cox declaration supporting that.
Yet Capstone introduced only one piece of evidence—an article from the
support page on Cox's website explaining that Cox provides its
customers with "hot spots" and explaining how to connect to them. *See*
ER-181-184. In its response to the Amber Hall declaration submitted
by Cox, Capstone mentioned for the first time that Cox "scans incoming
email traffic to filter out spam and blocks access to certain websites."

ER-142.  Again, nothing prevented Capstone from using the David Cox declaration in support.  The district court did not abuse its discretion in striking evidence that Capstone "already had ample opportunity to present" before the district court issued its order, and it "may not have a second bite at the apple because [it] do[es] not like the court's conclusion."  ER-24.

## III.  The District Court Did Not Abuse Its Discretion By Permitting Cox To Participate.

Finally, Capstone raises a series of drive-by arguments that the "District Court abused its discretion by allowing Cox to file motions or opposition papers."  OB70.  It says that Cox "waived any opportunity to participate," OB70, and "lacks standing to participate" because Capstone withdrew its subpoena as to Doe (but no one else) *after* the district court quashed the subpoena.  OB72-73.

At the outset, Capstone does not explain what appellate relief would flow from a finding that Cox should not have been allowed to file an opposition to Capstone's objections to the F&R or move to strike improper evidence.  Capstone does not argue that the district court lacked the power to resolve the motion to quash.  Nor does Capstone cite any case where an appellate court reversed, vacated, or modified a

62

judgment based on the improper-participation theory Capstone advances here. The district court's decision to allow Cox to participate therefore "do[es] not affect [Capstone's] substantial rights," 28 U.S.C. § 2111, and it therefore offers Capstone no basis for relief.

Capstone's arguments are meritless anyway. Cox is a proper party, and the district court did not abuse its discretion in requesting or permitting Cox's submissions in the case. *Infra* § A. And as the subpoena recipient whose response Capstone is seeking to compel, Cox had and continues to have standing—and indeed will have standing as long as Capstone continues to seek relief that implicates Cox's legal obligations. *Infra* § B.

## A. Capstone's waiver arguments are meritless.

Capstone argues that the district court "abused its discretion in considering Cox's [filings]" because "[Cox] waived any opportunity to challenge the validity of the subpoena or otherwise oppose [Capstone's] objections to the Magistrate Judge's F&R." OB70-71. According to Capstone, Cox is a "nonparty" to the subpoena proceedings. OB70. It argues that Federal Rule of Civil Procedure 45—titled "Subpoena"— applies to DMCA subpoenas and sets a deadline for a "nonparty" to

63

"make an objection" by the earlier of the "time specified for compliance or 14 days after the subpoena is served." OB70 (citing Fed. R. Civ. P. 45(d)(2)(B)). And it says that Cox waived any ability "to challenge the validity of the subpoena" because Cox supposedly "failed to make a timely objection to the subpoena" under Rule 45(d)(2)(B). OB70-71.

Each of these premises is wrong.

*First*, as the district court explained, "Cox was a party to the Subpoena" because "the Subpoena was directed to and served on Cox." ER-24 n.3. Recipients of DMCA subpoenas may and do participate in standalone actions challenging their validity.[3] Cox has a direct interest in the clear determination of its legal obligations—and in ensuring that those obligations rest on an accurate factual record. It is true that Cox's *counsel* did not *appear* in the subpoena proceeding at the outset. But that hardly deprives Cox of its legal interest in the matter.

Capstone's only contrary argument is that Cox supposedly "admit[ted] that it is a nonparty when it filed its notice of intent to file a

---

[3] *E.g.*, *Mount Hope Church v. Bash Back!*, 705 F.3d 418 (9th Cir. 2012); *Cognosphere Pte. Ltd. v. X Corp.*, No. 23-mc-80294-PHK, 2024 WL 4227594 (N.D. Cal. Sept. 18, 2024); *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 879 (N.D. Cal. 2020).

response to Petitioners' objection to the F&R" by labeling itself a "nonparty." OB70; *see* ER-173-174. But Cox used that label not to designate itself as a non-party *to the subpoena*, but as a non-party *to the dispute* between Capstone and the individuals it was accusing of infringement. That is standard terminology to refer to a third-party who receives a subpoena for information ostensibly relevant to an ongoing dispute. *See Pennwalt Corp. v. Durand-Wayland, Inc.*, 708 F.2d 492, 494 (9th Cir. 1983) (referring to entity that moved to quash third-party subpoena it received as a "nonparty"). And Cox's notice that it would respond to Capstone's objections specifically invoked "Local Rule 74.1(b)," ER-174, which provides that "[a]ny *party* may file and serve a response to the objection within fourteen (14) days after service of the objection," D. Hawaii L.R. 74.1(b) (emphasis added).

*Second*, Capstone is wrong that Rule 45(d)(2)(B)'s objection deadline applies to the recipient of a DMCA subpoena. That Rule contains comprehensive guidelines—everything from "Form and Contents" of the subpoena to "Contempt" for non-compliance— applicable "to subpoenas *ad testificandum* and *duces tecum*." Fed. R. Civ. P. 45(d) advisory committee's note to 1937 adoption. In enacting

the DMCA, however, Congress chose not to incorporate those procedures wholesale. Instead, it provided that "the procedure for *issuance and delivery* of the subpoena, and the *remedies for noncompliance* with the subpoena, shall be governed … by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." § 512(h)(6) (emphases added). Congress elected not to incorporate Rule 45's procedures for *objecting* to subpoenas.

This makes good sense. Congress's aim in § 512(h) was to create a new streamlined subpoena procedure, so it is unsurprising that it declined to adopt some of Rule 45's procedural hurdles. *See* H.R. Rep. No. 105-551, pt. 2, at 60-61 (explaining goals of DMCA subpoena process). And it is well within the district court's power and ability to set reasonable limits concerning the appropriateness and timing of particular filings in order to advance the due administration of justice and prevent prejudice to parties. *Cf. Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 627 (3d Cir. 1993) (noting "to implement a rule's purpose, courts of appeals have not hesitated to graft implicit reasonable time limits onto Federal Rules of Criminal Procedure").

66

*Third*, in all events, Capstone provides no authority for the proposition that a subpoena recipient waives "participation" in an otherwise active subpoena proceeding based on the formalities of its objection—and certainly no authority foreclosing a district court from permitting that participation. The only case it cites supporting its waiver theory is *Richmark Corp. v. Timber Falling Consultants*, which *affirmed* a district court's waiver finding concerning an objection to a *motion to compel* discovery. 959 F.2d 1468, 1473-74 (9th Cir. 1992). That case is therefore inapposite.

As the district court explained, Cox "act[ed] in good faith" in the circumstances presented. ER-24-25 n.3. Subject to a court-issued subpoena that rested on an uncertain foundation, Cox responded to the request as to subscribers who did not object, but not "to the extent the subpoena sought the information of John Doe," ER-24-25 n.3, effectively objecting to the subpoena insofar as it sought to *compel* a response. *See also* ER-194, ER-219.

When Capstone argued in its objections to the F&R that Cox was required to respond to a § 512(h) subpoena, ER-187-193, Cox appeared to litigate its own obligations, ER-24-25 n.3, effectively objecting more

formally. And indeed, many of Cox's filings were directly responsive to the district court's requests for briefing and supplemental evidence, required to ensure that Cox's legal obligations were not resolved based on Capstone's mischaracterization of Cox's services.[4] Capstone does not argue that the district court lacked the ability to request evidence from Cox on its basic operations. Nor, again, does it explain what appellate relief would even flow from a finding that Cox should not have been allowed to participate.

In short, there was no waiver of "participation" in this case. But even if there were, the district court was well within its discretion in allowing Cox to participate in the manner it did. *See* ER-24-25 n.3; *Yousuf v. Samantar*, 451 F.3d 248, 252 (D.C. Cir. 2006) (reviewing district court's decision to excuse waiver of objection to subpoena for abuse of discretion); *McCoy v. Sw. Airlines Co.*, 211 F.R.D. 381, 385 (C.D. Cal. 2002).

---

[4] *See* ER-150-152 (district court ordering Cox to submit evidence); ER-146-149 (declaration of Amber Hall filed in response to district court's order); ER-115-116 (district court ordering Cox to respond to Capstone's request for a stay); Dkt. No. 37 (Cox's response to Capstone's request for a stay); ER-82-83 (district court ordering Cox to respond to Capstone's motion for reconsideration); Dkt. No. 38 (Cox's opposition to Capstone's motion for reconsideration).

## B.    Cox has "standing to participate."

Capstone last argues that "Cox lacks standing to participate." OB72.  It is unclear what precisely Capstone is arguing.  In one page-long paragraph it variously invokes Article III's "case or controversy" requirement; rehashes its complaint about the timing of Cox's objection to the subpoena; suggests some defect in the scope of Cox's response to the "District Court … direct[ing] Cox to file a response to Petitioners' motion for a stay" post-judgment; and posits that any "limited interest" Cox previously had is now gone.  OB72.  There is no coherent argument here.  Cox had and continues to have standing as a subpoena recipient from whom Capstone seeks to compel information.  The rest of Capstone's objection is procedural minutiae within the district court's discretion.

Capstone does not dispute that the recipient of a subpoena, like Cox, has standing to challenge its validity.  *See Seila Law LLC v. C.F.P.B.*, 591 U.S. 197, 211 (2020) ("Article III does not restrict the opposing party's ability to object to relief being sought at its expense.") (quoting *Bond v. United States*, 564 U.S. 211, 217 (2011)).  This subpoena proceeding began when Capstone sought a subpoena

69

compelling Cox to disclose information. Capstone pressed it because Cox did not disclose all the information the subpoena sought. Capstone continues at this moment to seek to compel information from Cox that Capstone does not have. It is that simple.

Capstone argues that "any limited interest Cox had in these proceedings" as a result of not disclosing Doe's information "ended on Feb. 4" of 2024. OB72. That is when Capstone "withdrew [its] request for John Doe's identification information" (though not anyone else's information). OB72. This is not a *standing* argument, but *mootness* argument. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 n.6 (9th Cir. 2002) ("If it is determined that [a party] had standing at the time this case was filed, 'mootness' rather than 'standing' becomes the proper inquiry on appeal.").

Capstone's attempt to moot the case by belatedly withdrawing its request as to one of 29 subscribers fails. Though Cox initially disclosed information as to the other 28 individuals who did not object, the district court quashed the subpoena and ordered Capstone to destroy that information. *See* ER-138-139 (district court's order filed January 30, 2024). That is information Capstone continues to seek from Cox

pursuant to a subpoena that has been deemed unlawful. And it was not until *after* the district court quashed its subpoena and ordered destruction of previously disclosed information that Capstone withdrew its request as to Doe. *See* ER-85 (letter from Capstone's counsel dated February 4, 2024).

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307-08 (2012). Capstone is pressing this appeal to try to obtain such relief, and thereby to legally compel Cox to act. As the district court put it, "Cox stands to incur new costs or obligations if the court were to adopt [Capstone's] construction of § 512(d)." ER-24-25 & n.3. Capstone argues that Cox will not incur "new costs" because Cox "demands reimbursement" for subpoena production costs. OB73. But it does not contest that an order requiring Cox to disclose information is a legal "obligation" that remains on the line in this appeal.

In short, this is and always has been a live controversy in which Cox has a direct interest. The district court properly resolved it, on a full record, by joining the two circuits that had previously rejected the

71

use of DMCA subpoenas to obtain subscriber information from conduit ISPs.

## CONCLUSION

For the reasons addressed above, the Court should affirm.

December 10, 2024                    Respectfully Submitted,

                                     /s/ Christopher J. Cariello
Abigail Colella                      Christopher J. Cariello
ORRICK, HERRINGTON &                 ORRICK, HERRINGTON &
    SUTCLIFFE LLP                        SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW         51 West 52nd Street
Washington, DC 20037                 New York, NY 10019
                                     (212) 506-5000
Rachael Jensen
ORRICK, HERRINGTON &                 Jennifer Golinveaux
    SUTCLIFFE LLP                    Thomas J. Kearney
200 West 6th Street, Suite 2250      WINSTON & STRAWN LLP
Austin, TX 78701                     101 California Street
                                     San Francisco, CA 94111

*Counsel for Respondent-Appellee CoxCom LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 24-3978

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/ Christopher J. Cariello          **Date** December 10, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                                        *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-3978

I am the attorney or self-represented party.

**This brief contains** 13,794 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs;
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Christopher J. Cariello    **Date** December 10, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**    *Rev. 12/01/22*